# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | **06**   **725** |
| | : | |
| v. | : | CASE NO. 06- |
| | : | |
| | : | |
| [DEFENDANTS] | : | |
| | : | |
| Defendants. | : | FEB 1 7 2006 |

By _____ Dep. Clerk

## FILED UNDER SEAL

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

**PATRICK L. MEEHAN**
**United States Attorney**

**VIRGINIA A. GIBSON**
**Assistant United States Attorney**
**Chief, Civil Division**

**JOEL M. SWEET**
**Assistant United States Attorney**
**Office of the United States Attorney**
**615 Chestnut Street, Suite 1250**
**Philadelphia, PA 19106**
**Tel.  215-861-8581**
**Fax. 215-861-8349**



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,　　:
　　　　　　　　　　　　　　　　:
　　　　　Plaintiff,　　　　　　:　　　**06　-725**
　　　　　　　　　　　　　　　　:
　　　v.　　　　　　　　　　　　:　　CIVIL ACTION NO.
　　　　　　　　　:　　　　　　　:
　　　　　　　　　　　　　　　　:　　FILED UNDER SEAL
PAYMENT PROCESSING CENTER,　:
LLC, AND DONALD M. HELLINGER,　:
MICHAEL WEISBERG, RANDY　　:
D. TROST, JAMI M. PEARLMAN,　　:
MICHELLE O'KEEFE QUIGLEY,　　:
RONALD HELLINGER, AND　　　:
ROBERT DEBOYCE,　　　　　　:
　　　　　　　　　　　　　　　　:
　　　　　Defendants.　　　　　:

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

The United States of America, by its attorneys, Patrick L. Meehan, United States Attorney

for the Eastern District of Pennsylvania, and Joel M. Sweet, Assistant United States Attorney for

the same district, brings this civil action under the Anti-Fraud Injunction Statute, 18 U.S.C.

§ 1345. In support of its Verified Complaint for Injunctive Relief, the United States of America

alleges:

### INTRODUCTION

1.　　This is a civil action to enjoin fraud based on probable cause to find violations of

federal mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, respectively, and

banking laws as defined by 18 U.S.C. §3322(d). The United States seeks a temporary restraining

order, preliminary and permanent injunctions, and other equitable relief to enjoin the ongoing

commission of criminal fraud offenses, to prevent continuing and substantial injury to the victims

of fraud, and to prevent the alienation and disposition of the defendants' ill-gotten assets so that they will be available for distribution to victims of the defendants' fraud.

2.     Since at least 2004 and continuing to date, the defendants, using the United States mails and wires, and in concert with fraudulent telemarketers in the United States and abroad, have engaged in and enabled predatory fraudulent telemarketing schemes. These schemes are designed to extract money from victims' bank accounts, on false pretenses, and/or without authorization. The defendants' conduct, as alleged herein, is central to the success of the fraudulent schemes.

3.     The fraudulent telemarketing schemes begin with unsolicited telephone calls, commonly known as "cold calls," made by foreign and domestic telemarketers to vulnerable consumers residing throughout the United States of America. During the cold calls, victims are induced, through misrepresentations and false promises of goods and services of value, to provide the telemarketer with personal bank account information. The telemarketer then transmits the personal bank account information, using the United States mail and/or wires, to defendant Payment Processing Center, LLC ("PPC").

4.     Using victims' bank account information, PPC prints (or cause to be printed) demand drafts, commonly referred to as checks, to be drawn from victims' accounts. PPC deposits the demand drafts into PPC's own bank account, causing debits to victims' bank accounts, and corresponding credits to PPC's bank account.

5.     At all times relevant to the allegations in this Verified Complaint, the defendants have known – or have remained intentionally ignorant and willfully blind to the fact – that the telemarketers for whom PPC provides payment processing services use misrepresentations and

2

false promises of goods and services to induce victims to disclose to telemarketers personal bank account information. The defendants also have known – or have willfully ignored the fact – that had PPC's victims known the truth about telemarketers' misleading offers and inducements – the victims would not have disclosed to the telemarketers personal bank account information.

6.      The defendants' efforts to shield themselves from their client telemarketers' fraudulent conduct is a transparent ruse. The defendants knew – or have remained willfully blind to the fact – that they were participating and enabling telemarketing fraud on a massive scale. The defendants knew that, on a dollar basis, more than half of the bank draft transactions PPC processed for its telemarketing clients were reversed – or returned – due to victims' complaints that the transactions were not authorized, insufficient funds available in victims' account, and similar reasons. The defendants had copies of the sales scripts used by its telemarketing clients – scripts promoting offers that were facially suspect and easily discovered as misleading. Likewise, the defendants willfully ignored countless complaints lodged against PPC and/or its clients by victims of telemarketing fraud, as well as investigations of PPC's telemarketing clients by law enforcement and consumer protection agencies.

7.      In addition to causing unauthorized or otherwise improper bank drafts to be drawn on victims' bank accounts, based upon information and belief, the defendants participate actively in other aspects of fraudulent telemarketing schemes by developing and trading in lists of "lead" names for fraudulent telemarketers, printing and/or mailing fulfillment materials (brochures/booklets) that are then mailed to victims as part of fraudulent schemes, and otherwise orchestrating the operational requirements and financial aspects of telemarketing fraud.

8.      Under the Anti-Fraud Injunction Statute, 18 U.S.C. § 1345, the government is

3

entitled to injunctive relief upon a demonstration that "'probable cause' exists to believe that the defendant is currently engaged or about to engage in a fraudulent scheme violative of either the mail, wire or bank fraud statutes." United States v. William Savran & Assocs., Inc., 755 F. Supp. 1165, 1177 (E.D. N.Y. 1991) (internal citation omitted). See also  United States v. Cen-Card Agency/C.C.A.C., (table - 872 F.2d 414) slip op. No. 88-5764 (3d Cir. March 23, 1989) (Scirica, J.) (affirming district court's injunction and constitutionality of 18 U.S.C. §1345). The facts alleged in this Verified Complaint demonstrate overwhelmingly that injunctive relief is appropriate – and absolutely necessary – to protect vulnerable consumers throughout the United States of America.

## CAUSE OF ACTION

9.      The United States brings this civil action for injunctive relief pursuant to the Anti-Fraud Injunction Act, 18 U.S.C. §1345, based upon predicate violations of mail fraud, 18 U.S.C. §1341, and wire fraud, 18 U.S.C. §1343, and banking laws as defined by 18 U.S.C. §3322(d).

10.     The United States has probable cause to believe that the commission of wire and mail fraud, as defined by 18 U.S.C.§§ 1341 and 1343, respectively, and violation of banking laws as defined by 18 U.S.C. §3322(d), is occurring and will continue to occur in the future absent relief pursuant to 18 U.S.C. §1345.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction of this action pursuant to 18 U.S.C. § 1345 (anti-fraud injunctions), 28 U.S.C. § 1331 (federal question) and 28 U.S.C.§ 1345 (United States as plaintiff).

4

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because defendant PPC's headquarters and operations are located in this district, PPC's conducts banking related to the alleged fraudulent schemes in this district, defendant Donald M. Hellinger conducts business and is believed to reside in this district, all of the other defendants and relief defendants conduct business and reside in this district, and a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

13.     Plaintiff is the United States of America (the "United States" or the "government") acting on behalf of its agency, the United States Postal Service.

14.     Defendant Payment Processing Center, LLC ("PPC") is a limited liability corporation established on December 8, 2004, under the laws of the Commonwealth of Pennsylvania.  PPC purportedly is owned by defendant Michael Weisberg.

15.     PPC maintains its principal place of business at 121 Friends Lane, Suite 200, Newtown, PA 18940.  Until the summer of 2005, PPC's principal place of business was located at 1262 Wood Lane, Langhorne, Pennsylvania.

16.     PPC maintains an Internet website at www.paymentprocessingcenter.com. According to its Internet website, PPC provides telemarketing merchants with an "end-to-end solution" for processing bank draft transactions, including specifically "Bank Draft origination for telephone transactions that may be prohibited" by rules established by National Automated Clearing House Association.

17.     Defendant Donald M. Hellinger ("D. Hellinger") is an individual who resides, or has resided, in or about Morrisville, PA.

5

18.     At all relevant times, acting in concert with others, D. Hellinger formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Verified Complaint.  D. Hellinger's activities include establishing accounts and business agreements with fraudulent telemarketers.  D. Hellinger is responsible for pricing agreements with fraudulent telemarketers for PPC's services.  Upon information and belief, D. Hellinger is the dominant figure in PPC and maintains ultimate control of the company.

19.     D. Hellinger controls bank accounts into which proceeds of the defendants' fraudulent activity have been transferred.

20.     D. Hellinger was the founder and an owner of Netchex, Universal Payment Solutions, and Check Recovery Systems – referred to collectively as the "Newtown Platform" – all operated out of the same location in Newtown, PA, under common ownership, management and control.  The Newtown Platform is known by law enforcement agencies to have processed payments for fraudulent telemarketers.

21.     Defendant Michael Weisberg is an individual residing at 2 Kanon Court, Newtown, PA.  At all relevant times, acting in concert with others, Weisberg formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Verified Complaint.

22.     Weisberg is the putative owner of PPC and is responsible for leasing PPC's office space located at 1262 Wood Lane, Langhorne, PA.  Weisberg's activities at PPC include establishing accounts and business agreements with fraudulent telemarketers.

23.     Weisberg is a signatory of and controls bank accounts into which proceeds of the defendants' fraudulent activity have been transferred.

6

24.     Weisberg formerly was employed by the Newtown Platform.

25.     Defendant Randy D. Trost is an individual residing at 64 Laurel Circle, Newtown, PA 18940. At all relevant times, acting in concert with others, defendant Trost formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Verified Complaint.

26.     Trost is PPC's Customer Service Manager and its Director of Operations.

27.     Trost's signature appears on checks issued by PPC.

28.     Trost communicates on behalf of PPC with state law enforcement officials in connection with investigations of PPC's telemarketing clients. Trost misleadingly represents to law enforcement officials that PPC complies with a policy that no charges are issued to a consumer's account unless "independent" verification is conducted with the consumer.

29.     At this time, the following officers and employees of PPC are named as Relief Defendants. The Relief Defendants control PPC and participate in the acts and practices of PPC, including the acts set forth in this Verified Complaint. The Relief Defendants have benefitted from the fraudulent schemes described herein. PPC has wired into bank accounts controlled by the Relief Defendants proceeds of fraud, to which the Relief Defendants do not have a legitimate claim.

30.     Relief Defendant Jami M. Pearlman is an individual residing at 15 Putnam Drive, Holland, PA 18966, or 4 Hampshire Drive Warminister, PA 18974-1279. At all relevant times, acting in concert with others, Pearlman formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Verified Complaint. Pearlman controls bank accounts into which proceeds of the defendants' fraudulent activity have been

7

transferred.

31.    Pearlman was President, Chief Operating Officer and/or Chief Executive Officer – and an owner along with defendant D. Hellinger – of the Newtown Platform.

32.    Relief Defendant Michelle O'Keefe Quigley is an individual residing at 12097 Legion Street, Philadelphia, PA 19154.  At all relevant times, acting in concert with others, Quigley formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Verified Complaint.

33.    Quigley is signatory of and controls bank accounts into which proceeds of the defendants' fraudulent activity have been transferred.

34.    Quigley was Chief Financial Officer  – and an owner along with defendant D. Hellinger – of the Newtown Platform.

35.    Relief Defendant Ronald Hellinger ("R. Hellinger") is an individual residing at 58 Polder Drive, Langhorne, PA.  At all relevant times, acting in concert with others, R. Hellinger formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Verified Complaint.  R. Hellinger claims to be an equity owner of PPC, and is the putative owner of PPC's headquarters located at 121 Friends Lane, Newtown PA.

36.    R. Hellinger controls bank accounts into which proceeds of the defendants' fraudulent activity have been transferred.  R. Hellinger is a "member" of Payment Processing Solutions, an entity that has received fraud-tainted money from PPC.

37.    R. Hellinger formerly was employed by the Newtown Platform.

38.    Relief Defendant Robert DeBoyace is an individual residing at 135 Woodcrest Lane, Doylestown, PA.  At all relevant times, acting in concert with others, DeBoyace

formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Verified Complaint.

39.     DeBoyace controls bank accounts into which proceeds of the defendants' fraudulent activity have been transferred.

40.     As used in this Verified Complaint, the term "defendants" refers collectively to D. Hellinger, Weisberg, Trost, Pearlman, Quigley, R. Hellinger, and DeBoyace.

## THE SCOURGE OF TELEMARKETING FRAUD

41.     The United States Congress has estimated that telemarketing fraud costs Americans approximately $40 billion every year.

42.     The term "telemarketing" describes planned professional use of a telephone to advertise, market, or provide service functions to both individual consumers and businesses. Perpetrators of telemarketing fraud use the telephone to deprive victims dishonestly of money or property or to misrepresent the values of goods or services.

43.     To manipulate their victims, fraudulent telemarketers attempt to establish their own credibility by conveying misinformation for the purpose of persuading victims to part with funds, or personal information with which the telemarketer access the victims financial resources without authorization.

44.     Fraudulent telemarketers – like many of those identified in this Verified Complaint – often use in their pitches the names of widely recognized companies, such as Wal-Mart, K-Mart, Home Depot, Carnival Cruises, and AIG, to mislead victims.

45.     The telemarketing fraud industry is highly mobile and sophisticated.  The

schemes, including those in which PPC has been engaged, often involve "boiler room" call centers equipped with a large number of telephone lines. The boiler room call centers often are located in foreign locations, such as Canada, India, and the West Indies.

46.     In the boiler room call centers, telemarketers are trained to identify likely victims. Telemarketers are provided sales scripts based upon false promises, misleading information, and incorporating high-pressure sales techniques.

47.     The lack of face-to-face contact between fraudulent telemarketers and their victims allows offenders to impersonate government and corporate officials, and in some cases to coerce reluctant victims. Fraudulent telemarketers often operate under the guise of fictitious or sham companies, and often use false names. These tactics frustrate victims' and law enforcement officials' ability to identify wrongdoers. Moreover, victims can only identify fraudulent telemarketers by voice, if at all.

48.     The most common victims of fraudulent telemarketers are older Americans. This is so because older Americans are more likely than others to be home to receive a telemarketer's call, and are often too polite to hang up on a telemarketer. The American Association of Retired Persons, the National Association of Attorneys General, and the Federal Trade Commission, have estimated that 85 percent of the victims of telemarketing fraud are age 65 or older. See 148 Cong. Rec. S. 5055 (daily ed. June 5, 2002 (Statement of Senator Collins)).

49.     Fraudulent telemarketing schemes rob America's seniors not only of their hard-earned savings, but also of their self-respect and dignity.

50.     Fraudulent telemarketers and their accomplices often trade in lists of prospective victims, including repeat victims who are likely to become a victim of another fraudulent

scheme.

51.     Cross-border fraudulent telemarketing is common and is particularly difficult for law enforcement officials to investigate and prosecute because of jurisdictional limitations, differences in laws and available investigative tools, and because victims are dispersed geographically.

52.     Canada has been identified by the United States government as a country with a substantial fraudulent telemarketing activity directed at victims in the United States.  In 1997, United States President Clinton and Canadian Prime Minister Chretien directed officials to examine ways to counter the serious and growing problem of Canada-United States telemarketing fraud.  Montreal, Toronto and Vancouver have been identified as Canadian cities with particularly active fraudulent telemarketing operations.

## PAYMENT PROCESSORS ARE ESSENTIAL PARTICIPANTS IN TELEMARKETING FRAUD

53.     The success of telemarketing fraud, and in particular cross-border telemarketing fraud, is dependant upon entities known as payment processors to facilitate the banking procedures by which money is taken from victims' bank accounts and transferred to the perpetrators of fraud.

54.     The schemes require telemarketers, also known as merchants and originators, to contract with payment processors, like PPC, to collect and transmit money, among other services.

55.     A payment processor establishes an account with a bank.  As happens in PPC's schemes, the telemarketer provides the payment processor with victims' bank account

information and other information, such as the amount of a purported "sale" or "commitment."

56.     The payment processor uses the information received from the telemarketer to debit the victims' bank accounts through one of two methods: (1) an Automated Clearing House debit ("ACH"); or (2) a demand draft.

57.     An ACH debit refers to an electronic withdrawal of funds from a consumer's account.  ACH transactions are subject to the rules of the National Automated Clearing House Association ("NACHA").  Those rules prohibit processing of ACH transactions on behalf of businesses engaged in outbound telemarketing calls to consumers with whom they have no existing relationship.

58.     A demand draft refers to the submission to a bank of a paper in the form of a bank check.  The demand draft is prepared and printed by the payment processor, using the victim's bank routing and account information, as provided by the telemarketer.  The demand draft is not signed.  In the case of PPC, demand drafts had a legend stating: "Authorized By Your Depositor No Signature Required Reference #2265814."  Examples of defendant PPC's bank drafts (with account numbers and personal information redacted) are attached hereto as Exhibit A.

59.     The payment processor such as PPC makes the bank draft payable to the telemarketer, but the bank draft is deposited into the bank account of the payment processor.  The payment processor's bank — for PPC it is Wachovia Bank – treats the bank draft like an ordinary signed check and causes bank draft to be submitted to the victim's bank for payment from the victim's account.  Typically, a payment processor will forward funds received as a result of a bank draft transaction to the telemarketer, minus a fee for the payment processor.

60.     A consequence of NACHA rules governing ACH transactions is that fraudulent

12

telemarketers are more likely to use bank draft payment processing compared to ACH payment processing.

61.     PPC is a bank draft payment processor and is a critical and necessary participant in a large number of fraudulent telemarketing schemes.  In these schemes, victims are induced by misrepresentations and false promises to provide their bank account numbers and other personal data to a telemarketer, who then provides the information to PPC.  PPC creates bank drafts using victims' bank account information, and completes the scam by causing money to be withdrawn from the victims' bank accounts and deposited in its own bank account, before being transferred to defendants, fraudulent telemarketers, and vendors.  Attached as Exhibit B hereto is a diagram of the architecture of the fraud perpetrated by the defendants.

62.     A.K., of Othello, WA, is a typical PPC victim.  On or about July 19, 2005, A.K. received an unsolicited telephone call from a telemarketer who promised a "medical benefit refund" of $399.00 to be applied to A.K.'s bank account.  A.K. was made to understand by the telemarketer that by providing her bank account information, she would receive a bank credit of $399.00 to be used for medical needs.  A.K. believed the telemarketer's promises and so she provided the telemarketer with her bank account information.

63.     A.K. did not receive a bank credit of $399.  Without authorization, on or about July 20, 2005, the defendants caused a debit of $399 to A.K.'s bank account.  A bank draft, made payable to an entity called "Meditech," was processed by PPC and deposited into PPC's bank account.  In a letter to PPC, A.K. wrote:

> Since I am on Medicare I thought it was a refund on my account.
> Instead of that they took $399 out of my account and throw me for
> a loop  – as I asked several times about this being a medical refund.

> And they always said it would not cost me anything & I'd get $399
> <u>added</u> to my account – instead it was taken out.
>
> The innocent always "get took" & you guys fly wide & far.  They
> can put people on the moon but can't stop the "<u>gauging</u>
> telemarketing."

64.     In a letter to the Better Business Bureau, A.K. explained how during the

telemarketer's pitch she became concerned that her failure to answer the telemarketer's questions

would adversely affect her Medicare benefits:

> When they came at me with these health issues I am concerned – as
> I am 88 and no big insurance to fall back on – so that leave[s] me
> gullible – of course.  I do not want to mess my [with my]
> Medicare.
>                     *        *        *
> When they kept saying credit me – and talked about Medicare I
> listened – Some times if you don't respond to some of these things
> you are cut off & I did not want anything done to my Medicare.

65.     Only after the intervention of the Better Business Bureau did A.K. recover $399

from PPC.  A.K.'s letters referenced above are attached to the Verified Complaint as Exhibit C.


## THE DEFENDANTS HAVE ENGAGED IN TELEMARKETING
## FRAUD ON A MASSIVE SCALE

66.     The defendants know – or have been intentionally ignorant of and willfully blind

to the fact – that the telemarketers for whom they process bank drafts are engaged in fraud to

induce victims to purchase products and services of negligible value, or of wildly exaggerated

value, or to otherwise relinquish their bank account information.  Despite the defendants'

attempts to create the false impression that they are unaware of their merchant clients' illegal

activities – a transparent effort to create plausible deniability – strong evidence that PPC is

14

enabling a massive consumer fraud has been in the defendants' hands, and before their eyes.

67.     The defendants have intentionally ignored and have remained willfully blind to unreasonably high return rates, reaching approximately sixty percent, for purportedly authorized the sales by PPC's client-merchants – a red flag of telemarketing fraud.

68.     A bank draft or ACH "return" refers to a transaction refused or reversed by the payor's bank because the transaction was not authorized by the payor, insufficient funds in the payors' bank account, or other similar reasons. Return rates that deviate substantially from normative rates are often indicia of fraud. In many cases, high return rates reflect a lack of payor authorization for the bank draft.

69.     Since its inception in 2004, PPC's bank draft return rates have been a screaming warning that its merchant-clients are engaged in telemarketing fraud. As further described below, on a dollar basis, PPC's bank draft return rates for two of its depository accounts at Wachovia Bank were 60 percent and 58 percent, respectively.

70.     In other words, of the approximately $142 million deposited into the two depository accounts from April 2005 until December 2005 – an eight month period – approximately $84.1 million eventually was returned, i.e., never cleared by Wachovia Bank. Approximately $57.9 million of the fraudulently-obtained money did clear, and most of it was paid to the defendants, PPC's other employees, fraudulent telemarketers, and vendors.

71.     In September 2005, Wachovia Bank informed law enforcement authorities that it was investigating suspicious activity in PPC bank accounts.

72.     Neither the banking industry nor the Federal Reserve maintain information about reasonable bank draft return rates. However, substantial information is available concerning

15

reasonable return rates for similar consumer payment transactions.

73.    For example, rules established by NACHA require investigative action where the unauthorized return rate on ACH transactions initiated by telephone to consumers with whom the originator has an existing relationship appear to exceed two and one-half percent.

74.    VISA and MASTERCARD use a chargeback limit of two and one-half percent of total monthly dollar volume as the rate over which heavy fines are imposed on certain high risk e-businesses.  In fact, VISA warns merchants that chargebacks exceeding one percent are considered excessive.

75.    PPC markets itself to the telemarketing community through its Internet website as having the capability to process "Bank Draft origination for telephone transactions that may be prohibited by NACHA rules."

76.    PPC anticipates and plans for its merchant-clients to have return rates of fifty percent or more.  For example, PPC expected one of its telemarketer clients operating a grant scheme from  Montreal, Canada, to have a return rate exceeding fifty percent.

77.    PPC also provides refunds to victims who complain sufficiently and demand their money be refunded.   From April 2005 until December 2005, upon information and belief, PPC issued 8,202 separate refund checks with an aggregate value of $1.54 million to telemarketing victims.  The average refund was $188.  Upon information and belief, a large number of PPC's victims did not obtain refunds, either because they were unaware that they were victims of fraud, or because they were intimidated or daunted by the challenge of demanding a refund.

78.    The defendants also know – or have remained intentionally ignorant of and willfully blind to the fact – that the telemarketers for whom they process bank drafts use false,

misleading, and high-pressure sales scripts to induce victims to agree to purchase products and services of negligible value, or of wildly exaggerated value.

79.     PPC reviews its clients' sales scripts.  On November 4, 2005, PPC's special regulatory counsel represented to the Attorney General of North Dakota that PPC "undertakes a due diligence investigation" of its merchant-clients to assure that they comply with applicable laws.  As part of that due diligence investigation, PPC admits that it reviews its clients ' "[m]arketing [m]aterials including sales and verification scripts," among other information concerning the client's business history and legal status.

80.     Moreover, records produced by PPC to the Attorney General of North Dakota included various fraudulent telemarketing sales scripts, and e-mails referring to PPC's review of telemarketing sales scripts.

81.     The sales scripts received by PPC are misleading and are intended to induce victims to provide personal bank account information to fraudulent telemarketers based upon a false hope that they will receive something of value in return.

82.     For example, on August 18, 2005, defendant Trost received from Advantage America, a fraudulent telemarketer based in Nassau, Bahamas, a script to be used by telemarketers to entice victims to provide their bank account information.  See Exhibit D, hereto.

83.     The script directs telemarketers to offer victims government grants of "up to $12,500 or more per year which never needs to be paid back."  The script also directs telemarketers to include on the offer membership in the "Health Works Health Care Plan," through which the consumer purportedly will receive "access to over 300,000 health care professionals who offer huge savings on basic health care needs and much more for only

17

$19.95." The script further directs telemarketers to offer consumers the following inducement:

> As a special gift for looking at our risk-free 7-day review we are going to send you $500 in Groceries of your choice. Now, after reviewing the letter if you decide that you could use the extra cash with government grants you will be billed $299.95. But, if you decide the program is not for you simply call the toll-free number located in your letter and will not be billed. Either way the $500 in Groceries are yours to keep.
>
> We are so confident here at Advantage America which state, if you don't receive up to $12,500 in government Grant money within 7 months you will received a refund, no questions asked.
>
> For your convenience we have made arrangements for you to process the one-time processing fee of $49.95 through a bank-to-bank transfer. Therefore, I will need some additional information.

See Exhibit D, hereto (words omitted in original).

84.     The defendants knew when they received the script from Advantage America – or remained intentionally ignorant and willfully blind of the fact – that the script would be used to defraud consumers, and that victims of the scheme would not receive the benefits and values offered by the Advantage America telemarketers.

85.     On November 10, 2005, the Attorney General of North Dakota issued a Cease and Desist Order against Advantage America (and other companies) on the ground that Advantage America has been engaging in deceptive acts or practices during telephone solicitations.

86.     As recently as November 10, 2005, PPC processed bank drafts for Advantage America.

87.     The defendants were aware – or remained willfully blind – of a facially fraudulent script used by their telemarketing client Grant Information Guide.com. That script directed telemarketers to inform victims that their names had "come up on a list of individuals who could

qualify for a **New Federal Government Grant** up to $5,000." To further misleadingly induce victims, the script directed telemarketers to offer a "special bonus" – a **"certificate for $500 in emergency cash and a Identity Theft certificate absolutely free**." See Exhibit E, hereto.

88.     The defendants knew when they received the script from Grant Information Guide.com – or they remained intentionally ignorant of the fact – that the script would be used to defraud consumers, and that victims of the scheme would not receive the benefits and values offered by the fraudulent telemarketers.

89.     PPC caused at least $249 to be withdrawn from the bank accounts of each of the victims of this fraudulent scheme.

90.     The script PPC received from a telemarketing client for use in a scheme known as "Dream Vacations" was misleading and fraudulent.  The Dream Vacations telemarketing fraud involves cold-calls originating in boiler rooms in Mumbai (Bombay), India.  In the Dreams Vacation scheme, victims are informed:

> WE ARE HAVING A PROMOTION FOR OUR NEW TRAVEL
> AGENT ID PROGRAM.  You (mr. jones) HAVE BEEN
> RANDOMLY SELECTED TO RECEIVE 800.00 DOLLARS IN
> AIRLINE VOUCHERS AND3 FREE NIGHTS HOTEL
> ACCOMODATIONS, ALL THAT WE ASK IS THAT YOU PAY
> 3 DOLLARS AND 95 CENTS FOR POSTAGE.

See Exhibit F, hereto.

91.     After establishing that the victim has a checking account, the telemarketer states to the victim:

> NOW TO GIVE YOU A LITTLE BRIEF REGARDING THE
> USAGE OF THIS PACKAGE INCLUDING IN THIS PACKAGE
> YOU WILL GET

19

1.)   $800 IN AIRLINE VOUCHERS FOR INTERNATIONAL AND DOMESTIC FLIGHTS. THESE ARE VALID FOR ALL MOST ALL THE AIRLINE'S WHICH YOU CAN THINK OF....

2.)   YOU ALSO GET A HOLIDAY ADVENTURE FOR 2 ADULTS FOR THREE DAYS AND TWO NIGHTS TO ALL THE FINEST HOTELS IN WHICH WE PROMISE YOUR SATISFACTION. WE ALSO GIVE AN OPTION TO CHOOSE YOUR DESTINATIONS FROM THE FOLLOWING PLACES LIKE (Anaheim CA)(Reno NV)(Scottsdale, Sedona, AZ)(Orlando and Miami FL) (Wisconsin Dells WI) and many more exotic Destinations,

3.)   Apart from this you ARE ALSO GETTING 3 TO 7 night's OF Carnival Cruises like IMAGINATION-FASCINATION MIAMI, ECSTACY, ELATION LA, WHICH EVER YOU CHOOSE YOU AND YOUR COMPANION WILL ENJOY 3 TO 7 NIGHTS OF FABULOUS FOOD AND PAMPERED SERVICE AND CARE FREE FUN ABOARD A CARNIVAL LUXURY CRUISE

4.)   AS YOU ARE OUR PRESTIGIOUS CUSTOMER WE WOULD ALSO LIKE TO OFFER YOU OUR VIP GOLD MEMBERSHIP CARD WORTH $500. THIS HELPS YOU IN GETTING 50% DISCOUNT ON HOTELS, CAR RENTALS, AIR, CRUISES AND MANY MORE,
WE ARE ALSO PROVIDING YOU A WORD WIDE DIRECTORY OF MEMBER HOTELS WHICH INCLUDES THE NAMES AND TELEPHONE NUMBER FOR OVER 3000 HOTELS WHERE THIS GOLD CARD CAN BE USED WHICH CAN BE USED IN INTERNATIONAL HOTELS AS WELL.

IF YOU DECIDE THAT THE PACKAGE IS FOR YOU, YOU WILL BE SET UP FOR $19.95 PER MONTH: WITH A ONE TIME SET UP FEE OF $79.95. IF YOU DECIDE THAT THE PACKAGE DOES NOT BENEFIT YOU, SIMPLY CALL THE TOLL FREE NUMBER IN YOU PACKAGE WITHIN 10 AFTER RECEIVING THE PACKAGE AND YOU WILL NEVER BE BILLED. OK!
AND YOU STILL GET TO KEEP AIRLINE VOUCHERS AS WAY OF SAYING THANKS FOR USING OUR SERVICES. OK!

See Exhibit F, hereto.

92.   The defendants knew when they received false and misleading sales scripts – or

remained intentionally ignorant and willfully blind to the fact – that the script will be used to

defraud consumers, that victims will not receive the benefits and values offered by the fraudulent telemarketers, and that the telemarketers will provide PPC with the victims' bank account information so that PPC can process bank drafts.

93.     Upon information and belief, PPC has responded to victims' complaints, law enforcement inquiries, or consumer protection agency inquiries, concerning many of its telemarketing clients.

94.     PPC's purported policy of providing refunds to victims who contact PPC to lodge complaints about unauthorized bank draft withdrawals is designed and intended merely to minimize victims' complaints to law enforcement authorities and consumer protection agencies, and to evade scrutiny of its fraudulent practices.

95.     In connection with a complaint from a fraud victim, Weisberg sent an e-mail to a PPC telemarketing client concerning a grant scheme: "Here is another person that was promised a grant for 5K and the money was being but [sic] into his account for 249.00, which of course he never received. . . . [We] have sent him a refund letter.  I hope that this room did not send many transactions, or it could be very big problems."

96.     Defendant Trost reminded one fraudulent telemarketer: "You know as well as me that if the consumer is unable to reach customer service it puts red flags up."

97.     Trost repeatedly misleads victims and consumer protection agencies concerning PPC's business practices.  Trost falsely states in correspondence concerning victim complaints that PPC has a policy "that no charges are issued from our customer's orders unless independent verification is conducted with the consumer."

98.     PPC does not assure that independent verifications are conducted of customer

orders.  PPC knows that the "verifications" that it relies upon are not independent, and neither

designed nor conducted to protect consumers from fraudulent telemarketers.  On the contrary,

PPC's purported "independent verifications" are designed and conducted to further mislead

victims and to evade scrutiny from law enforcement officials and consumer protection agencies.

### THE DEFENDANTS OPERATED THE NEWTOWN PLATFORM – ANOTHER PAYMENT PROCESSOR THAT SERVICED ALLEGEDLY FRAUDULENT TELEMARKETERS

99.     From approximately 2001until May 20, 2004, D. Hellinger, Weisberg, Pearlman,

Quigley, and R. Hellinger, operated another payment processor operation that serviced allegedly

fraudulent telemarketers.

100.    The payment processing operation, referred to here as the Newtown Platform,

consisted of: (1)  Netchex, a demand draft service provider; (2)  Universal Payment Solutions, an

automated clearing house (ACH) service provider; and (3)  Check Recovery Systems, a provider

of software and services for the funds recovery industry.

101.    D. Hellinger was the founder of the Newtown Platform.  The Newtown Platform

operated out of the same location in Newtown, PA, under common ownership, management and

control.  Pearlman served as Chief Operating Officer; Quigley served as Chief Financial Officer;

and, D. Hellinger performed duties as founder.  R. Hellinger and Weisberg were employed by the

Newtown Platform as key sales and technical personnel.

102.    The Newtown Platform, through Netchex, performed bank draft payment

processing services for telemarketers in a manner the same or similar to how PPC now operates.

On or about June 6, 2003, Netchex opened Wachovia Bank Account No. 2000011522041 as a

depository account.  From its opening until August 2004, Netchex deposited approximately $58 million into that account.  The deposits ranged from $100,000 to $300,000, and consisted primarily of thousands of demand drafts, drawn on the accounts of consumers at the direction of numerous telemarketers.  This account experienced a significant number of return deposit items.

103.    Merchant-clients of the Newtown Platform that have been engaged in fraudulent schemes, including, for example, Continuity Partners, AIG Limited, and Denarius Financial – now receive payment processing services from PPC.

104.    A large number of the Newtown Platform's former merchant-clients have been the subject of federal and state law enforcement actions for alleged consumer fraud.  For example, Netchex processed bank drafts for Consumer Grants USA from April 2004 until August 2004.  During that time period, the return rate for Consumer Grants USA's purported sales was approximately 55 percent.  On or about April 12, 2005, the Attorney General of North Carolina filed an action for injunctive relief against Consumer Grants USA.  On July 29, 2005, the court entered a default judgment against Consumer Grants USA.

105.    Similarly, Netchex and then PPC – processed bank drafts for Continuity Partners, Inc. – ironically, doing business as "American Values" – from March 2004 until April 2005.  During that time, the return rate for Continuity Partners' purported sales was approximately 32 percent.  On or about January 18, 2006, the Attorney General of Ohio entered a Consent Judgment against Continuity Partners, which included findings that Continuity Partners had engaged a various fraudulent conduct against consumers, including specifically causing deductions from "consumers bank accounts when those consumers did not authorize those transactions."

106.    Other actions against Netchex merchant-clients concerning consumer fraud include:   FTC v. Diversified Marketing Services, et al., Civ. No. 96-388 M (W.D. Okla 1996); FTC. v. H.G. Kuykendall, Jr. et al., Civ-96-388-M (Motion for Contempt, January 2002; Stipulated Order for Contempt, Feb. 22, 2005);  FTC v. Capital Choice Consumer Credit, Inc., et al., No. 02-21050-CIV (S.D. Fla 2002); FTC v. Sun Spectrum Communications Organization, et al., No. 03-81105-CIV-COHN/SNOW (S.D. Fla 2003);  FTC v. Xtel Marketing, Inc., et al., No. 04C 7238 (N.D. Ill. Nov. 19, 2004); FTC v. 120194 Canada, Ltd., et al., ("Prime One"), No. 04C 7204 (N.D. Ill. Nov. 8, 2004); FTC v. Frankly Speaking, et al., Civ. No. 1:05-CV-60 (WLS) (M.D. Ga. 2005); FTC v. Oleg OKS, et al., No. 05C 5389 (N.D. Ill. September 19, 2005); and State of North Carolina v. Consumer Grants USA, Inc. et al., (File Nov. 05 CVS 04732 (Wake County, NC).

107.    On or about May 20, 2004, D. Hellinger, Pearlman and Quigley entered into an Asset Purchase Agreement to sell the assets of the Newtown Platform to YMA Company LLC ("YMA") for more than $3.825 million.

108.    As part of the transaction, YMA hired defendants D. Hellinger, Pearlman, Quigley, R. Hellinger and Weisberg to continue to provide services for and operate the Newtown Platform under YMA's ownership.

109.    On May 16, 2005, YMA filed a civil action against D. Hellinger, Pearlman, Quigley, R. Hellinger, Weisberg, and others, in Florida state court.  YMA asserts 48 counts against the defendants, including fraud in the inducement, and a variety of contract and tort claims.

110.    YMA alleges in its complaint that defendant D. Hellinger (and Business

24

Development Services Corp., an entity he controls), Pearlman, Quigley, R. Hellinger and Weisberg breached fiduciary duties to YMA and covenants not to compete by establishing PPC as a rival business and soliciting the Newtown Platform's former merchant clients to leave YMA and to contract with PPC for payment processing services.

111.     YMA also alleges that D. Hellinger, Pearlman, Quigley, R. Hellinger and Weisberg deceived YMA during due diligence by failing to disclose correspondence and filings with government entities concerning investigations into the business practices of the defendants' clients. YMA alleges that the defendants failed to disclose that: (1) the defendants had received a request from an enforcement entity to freeze the assets of certain merchants for whom defendants performed services; (2) one of the defendants' largest merchant clients was the subject of an ongoing investigation by the Attorney General of Iowa; (3) the Attorney General of Vermont had initiated an investigation of the defendants with the issuance of a Civil Investigative Subpoena; (4) a Social Security Administration investigator had requested information from Netchex about Pearlman.

112.     The day after the consummation of the YMA-Newtown Platform transaction, YMA learned that the Attorney General of North Carolina had initiated an investigation into the business practices of merchant clients of the Newtown Platform. This investigation included a subpoena directed to D. Hellinger.

113.     Following the consummation of the YMA-Newtown Platform transaction, YMA learned of investigations by four federal agencies, three additional states, and three local government units, relating to the business practices of the defendants and/or their merchant clients. Nine of the Newtown Platform's fourteen largest merchant clients were named in

25

information requests received by YMA in connection with the investigations.

## PPC IS DEEPLY ENGAGED IN MANY FRAUDULENT
## TELEMARKETING SCHEMES

114.   Since December 2004, PPC has performed demand draft processing – causing debits to be applied to victims' bank accounts and corresponding credits to be applied in its own bank account – on behalf of numerous deceptive and abusive telemarketing schemes, many of which are based in Canada, India and the West Indies.

115.   All or a large majority of PPC's bank draft clients are believed to be fraudulent telemarketers that obtain bank account information from their victims by misleadingly offering goods and services, and by misrepresenting material facts about such offers.

116.   PPC uses the victim's private bank account and other information to create bank drafts in varying dollar amounts. PPC deposits the bank drafts into its own bank account, causing withdrawals from the victims' bank accounts either without the victims' knowledge or consent, or in dollar amounts greater than previously agreed to by the victims.

117.   The bank drafts created by PPC – whether made payable to a telemarketer, an 800 telephone number, or another sham entity – bear the name and address of PPC.

118.   PPC advertises on its Internet website that it can process payments for companies that are prohibited under NACHA rules from using ACH transactions, and states: "Payment Processing Center can provide Bank Draft origination for telephone transactions that may be prohibited by NACHA Rules."

119.   PPC often processes within a short span of time multiple unauthorized bank drafts

against a victim's bank account. This practice decreases the risk that a bank draft for a large amount of money will not be honored by the victim's bank because of insufficient funds, and increases the likelihood that the defendants can deplete victims' bank accounts before the fraud is discovered.

120.    Numerous victims have lodged complaints against PPC with governmental consumer protection agencies and the Better Business Bureau. The complaints allege generally schemes in which the defendants cause unauthorized debits against victims' bank accounts following unsolicited contact with a telemarketer. Among the telemarketing entities referenced in complaints are:  Health Network USA, Consumer Reward Network, K-mart Consumers Reward, GSI Grant Services, Net4ever, Mega Movie Club, Buyers Union, Premier Benefits, CDSVC, Meditech, GE International, and Profile Protection. PPC provides, or has provided, payment processing services to the telemarketers identified in this paragraph.

121.    PPC's participation in telemarketing fraud runs wide and deep. Following are examples of other PPC-related fraudulent telemarketing schemes directed at victims in the United States:

<em>Star Communications/Family Fun Pass</em>

122.    PPC processes bank drafts for fraudulent telemarketer Star Communications/ Family Fun Pass.

123.    J.W. of Siloam, AK, is a victim of PPC and Star Communications/ Family Fun Pass. J.W. received an unsolicited telemarketing call from Star Communications/Family Fun Pass. The telemarketer induced J.W. to provide her bank account information by offering information about a $500 shopping spree at no cost. The telemarketer further informed J.W. that

27

she would have ten days to review information about the shopping spree.

124.    J.W. never received the promised information.  The defendants nonetheless
caused debits to J.W.'s bank account totaling of $259.80.  The debits were deposited into a PPC
bank account.

125.    Other victims of the same scheme by PPC and Star Communications/ Family Fun
Pass are know to reside in Texas, California, Connecticut, South Carolina, Illinois, Maine, and
Washington, DC.

126.    From April 2005 until December 2005, PPC wired approximately $5.5 million to
Star Communications, LLC.

*Consumer Reward Network*

127.    PPC processes bank drafts for fraudulent telemarketer Consumer Reward
Network,  a California-based company that falsely promises its victims vouchers for amounts up
to $500 redeemable at Wal-Mart and other retail outlets, medical discounts plans, free movie
passes, and other benefits, in exchange for a payment of $4.95 to be withdrawn from the victim's
bank account.  After Consumer Reward Network has obtained a victim's bank account
information, the defendants cause unauthorized withdrawals of hundreds of dollars from the
victim's bank account.  The victims do not receive vouchers or other the benefits offered by
Consumer Reward Network.

128.    For example, B.L. of Caldwell, ID, is one of many victims of Consumer Reward
Network.   B.L. received an unsolicited telephone call from a telemarketer associated with
Consumer Reward Network.  B.L. authorized $4.95 to be withdrawn from her bank account in
exchange for what she understood to be an upgrade to her automobile road service.  From

28

approximately May 18, 2005, through July 5, 2005, PPC caused six separate bank draft

withdrawals from B.L.'s bank account, all without authorization, totaling approximately $408.85.

The proceeds of the bank drafts were deposited into a PPC bank account.

129.    Other victims of Consumer Rewards telemarketing fraud are known to reside in

Oklahoma, Texas, and New York, among other states.

130.    From April 2005 until December 2005, PPC wired approximately $4.9 million to

Consumer Reward Network.

*Premier Benefits*

131.    PPC processes bank drafts for fraudulent telemarketer Premier Benefits.  Victims

allege that Premier Benefits telemarketers offer movie passes or shopping coupons to known

companies, such as Home Depot, in exchange for $3.95 (or a like amount) to be paid by bank

draft to pay for shipping.  The victims of this scheme do not receive movie passes or shopping

coupons of value, and their bank accounts are debited an amount exceeding the originally agreed-

upon "shipping fee."

132.    D.B. of Brooklyn, NY, is one of many victims of PPC and Premier Benefits.  D.B.

agreed to pay $3.95 for shipping for movie passes and shopping coupons that a Premier Benefits

telemarketer informed him he had won.  D.B. did not receive movie passes or shopping coupons.

The defendants, however, caused  $3.95 to be withdrawn from D.B.'s bank account on two

separate occasions, as well as a withdrawal of $199, and another withdrawal of $140.

133.    From April 2005 until December 2005, PPC wired approximately $2.3 million to

Premier Benefits.

*GSI Grant Service*

29

134.    PPC processes bank drafts for fraudulent telemarketer GSI Grant Service, a

Barbados-based entity that misleadingly advises its victims that they are entitled to a guaranteed

grant of thousands of dollars in exchange for a "processing fee" of $298, or a similar amount of

money.  After victims agree to a payment, they receive at most a booklet listing names of

agencies that provide grants.

135.    For example, D.K of Church Hill, TN, is a victim of PPC and GSI Grant Service.

D.K., who is disabled and lives alone, is attending vocational college.  Her only income is $597

per month in Social Security and Social Security Insurance payments.

136.    GSI Grant Service contacted D.K. by telephone and informed her that "President

Bush had allocated money to help the needy" with grants to be used for education, housing and

auto-repair only.  D.K. was told that – specifically because of her status as a low income disabled

person – she qualified for a $5,000 payment.  D.K. was informed she would never have to repay

the government as long as she retained receipts to prove that she used the money for the

designated purposes.

137.    D.K. specifically questioned the telemarketer whether she would be provided a

grant of money, or merely a directory of grants.  The telemarketer assured D.K. that she would

receive a cash grant and not merely a directory of grants.  D.K. called GSI Grant Services

customer service number to verify that she would receive a cash grant if she accepted the

telemarketer's offer.  The GSI Grant Services customer service representative assured D.K. that

she would receive "actual money, from a grant backed by the US Government."

138.    Based upon these assurances, D.K. provided her bank account information to GSI

Grant Services.  After the defendants caused a $298.00 bank draft withdrawal from D.K.'s bank

account, D.K. received in the mail a grant directory.

139.    Victims of the GSI Grant Service–PPC fraud are known to reside at least in Texas, Washington, D.C., Minnesota, and Georgia.

140.    From April 2005 until December 2005, PPC wired approximately $1.5 million to GSI Grant Direct.

*Continuity Partners*

141.    PPC processes bank drafts for fraudulent telemarketer Continuity Partners, a company that offer victims a package of benefits, including gasoline vouchers and other benefits, in exchange for a token amount of money to be withdrawn from the victim's bank account. Continuity Partners does not provide victims with the benefits offered by the telemarketer.  PPC nonetheless cause withdrawals from victims' bank accounts, purportedly on behalf of Continuity Partners.  For example, after Continuity Partners informed A.S of Hempstead, TX, that it would withdraw only $1.95 from his bank account, PPC caused $1,200 to be withdrawn from A.S.'s bank account.

142.    From April 2005 until December 2005, PPC wired approximately $1.3 million to Continuity Partners.

*AEZ Global Marketing*

143.    PPC provides payment processing services to fraudulent telemarketer AEZ Global Marketing, a company engaged in fraudulent sweepstakes schemes.

144.    One of PPC and AEZ Global Marketing's victims is W.P of Roanoke, VA.  W.P. received an unsolicited telephone call from TR Lansing & Associates, an affiliate of AEX Global Marketing.  The telemarketer informed W.P. that she had won $300,000 in a lottery.  As

31

requested, W.P. provided her bank account information to the telemarketer. The telemarketer instructed W.P. to make the following payments to secure her lottery winnings: $1,700 as an attorney fee; $3,800 to pay for transfer of the lottery winnings over state lines; and $3,800 to resolve unspecified problems. W.P. transferred $9,309.99 to TR Lansing& Associates. She did not receive her purported lottery winnings.

145. Another victim of the PPC-AEZ Global Marketing Scheme is C.F. of West Lynn, MA. In May 2005, an AEZ Global Marketing telemarketer called C.F., requesting to speak to C.F.'s mother, aged 93 years. The AEZ Global Marketing telemarketer stated that C.F.'s mother had won $375,000 in an Australian sweepstakes. To collect the money, the telemarketer instructed C.F. to pay one percent of the winnings – $3,750 – as insurance on a cashier's check. To further induce C.F. to participate in the fraudulent scheme, AEZ Global Marketing reduced to $2,700 the amount that C.F. was required to pay, and further misleadingly stated that all but $150 would be returned to C.F. with her mother's winnings. The check with the winnings never arrived.

146. From April 2005 until December 2005, PPC wired approximately $1 million to an account at the Bank of America for the benefit of AEZ Global Marketing.

### *Your Choice, Inc.*

147. PPC processes bank drafts for fraudulent telemarketer Your Choices, Inc.

148. In November 2005, the Attorneys General of Vermont, Florida, North Carolina and Ohio obtained a Consent Judgment and Permanent Injunction against bank draft payment processor AmeriNet and its owner, David Kerlin. The Attorneys General's allegations were based upon AmeriNet's relationship with Your Choices, Inc., and another fraudulent

telemarketer. The Attorneys General alleged that AmeriNet improperly continued to provide check processing services to Your Choices despite a high return rate.

149.    From April 2005 until December 2005, PPC wired approximately $2.7 million to Your Choice, Inc.

### Business Resource Network

150.    PPC processes bank drafts for fraudulent telemarketer Business Resource Network. During unsolicited telephone calls, Business Resource Network telemarketers induce victims – both businesses and individuals – with misleading offers of $25,000 loans, and in some cases internet services. Business Resource Network representatives request that victims provide bank account information for purposes of verifying qualifications for the purported benefit. After the victim produces his or her bank account information to the telemarketer, the defendants cause unauthorized withdrawals of hundreds of dollars each from victim's bank account.

151.    From April 2005 until December 2005, PPC wired approximately $499,000 to Business Resource Network.

### AIG Limited

152.    PPC processes bank drafts for fraudulent telemarketer AIG Limited. Victims have complained that AIG Limited, operating under its own name and as Fundamental Consumer Strategies and Everest Consumers and Service, offered credit cards or credit repair for a fee of $299. After the defendants cause bank draft deductions from victims' accounts, no credit cards or services are provided. Generally, victims' attempts to contact AIG Limited (and its front companies) are not successful.

153.    A United States Postal Inspection Service investigation has identified hundreds of

victims, and several hundred thousand dollars in losses, resulting from telemarketing schemes conducted by the defendants and AIG Limited.

154.    On November 10, 2005, the Attorney General of North Dakota issued a Cease and Desist Order against AIG Limited (and others) as a result of an investigation into complaints that AIG Limited engaged in deceptive acts or practices during telephone solicitations by falsely promising victims guaranteed grants.

155.    From April 2005 until December 2005, PPC wired approximately $377,000 to bank accounts for the benefit of AIG Limited, including bank accounts at Bank of Nevis in the West Indies.

*American Select*

156.    PPC processes bank drafts for fraudulent telemarketer American Select.  Victims have complained that American Select telemarketers have offered travel and vacation opportunities, sweepstakes and prizes in exchange for bank account information.  Victims have reported that following telephone contact with American Select, the defendants have caused withdrawals of several hundreds of dollars from the bank accounts of their victims.

157.    Law enforcement agencies have received numerous complaints against American Select Getaway Vacations.  For example, F.S. of Enda, PA, complained that after a telephone contact with American Select, the defendants caused three separate unauthorized bank draft withdrawals from his bank account for $497, $398 and $479, respectively.

158.    From April 2005 until December 2005, PPC wired approximately $266,000 to American Select, which the government believes is affiliated with American Select Getaway Vacations.

34

*Free Medicine Direct*

159.    PPC processes bank drafts for fraudulent telemarketer Free Medicine Direct.

160.    Free Medicine Direct is the subject of numerous victim complaints to the United States Postal Inspection Service, the Federal Trade Commission, and the Better Business Bureau.

161.    Free Medicine Direct uses television commercials to offers free medicine to people in the United States without health insurance. Free Medicine Direct uses the United States mail to obtain bank account information from its victims.

162.    Victims of Free Medicine Direct's fraudulent inducements do not receive free medicine or any other benefit of value. The defendants, however, cause bank draft withdrawals from their bank accounts. For example, R.W. of Houston, TX, was defrauded of $199.99 by Free Medicine Direct, and M.P. of Dekalb, TX, was defrauded of $499.99 by Free Medicine Direct, as described above.

163.    From April 2005 until December 2005, PPC wired approximately $183,000 to Free Medicine Direct.

*Travel ExchangeUnlimited*

164.    PPC processes bank drafts for fraudulent telemarketer Travel Exchange Unlimited. Travel Exchange Unlimited telemarketers misleadingly offer victims vacation packages in Florida and requests that the consumer provide his or her bank account information in order to transact a small "processing fee." After the telemarketer obtains the consumer's bank account information, the defendants cause unauthorized bank draft withdrawals from the consumer's bank account.

165.    Victims of the fraudulent scheme perpetrated by the defendants and Travel

Exchange Unlimited reside in many states, including New Mexico, Hawaii, Maryland, and Michigan.

166.    From April 2005 until December 2005, PPC wired approximately $129,000 to Travel Exchange Unlimited.

*Denarius Financial*

167.    PPC provides payment processing services to fraudulent telemarketer Denarius Financial.   Denarius Financial is believed to be located and operate from Montreal, Canada.

168.    The father of P.S. of Dover, MA was the victim of a fraud perpetrated by Denarius Financial.   A telemarketer representing Denarius Financial fraudulently induced P.S.'s father to authorize wire transfers totaling $102,000 from P.S.'s father's bank account to a New York bank.

169.    From April 2005 until October 2005, PPC wired approximately $89,000 to Denarius Financial.

\*            \*            \*

170.    In processing bank drafts on behalf of telemarketing businesses identified in the preceding paragraphs, and on behalf of numerous other deceptive or abusive telemarketers, PPC has caused tens of millions of dollars to be drawn from the bank accounts of unwary American victims.   Upon information and belief, PPC retains as payment for services and as commissions a portion of the money it receives in connection with fraudulent telemarketing schemes.

171.    PPC processed bank drafts for telemarketers knowing – or willfully blind and intentional ignorant of the fact that – the telemarketers were engaged in massive and pervasive fraudulent schemes to induce victims to provide their bank account information for the benefit of the fraudulent telemarketers and PPC.   The defendants engaged in mail fraud and wire fraud in

36

connection with their fraudulent schemes, and those violations affected financial institutions.

## PPC PROCESSES BANK DRAFTS FOR FRAUDULENT
## TELEMARKETING SCHEMES BASED IN CANADA

172.    During the period April 2005 until October 2005, in addition to the transfers to

fraudulent telemarketers already identified in this Verified Complaint, from April 2005 until

December 2005 PPC wired more than $5 million to accounts in Canadian banks, including many

accounts identified only by numbers.  Upon information and belief, the money PPC wired to

Canadian banks is the proceeds of cross-border telemarketing fraud.

## DEFENDANT D. HELLINGER HAS SUBSTANTIAL EXPERIENCE
## PERPETRATING CONSUMER FRAUD SCHEMES

173.    Defendant D. Hellinger has a long history of operating illegal consumer fraud

schemes.

174.    In 1989, D. Hellinger was convicted of tax evasion and mail fraud in connection

with a "cents off coupon" consumer fraud scheme.

175.    In July 1995, D. Hellinger settled Federal Trade Commission allegations that he

had engaged in the deceptive promotion of credit cards and other products via "900 numbers."

D. Hellinger's settlement with the FTC prohibits him from engaging in consumer fraud, and in

assisting others that he knows, or should know, are engaged in consumer fraud.  The settlement

agreement also required D. Hellinger to obtain a $250,000 bond to protect his customers before

engaging in further telemarketing activities.

176.    D. Hellinger is the owner of Choices Unlimited, LLC, an entity in the business of generating and trading in telemarketing prospect lists.  Upon information and belief, D. Hellinger provides fraudulent telemarketers, including entities identified in this Verified Complaint, with names and telephone numbers of individuals who already have been victimized by fraudulent telemarketers and who are believed to be susceptible to other fraudulent schemes.

177.    Choices Unlimited's address is 121 Friends Lane, Newtown PA – the same as address as PPC.  From 1998 until 2004, Choices Unlimited was located at 395 Brownsburg Road, Newtown, PA, a single-family residence owned by D. Hellinger.

178.    The 395 Brownsburg Road address is associated with several other entities, including Check Recovery Systems, Inc., Universal Payment Solutions, and Business Development Services Corp., which, upon information and belief, all have been engaged in schemes to defraud consumers.

179.    D. Hellinger previously has misled government investigators concerning a business relationship with a telemarketer.  D. Hellinger falsely represented to federal investigators that he had stopped conducting business with a particular Montreal-based telemarketing company in 1999.  At the time of his misrepresentation to investigators, D. Hellinger continued to be associated with the same Montreal-based company in connection with a sweepstakes scheme known as "Office of Disbursement."

180.    D. Hellinger travels frequently to Montreal, Canada, where, upon information and belief, he conducts business with Canada-based fraudulent telemarketers.

## QUIGLEY HAS SUBSTANTIAL EXPERIENCE

## PERPETRATING  CONSUMER FRAUD SCHEMES

181.    Quigley has a long history of operating illegal consumer fraud schemes.

182.    Doing business as Prophets, Inc., Quigley conducted a fraudulent direct mail marketing scheme under the names "Madame Arielle Dupont," "Institute of Astrological Research," and "Sweepstakes Claim Center" – all out 301 Oxford Valley Road, Yardley, PA.

183.    Quigley's "Madame Arielle Dupont" scheme misrepresented to its victims that for a fee of $20, the allegedly clairvoyant Madame Dupont would provide the victim with winning lottery numbers.

184.    Quigley's "Sweepstakes Claim Center" scheme misrepresented to its victims that they were the winners of a valuable prize and that a fee paid in advance by the victim was required to insure handling of the prize.   This scheme is substantially similar to schemes conducted by fraudulent telemarketers for which PPC processes bank drafts.

185.    After an investigation by the United States Postal Inspection Service, and pursuant to a civil seizure warrant, Quigley relinquished $92,527 of proceeds from her fraudulent schemes.


## PPC'S BANK ACCOUNTS ARE TAINTED WITH
## PROCEEDS OF TELEMARKETING FRAUD

186.    PPC deposits bank draft proceeds obtained in connection with fraudulent telemarketing schemes into accounts at Wachovia Bank.

187.    On or about March 24, 2005, Weisberg opened Wachovia Bank Account No. 2000018538232 ("Depository Account '232") on behalf of PPC.  Weisberg and Trost are the

signatories for Depository Account '232.

188.    From April 2005 until December 2005, the defendants deposited more than $88 million into Depository Account '232.

189.    The defendants' individual deposits into Depository Account '232 ranged in amounts between $100,000 and $1 million.  The individual deposits were comprised of hundreds or thousands of individual bank drafts.  Upon information and belief, the vast majority or all of bank drafts primarily were drawn on accounts of the victims of fraudulent telemarketers.

190.    From April 2005 until December 2005, Wachovia was required to return more than $52.8 million – or approximately sixty percent – of the defendants' deposits into Depository Account '232.  The reasons for the returns included claims by victims that the bank drafts had not been authorized, allegations by victims of fraud in connection with the bank drafts, and insufficient funds in the payors' accounts.

191.    In September 2005, Wachovia Bank informed law enforcement authorities that it was investigating suspicious activity in Depository Account No. '232.

192.    On or about September 27, 2005, PPC opened Wachovia Bank Account No. 2000018853548 ("Depository Account '548") on behalf of PPC.  Weisberg and Trost are the signatories of Depository Account '548.

193.    From April 2005 until December 2005, the defendants deposited more than $54 million into Depository Account '548.

194.    The defendants' individual deposits into Depository Account '548 ranged largely in amounts between $700,000 and $1.9 million.  The individual deposits were comprised of hundreds or thousands of individual bank drafts.  Upon information and belief, the vast majority

40

or all of bank drafts primarily were drawn on accounts of the victims of fraudulent telemarketers.

195.    From April 2005 until December 2005, Wachovia was required to return more than $31 million – or approximately 58 percent – of the defendants' deposits into Depository Account '548. The reasons for the returns included claims by victims that the bank drafts had not been authorized, allegations by victims of fraud in connection with the bank drafts, and insufficient funds in the payors' accounts.

196.    On or about December 27, 2005, PPC opened Wachovia Account No. 2000018853797 ("Depository Account '797"). Weisberg, Trost and Quigley are the signatories of Depository Account '797.

197.    At the time of the filing of this Verified Complaint, upon information and belief, the defendants use Depository Account '797 as the primary account for depositing of bank drafts relating to telemarketing fraud.

198.    PPC also has other accounts at Wachovia Bank that it uses to in connection with fraudulent telemarketing schemes.

199.    On or about March 10, 2005, PPC opened Wachovia Account No. 2000013369422 ("Operating Account '422"). Operating Account '422 is used by the defendants to transfer money to their telemarketer clients, vendors, and themselves. Weisberg and Trost are the signatories for Operating Account '422.

200.    From April 2005 until December 2005, the defendants caused the transfer of approximately $50 million from Operating Account '422 to numerous accounts at various banks for the benefit of fraudulent telemarketing entities (including GSI Grant Service, Your Choice, Inc, Health Advantage, Guardian Marketing, Premier Benefits, Inc., Consumer Reward Network,

Inc., SUI International, First Liberty, Business Resource Network, Travel Exchange, LLC, Continuity Partners, Inc, American Select, Star Communications, AIG Limited and Free Medicine Direct), telemarketing fraud vendors, and entities controlled by the defendants and other PPC's employees.

201.    PPC maintains Wachovia Account No. 2000013369448 as a "Check Clearing" account. Weisberg and Trost are signatories of this account. Since April 2005, the defendants have transferred approximately $4.5 million from this account to fraudulent telemarketers such as AEX Global Marketing and AIG Limited, and other companies that the government believes may be engaged in consumer fraud, such as Cashorama, Prize Paradise, Inc., Corporate Prize Headquarters, and Prize Advisory Corporation, and other entities.

202.    PPC uses Wachovia Account No. 2000013369529 (the "Reserve Account"), Wachovia Account No. 2000018538274 (the "Refund Account"), Wachovia Account No. 2000013369435, and Commerce Bank Account No. 0366843308, to further the fraudulent telemarketing schemes in which it is engaged.   Weisberg and Trost are signatories of all three of these accounts.

### PPC IS ALIENATING AND DISPOSING OF THE PROCEEDS OF FRAUD BY TRANSFERRING MONEY TO ITS OFFICERS AND EMPLOYEES, TO FRAUDULENT TELEMARKETERS, AND TO VENDORS

203.    On a regular basis, PPC is alienating and disposing of proceeds of telemarketing fraud. During the period April 2005 until December 2005, PPC has transferred $50 million of fraud-tainted money from Operating Account No. '422 to the defendants, fraudulent telemarketers, and vendors.

204.    From April 2005 until December 2005, D. Hellinger has received approximately $218,000 that PPC wired into Wachovia Account No. 2000013367107 – an account opened by D. Hellinger for an entity identified as Choices Unlimited.  Choices Unlimited is owned and controlled by D. Hellinger.  D. Hellinger also received $56,000 that PPC wired to First Trust Bank Account No. 70-1603797 – an account opened by D. Hellinger for an entity identified as Business Development Services Corp., a company D. Hellinger controls.

205.    From April 2005 until December 2005, Pearlman has received approximately $516,759 that PPC wired to Commerce Bank Account No. 365739051 – an account opened by Jami Pearlman for an entity identified as First Liberty LLC, which Pearlman controls.  Pearlman also has received approximately $120,000 that PPC wired to Commerce Bank Account No. 367576766 – an account opened by Jami Pearlman for an entity identified as JMP Consulting LLC, another company that Pearlman controls.

206.    From April 2005 until December 2005, D. Hellinger and Pearlman also have received approximately $267,909 that PPC wired to National Penn Bank Account No. 215699939 – an account opened by D. Hellinger and Jami Pearlman for an entity identified as DONJA.  Upon information and belief, DONJA is controlled by D. Hellinger and Pearlman.

207.    From April 2005 until December 2005, Quigley has received approximately $120,000 that PPC wired to Commerce Bank Account No. 0367773447 an account opened by Quigley for an entity identified as MOQ Financial LLC, an entity that Quigley controls.

208.    From April 2005 until December 2005, Weisberg has received approximately $532,000 that PPC wired to PNC Bank Account Nos. 8400700053, 8995987881 and 8610434697, all of which were opened by Weisberg.

43

209.     From April 2005 until December 2005, R. Hellinger has received approximately

$638,000 that PPC wired to Commerce Bank Account No. 0365738905 – an account opened by

R. Hellinger for an entity identified as Payment Processing Solutions LLC, a company R.

Hellinger controls.  Since April 2005, R. Hellinger has transferred fraud-tainted money from

Payment Processing Solutions' Commerce Bank Account No. 0365738905 to other bank accounts

he controls, namely Commerce Bank Account Nos. 0365164011 and 0361941958.

210.     From April 2005 until December 2005, DeBoyace has received approximately

$188,000 that PPC wired to Sovereign Bank Account No. 0721070116 – an account opened by

DeBoyace for an entity identified as DM Capital Solutions LLC, an entity DeBoyace controls.

211.     DeBoyace, Quigley and Pearlman also received approximately $77,679 that PPC

wired to Wachovia Bank Account No. 20000018538902, an account opened by DeBoyace,

Quigley and Pearlman for an entity identified as Transaction Support Services LLC.  Transaction

Support Services LLC is controlled by DeBoyace, Quigley and Pearlman.

212.     PPC also has transferred proceeds of telemarketing fraud to vendors on behalf of

fraudulent telemarketers to pay for services.  For example, during the period April 2005 through

October 2005, PPC paid approximately $411,285 to Helen IT Systems.  Upon information and

belief, Helen IT Systems is a St. Lucia-based company providing boiler room cold-call services to

fraudulent telemarketers who prey on victims in the United States.

## THE RELIEF REQUESTED BY THE GOVERNMENT IS NECESSARY TO PROTECT THE PUBLIC AND TO PROTECT THE PROCEEDS OF FRAUD FROM FURTHER DISSIPATION

213.     Absent the injunctive relief requested by the government, the defendants'

44

fraudulent conduct will continue, the vulnerable public will suffer more losses, and fraudulently obtained money will be transferred out of reach of the Court.

214.    All of the conduct described in this Verified Complaint was undertaken with knowledge and intent to defraud unwitting victims – or with intentional ignorance and willful blindness  – of telemarketing fraud perpetrated for the benefit of the defendants and others.

215.    The defendants' conduct and practices violate the provisions of federal law designed to protect consumers by preventing the fraudulent use of the mail and wires, and banking laws as defined by 18 U.S.C. §3322(d).

216.    The defendants' illegal activities, as set forth in this Verified Complaint, continue to date.  Consumers throughout the United States of America have suffered, and will continue to suffer substantial monetary loss as a result of the defendants' unlawful – and unconscionable – acts and practices.  During the period April 2005 until December 2005, the defendants caused approximately $50 million – the proceeds of fraud – to be transferred out of PPC's Operating Account '422 and into the pockets of the defendants, fraudulent telemarketers operating in the United States and abroad, and vendors.

217.    Absent injunctive relief as requested in this Verified Complaint, the defendants are likely to continue to injure consumers and to harm the public interest.

218.    The government has obtained a warrant to search PPC's offices located at 121 Friends Lane, Suite 200, Newtown, PA, based upon probable cause that PPC is engaged in violations of 18 U.S.C. §1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

## COUNT I
## (Against all Defendants)

45

## 18 U.S.C. § 1345 – INJUNCTIONS AGAINST FRAUD

219.    The United States incorporates here the allegations in paragraphs 1 through 218 of this Verified Complaint.

220.    The defendants committed the acts alleged in this Verified Complaint knowingly and intentionally, or by remaining intentionally and willfully ignorant, that they were engaged in, and enabled, the fraudulent schemes described above.

221.    The defendants used the United States mail and wires to defraud the victims of the telemarketing schemes described above.

222.    The defendants use of the United States mails and wires to defraud the victims of telemarketing schemes have affected financial institutions.

223.    The defendants are perpetrating an ongoing violation of the mail fraud statute, 18 U.S.C. § 1341, the wire fraud statute, 18 U.S.C. § 1343, and banking laws as defined by 18 U.S.C. §3322(d).

WHEREFORE, the United States requests of the Court the following relief:

(a)    a temporary restraining order under 18 U.S.C. § 1345, based upon a finding that probable cause exists to believe that the defendants have violated, and are likely to continue to violate, mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, respectively, and banking laws as defined by 18 U.S.C. §3322(d), enjoining the defendants, and all other persons and entities in active concert or participation with the defendants who receive actual notice of the Court's order, from:

(I)    processing bank drafts in all instances where the purported authorization for the bank draft has been obtained in connection

46

with outbound telemarketing;

(ii)   processing bank drafts in all instances where the return rate on deposited bank drafts for a merchant telemarketer exceeds two (2) percent in any one-week period;

(iii)  processing bank drafts for all merchants that are, or that have been within the past two years, the subject of an action or inquiry by any state or federal regulatory agency;

(iv)   processing bank drafts for all merchants owned by, or that employ, or that consult with, a person who is, or who has been within the past two years, the subject of an action or inquiry by any state or federal regulatory agency;

(v)    transferring, withdrawing, pledging, encumbering, disposing of, or otherwise using funds in any of the following bank accounts:

*PPC Accounts*

Wachovia Bank Account No. 2000018538232

Wachovia Bank Account No. 2000018853548

Wachovia Bank Account No. 2000018853797

Wachovia Bank Account No. 2000013369422

Wachovia Bank Account No. 2000013369448

Wachovia Bank Account No. 2000013369529

Wachovia Bank Account No. 2000018538274

Wachovia Bank Account No. 2000013369435

47

Commerce Bank Account No. 0366843308

*D. Hellinger Accounts*

Wachovia Bank Account No. 2000013367107

First Trust Bank Account No. 70-16037

*Weisberg Accounts*

PNC Bank Account No. 8400700053

PNC Bank Account No. 8995987881

PNC Bank Account No. 8610434697

*Pearlman Accounts*

Commerce Bank Account No. 0365739051

Commerce Bank Account No. 0367576766

*D. Hellinger and Pearlman Account*

National Penn Bank Account No. 215699939

*Quigley Account*

Commerce Bank Account No. 0367773447

*R. Hellinger Accounts*

Commerce Bank Account No. 0365738905

Commerce Bank Account No. 0365164011

Commerce Bank Account No. 0361941958

*DeBoyace Accounts*

Sovereign Bank Account No. 0721070116

*Quigley, DeBoyace and Pearlman Account*

48

Wachovia Bank Account No. 20000018538902

\*      \*      \*

(vi)  establishing any new bank accounts;

(vii)  dissipating, transferring, selling, withdrawing, pledging, encumbering, disposing of, or otherwise using, any personal or business assets that were derived or obtained from telemarketing-related activities and/or payment processing-related activities, or that are co-mingled with money or other assets derived or obtained from telemarketing-related activities and/or payment processing-related activities;

(viii)  opening or attempting to open safe-deposit boxes and/or safes into which proceeds of telemarketing-related activities and/or payment processing-related activities have deposited, transferred or placed;

(ix)  concealing from plaintiff any assets, and requiring defendants and relief defendants to disclose to plaintiff within two (2) days of the service of this injunctive order the identity of all banks, brokerage houses and/or other financial institutions, and respective account numbers, and the location of all safe-deposit boxes and/or safes, into which proceeds of telemarketing-related activities and/or payment processing-related activities have been deposited, transferred or placed; and

(x)  destroying or otherwise discarding any records (including

49

electronically-stored information) relating to the business of Payment Processing Center, LLC, and any business activity related to telemarketing and/or payment processing.

(b)     a preliminary injunction on the same basis and to the same effect, to preserve the status quo pending the outcome of this litigation;

(c)     a permanent injunction directing that the defendants be permanently enjoined from the unlawful activities described in the Verified Complaint, and that assets sufficient to compensate the victims of the fraud be set aside for restitution to them;

(d)     the appointment of a trustee to administer the temporary restraining order and injunction, and to supervise refunds to victims from PPC's bank accounts; and

      (e)     such other and further temporary, preliminary and permanent relief as is warranted to prevent injury to the public.

Respectfully,

PATRICK L. MEEHAN
United States Attorney

VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division

JOEL M. SWEET
Assistant United States Attorney
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Tel.  215-861-8581
Fax. 215-861-8349

Dated:  2/17/06

<u>VERIFICATION</u>

I, Jeffrey Braun, am a United States Postal Inspector assigned to the investigation of this

matter.  I verify, under penalty of perjury, that the facts in the Verified Complaint for Injunctive

Relief are true and correct to the best of my knowledge, and are based upon information obtained

by me during an investigation conducted in my capacity as a United States Postal Inspector.

JEFFREY BRAUN
United States Postal Inspector