## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 06-725 (JP) |
| | : | |
| | : | |
| PAYMENT PROCESSING CENTER, | : | |
| LLC, DONALD M. HELLINGER, | : | |
| MICHAEL WEISBERG, RANDY | : | |
| D. TROST, JAMI M. PEARLMAN, | : | |
| MICHELLE O'KEEFE QUIGLEY, | : | |
| RONALD HELLINGER, and ROBERT | : | |
| DEBOYACE, | : | |
| | : | |
| Defendants. | : | |

## AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

PATRICK L. MEEHAN
United States Attorney

VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division

JOEL M. SWEET
Assistant United States Attorney

MARK ANDERSON
Assistant United States Attorney
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Tel.  215-861-8200
Fax. 215-861-8349

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ORGANIZATION AND CONTROL OF PPC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

THE SCOURGE OF TELEMARKETING FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

UNSIGNED BANK DRAFTS ARE AN IMPORTANT
PART OF CONSUMER FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

THE DEFENDANTS HAVE KNOWN OR HAVE
REMAINED WILLFULLY BLIND TO CONSUMER
FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

THE DEFENDANTS ARE DEEPLY ENGAGED IN
MANY CONSUMER FRAUD SCHEMES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONSUMERS' BANKS HAVE BEEN ADVERSELY
AFFECTED BY THE DEFENDANTS' FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

FIRST LIBERTY PROVIDES PPC WITH MATERIAL
SUPPORT FOR PPC'S BANK DRAFT OPERATION,
AND ALSO MISLEADINGLY OFFERS BENEFIT
"CLUB MEMBERSHIPS" TO CONSUMERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

PPC PROCESSES BANK DRAFTS FOR FRAUDULENT
DIRECT MARKETING SCHEMES BASED IN CANADA . . . . . . . . . . . . . . . . . . . . . . . 48

THE DEFENDANTS OPERATED THE NEWTOWN
PLATFORM – ANOTHER PAYMENT PROCESSOR
THAT SERVICED ALLEGEDLY FRAUDULENT
TELEMARKETERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

DEFENDANT D. HELLINGER HAS SUBSTANTIAL
EXPERIENCE PERPETRATING CONSUMER FRAUD . . . . . . . . . . . . . . . . . . . . . . . . 53

QUIGLEY HAS SUBSTANTIAL EXPERIENCE
PERPETRATING CONSUMER FRAUD  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

PPC'S BANK ACCOUNTS ARE TAINTED WITH
PROCEEDS OF CONSUMER FRAUD  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

PPC IS ALIENATING AND DISPOSING OF THE PROCEEDS OF
FRAUD BY TRANSFERRING MONEY TO THE DEFENDANTS,
TO FRAUDULENT DIRECT MARKETERS, AND TO VENDORS  . . . . . . . . . . . . . . . . . . 58

THE RELIEF REQUESTED  BY THE GOVERNMENT
IS NECESSARY TO PROTECT THE PUBLIC AND TO PROTECT
THE PROCEEDS OF FRAUD FROM FURTHER DISSIPATION  . . . . . . . . . . . . . . . . . . . . . 61

COUNT I – 18 U.S.C. § 1345  – INJUNCTIONS AGAINST FRAUD . . . . . . . . . . . . . . . . . . . 62

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 06-725 (JP) |
| | : | |
| | : | |
| PAYMENT PROCESSING CENTER, | : | |
| LLC, DONALD M. HELLINGER, | : | |
| MICHAEL WEISBERG, RANDY | : | |
| D. TROST, JAMI M. PEARLMAN, | : | |
| MICHELLE O'KEEFE QUIGLEY, | : | |
| RONALD HELLINGER, and ROBERT | : | |
| DEBOYACE, | : | |
| | : | |
| Defendants. | : | |

**AMENDED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**

The United States of America, by its attorneys, Patrick L. Meehan, United States Attorney

for the Eastern District of Pennsylvania, and Joel M. Sweet and Mark Anderson, Assistant

United States Attorneys for the same district, brings this civil action under the Anti-Fraud

Injunction Statute, 18 U.S.C. § 1345.  In support of its Amended Verified Complaint, the United

States of America alleges:

**INTRODUCTION**

1.      This is a civil action to enjoin fraud based on probable cause of violations of

federal mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, respectively, and

banking laws as defined by 18 U.S.C. §3322(d).

2.      The United States seeks injunctive and other equitable relief to enjoin the

commission of criminal fraud offenses, to prevent continuing and substantial injury to the victims

of fraud, and to prevent the alienation and disposition of the defendants' assets derived from the

fraud and in value equivalent to the victims' losses, so that such assets will be available for

distribution to victims of the defendants' fraud.

3.       Since approximately April 2005 and continuing until February 21, 2006, the

defendants, using the United States mails and/or wires, and in concert with fraudulent direct

marketers in the United States and abroad, engaged in and enabled predatory fraudulent direct

marketing schemes, including but not limited to telemarketing schemes.  These schemes were

designed to extract money from victims' bank accounts, on false pretenses, and/or without

authorization.  The defendants' conduct – primarily the creation and deposit into the banking

system of unsigned bank drafts – as alleged herein, was central to the success of the fraudulent

schemes.

4.       The defendants' clients – known here as "merchant-clients" – engage in various

forms of direct marketing, including telemarketing and mail solicitations.  Central to all of their

schemes is the practice of obtaining consumers' bank account information for the purpose of

creating unsigned bank drafts.

5.       Fraudulent telemarketing schemes, for example, begin with unsolicited telephone

calls, commonly known as "cold calls," made by foreign and domestic telemarketers to

vulnerable consumers residing throughout the United States of America.  During the cold calls,

victims are induced, through misrepresentations and false promises of goods and services of

value, to provide the telemarketer with personal bank account information.  The telemarketer

then transmits the personal bank account information, using the United States mail and/or wires

2

(including the Internet), to defendant Payment Processing Center, LLC ("PPC").

6.    Using victims' bank account information, PPC prints (or causes to be printed) demand drafts, commonly referred to as checks, to be drawn from victims' accounts.  PPC deposits the demand drafts into PPC's own bank account, thereby causing debits to victims' bank accounts, and corresponding credits to PPC's bank account.

7.    At all times relevant to the allegations in this Amended Verified Complaint, the defendants have known – or have remained intentionally ignorant and willfully blind to the fact – that the merchant-clients for whom PPC provides payment processing services use misrepresentations and false promises of goods and services to induce victims to disclose personal bank account information.

8.    The defendants also have known – or have willfully ignored – that had PPC's victims known the truth about merchant-clients' misleading offers and inducements, the victims would not have disclosed their personal bank account information.

9.    The defendants' efforts to shield themselves from their merchant-clients' fraudulent conduct is a transparent ruse.  The defendants know that they are participating and enabling telemarketing fraud on a massive scale, or they remain intentionally ignorant and willfully blind to that fact.

10.    The defendants know that, on a dollar basis, more than half of the bank draft transactions PPC processes for its telemarketing clients are reversed – or returned – due to victims' banks rejecting the bank drafts as potentially fraudulent, unauthorized, or otherwise suspicious, or because the victims' account have insufficient funds or have been closed.

11.    PPC bank drafts also are returned in significant numbers due to victim complaints

3

that the transactions are not authorized.

12.    The defendants have copies of the sales scripts and promotional materials used by PPC's merchant-clients promoting offers that are facially suspect.

13.    The defendants receive a large number of complaints lodged against PPC and/or its merchant-clients, including a substantial number of demands by victims of fraud for refunds.

14.    The defendants have received inquiries from law enforcement and consumer protection agencies concerning PPC's merchant-clients' sales practices, as well as its own practices.

15.    Under the Anti-Fraud Injunction Statute, 18 U.S.C. § 1345, the government is entitled to injunctive relief upon a demonstration that "'probable cause' exists to believe that the defendant is currently engaged or about to engage in a fraudulent scheme violative of either the mail, wire or bank fraud statutes." United States v. William Savran & Assocs., Inc., 755 F. Supp. 1165, 1177 (E.D.N.Y. 1991) (internal citation omitted). See also  United States v. Cen-Card Agency/C.C.A.C., (table - 872 F.2d 414) slip op. No. 88-5764 (3d Cir. Mar. 23, 1989) (Scirica, J.) (affirming district court's injunction and constitutionality of 18 U.S.C. § 1345).  The facts alleged in this Amended Verified Complaint demonstrate overwhelmingly that injunctive relief is appropriate – and absolutely necessary – to protect vulnerable consumers throughout the United States of America.

16.    On February 17, 2006, the government commenced this action by filing under seal a verified complaint, along with an ex parte motion for a temporary restraining order.

17.    On February 21, 2006, the Court entered an order temporarily restraining the defendants from engaging in the schemes described herein, and restraining assets traceable to the

schemes.

18.     On April 7, 2006, the temporary restraining order was converted to a Stipulated Preliminary Injunction.

19.     PPC now operates under the terms of the Stipulated Preliminary Injunction, which are binding on all of the defendants.

## CAUSES OF ACTION

20.     The United States brings this civil action for injunctive relief pursuant to the Anti-Fraud Injunction Act, 18 U.S.C. §1345, based upon predicate violations of mail fraud, 18 U.S.C. §1341, and wire fraud, 18 U.S.C. §1343, and banking laws, as defined by 18 U.S.C. §3322(d).

21.     The United States has probable cause to believe that the commission of wire and/or mail fraud, as defined by 18 U.S.C.§§ 1341 and 1343, respectively, and violation of banking laws as defined by 18 U.S.C. §3322(d), occurred and will occur in the future absent relief pursuant to 18 U.S.C. §1345.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction of this action pursuant to 18 U.S.C. § 1345 (anti-fraud injunctions), 28 U.S.C. § 1331 (federal question) and 28 U.S.C.§ 1345 (United States as plaintiff).

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because defendant PPC's headquarters and operations are located in this district, PPC conducts banking related to

5

the alleged fraudulent schemes in this district, all of the defendants conduct business and/or reside in this district, and a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

24.     Plaintiff is the United States of America (the "United States" or the "government") acting on behalf of its agency, the United States Postal Service.

25.     Defendant Payment Processing Center, LLC ("PPC") is a limited liability corporation established on December 8, 2004, under the laws of the Commonwealth of Pennsylvania.

26.     Documents filed with the Commonwealth of Pennsylvania state that PPC is owned exclusively by defendant Michael Weisberg.

27.     PPC maintains its principal place of business at 121 Friends Lane, Suite 200, Newtown, PA 18940.

28.     Until the summer of 2005, PPC's principal place of business was located at 1262 Wood Lane, Langhorne, Pennsylvania.

29.     PPC maintains an Internet website at www.paymentprocessingcenter.com.

30.     According to its Internet website, PPC provides telemarketing merchants with an "end-to-end solution" for processing bank draft transactions, including specifically "Bank Draft origination for telephone transactions that may be prohibited" by rules established by National Automated Clearing House Association.

31.     Defendant Donald M. Hellinger ("D. Hellinger") is an individual residing at 1748

6

Quarry Road, Yardley, PA.

32.     At all relevant times, acting in concert with others, D. Hellinger formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Amended Verified Complaint.

33.     D. Hellinger is a member of PPC.

34.     Hellinger's activities on behalf of PPC include sales and development, including establishing accounts and business agreements with merchant-clients PPC's services.

35.     D. Hellinger received both commissions and profit sharing distributions from PPC.

36.     D. Hellinger participates actively in other aspects of fraudulent direct marketing schemes by developing and trading in lists of "lead" names for fraudulent telemarketers, printing and/or mailing fulfillment materials (brochures/booklets) that are then mailed to victims as part of fraudulent schemes, and by orchestrating relationships between PPC and merchant-clients.

37.     D. Hellinger is the owner of Choices Unlimited and Business Development Services, both of which have received fraud-tainted funds from PPC.

38.     D. Hellinger controls bank accounts into which proceeds of the defendants' fraudulent activity have been transferred.

39.     D. Hellinger was a founder and an owner of Netchex, Universal Payment Solutions, and Check Recovery Systems – referred to collectively as the "Newtown Platform" – all operated out of a common location in Newtown, PA, under common ownership, management and control.

40.     The Newtown Platform is known by law enforcement agencies to have processed

7

payments for fraudulent telemarketers.

41.    Defendant Michael Weisberg is an individual residing at 2 Kanon Court, Newtown, PA.

42.    At all relevant times, acting in concert with others, Weisberg formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Amended Verified Complaint.

43.    Weisberg is the sole member and managing member of PPC, according to PPC's corporate documents filed with the Commonwealth of Pennsylvania.

44.    Weisberg's activities at PPC include establishing accounts and business agreements with merchant-clients, performing due diligence on PPC merchant-clients, and managing PPC's relationships with banks, including Wachovia Bank, N.A.

45.    Weisberg has a bachelor degree in accounting.

46.    Weisberg is a signatory of and controls bank accounts into which proceeds of the defendants' fraudulent activity have been transferred.

47.    Weisberg is the sole member of ODI Financial Solutions, LLC, an entity that received fraud-tainted funds from PPC.

48.    Weisberg formerly was employed by the Newtown Platform.

49.    Defendant Randy D. Trost is an individual residing at 64 Laurel Circle, Newtown, PA 18940.

50.    At all relevant times, acting in concert with others, Trost formulated, directed, controlled, or participated in the acts and practices of  PPC, including the acts set forth in this Amended Verified Complaint.

8

51.     Trost is a member of PPC, and an employee of PPC.

52.     Trost is PPC's Customer Service Manager and its Director of Operations.

53.     Trost's activities on behalf of PPC include reviewing documents to assure merchant-clients' compliance with PPC's due diligence requirements.

54.     Trost's signature appears on refund checks and other checks payable from PPC's accounts.

55.     Trost is the sole member of RDT, LLC, an entity that received fraud-tainted funds from PPC.

56.     Defendant Jami M. Pearlman is an individual residing 4 Hampshire Drive Warminister, PA 18974-1279.

57.     At all relevant times, acting in concert with others, Pearlman formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Amended Verified Complaint.

58.     Pearlman is member of PPC, and an employee of PPC.

59.     Pearlman's activities at PPC include performing due diligence on PPC merchant-clients, and managing PPC's relationships with banks.

60.     Pearlman controls bank accounts into which proceeds of the defendants' fraudulent activity have been transferred.

61.     Pearlman is the sole member of JMP Consulting, LLC, an entity that has received fraud-tainted funds from PPC.

62.     Pearlman was President, Chief Operating Officer and/or Chief Executive Officer – and an owner along with D. Hellinger – of the Newtown Platform.

9

63.     Defendant Michelle O'Keefe Quigley is an individual residing at 12097 Legion Street, Philadelphia, PA 19154.

64.     At all relevant times, acting in concert with others, Quigley formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Amended Verified Complaint.

65.     Quigley is member of PPC, and also an employee of PPC.

66.     Quigley is responsible for PPC's accounting system and acts as its Chief Financial Officer.

67.     Quigley is a signatory of and controls bank accounts into which proceeds of the defendants' fraudulent activity have been transferred.

68.     Quigley is the sole member of MOQ Financial, LLC, an entity that has received fraud-tainted funds from PPC.

69.     Quigley was Chief Financial Officer  – and an owner along with D. Hellinger – of the Newtown Platform.

70.     Defendant Ronald Hellinger ("R. Hellinger") is an individual residing at 58 Polder Drive, Langhorne, PA.

71.     At all relevant times, acting in concert with others, R. Hellinger formulated, directed, controlled, or participated in the acts and practices of PPC, including the acts set forth in this Amended Verified Complaint.

72.     R. Hellinger is member of PPC.

73.     R. Hellinger's activities on behalf of PPC include sales, performing due diligence on PPC merchant-clients, reporting to merchant-clients concerning returned bank drafts, and

10

providing merchant-clients with customer service information.

74.     R. Hellinger controls bank accounts into which proceeds of the defendants'
fraudulent activity have been transferred.

75.     R. Hellinger is the sole member of Payment Processing Solutions, LLC, an entity
that has received fraud-tainted money from PPC.

76.     R. Hellinger formerly was employed by the Newtown Platform.

77.     Defendant Robert DeBoyace is an individual residing at 135 Woodcrest Lane,
Doylestown, PA.

78.     At all relevant times, acting in concert with others, DeBoyace formulated,
directed, controlled, or participated in the acts and practices of  PPC, including the acts set forth
in this Amended Verified Complaint.

79.     DeBoyace is a member of PPC.

80.     Starting approximately November 2005, DeBoyace has been responsible for
regulatory compliance at PPC.

81.     DeBoyace also has been responsible for managing PPC's technology and data
systems.

82.     DeBoyace controls bank accounts into which proceeds of the defendants'
fraudulent activity have been transferred.

83.     DeBoyace is the sole member of DM Capital, an entity that has received fraud-
tainted money from PPC.

84.     All of the defendants are members of Transaction Support Services, LLC, an
entity that has received fraud-tainted funds from PPC.

11

## ORGANIZATION AND CONTROL OF PPC

85.      PPC was incorporated in December 2004 under the laws of the Commonwealth of Pennsylvania.

86.      Weisberg represented himself in a corporate filing with the Commonwealth of Pennsylvania to be the sole owner of PPC.  At a deposition, however, Weisberg testified that at the time of incorporation R. Hellinger owned a one-half interest in PPC.

87.      Despite Weisberg's representation to the Commonwealth of Pennsylvania, in early 2005, Weisberg testified at a deposition that he and R. Hellinger each owned 47 ½ percent of PPC, and Trost owned five percent of PPC.

88.      Weisberg testified at a deposition that in approximately April 2005, Weisberg and R. Hellinger conveyed a fifty (50) percent interest in PPC to D. Hellinger.

89.      The conveyance to D. Hellinger is not reflected in corporate records.

90.      D. Hellinger thereafter allocated part of his 50 percent interest in PPC to Pearlman, Quigley and DeBoyace in varying amounts.

91.      At all times, D. Hellinger retained the right at his sole discretion to reallocate his rights in PPC profit-sharing among Pearlman, Quigley, DeBoyace or others.

92.      Since April 2005, the defendants all considered themselves to be members and owners of PPC.

93.      Since April 2005, the defendants all have participated in PPC profit-sharing.

94.      During 2005, the defendants received (at a minimum) the following amounts of money from PPC in the form of commissions, salary, profit sharing distributions, and/or other payments:

12

    a.      D. Hellinger – $840,084

    b.      Weisberg – $925,742

    c.      Trost – $240,000

    d.      Pearlman – $389,706

    e.      Quigley – $380,038

    f.      R. Hellinger – $1,189,618

    g.      DeBoyace – $341,043

95.    The amounts described in paragraph no. 94 do not include money received by the defendants from PPC (or accrued) in 2006.

96.    PPC has conveyed $1,228,229 to Nylon Holdings ("Nylon"), a company owned by D. Hellinger and controlled by D. Hellinger and Pearlman.

97.    PPC's conveyance to Nylon is booked by PPC as a loan to Nylon in the amount of $730,023.

98.    In addition to PPC's loan to Nylon, the individual defendants have made loans to Nylon in the following amounts:

    a.      D. Hellinger – $101,652

    b.      Weisberg – $114,332

    c.      Trost – $25,413

    d.      Pearlman – $54,097

    e.      Quigley – $50,826

    f.      R. Hellinger – $114,332

    g.      DeBoyace – $47,555

99.     The individual defendants' loans to Nylon were made by transfers from PPC to Nylon.

100.    All of the managerial decisions at PPC are made collectively by the members.

101.    All of the members of PPC have equal access to information about the operation and management of PPC.

102.    Compensation to the defendants is decided collectively by all of the members.  In addition to deciding collectively how much each member receives from PPC as compensation, the members decide collectively the form of compensation, i.e., salary, commission, profit-sharing, for each member.

## THE SCOURGE OF TELEMARKETING FRAUD

103.    The majority of PPC's merchant-clients are telemarketers.

104.    The term "telemarketing" describes planned professional use of a telephone to advertise, market, or provide services to both individual consumers and businesses.

105.    Perpetrators of telemarketing fraud use the telephone to deprive victims dishonestly of money or property or to misrepresent the values of goods or services.

106.    The United States Congress has estimated that telemarketing fraud costs Americans approximately $40 billion every year.

107.    Telemarketing differs from other sales activities in that it can be carried out by sellers across state lines or international borders without direct face-to-face contact with the consumer.

108.    Telemarketers can be very mobile, easily moving among states and other

14

locations.

109.   To manipulate their victims, fraudulent telemarketers attempt to establish their own credibility by conveying misinformation for the purpose of persuading victims to part with funds or personal information with which the telemarketer accesses the victims' financial resources without authorization.

110.   Fraudulent telemarketers – like many of those identified in this Amended Verified Complaint – often mislead their victims by using in their pitches the names of widely recognized companies, such as Wal-Mart, K-Mart, Home Depot, Carnival Cruises, and AIG.

111.   The telemarketing fraud industry is sophisticated.  The schemes, including those in which PPC has been engaged, often involve "boiler room" call centers equipped with a large number of telephone lines.  The boiler room call centers often are located in foreign locations, such as Canada, India, and the West Indies.

112.   In the boiler room call centers, telemarketers are trained to identify likely victims. Telemarketers are provided sales scripts which are based upon false promises, misleading information, and  incorporating high-pressure sales techniques.

113.   The lack of face-to-face contact between fraudulent telemarketers and their victims allows offenders to impersonate government and corporate officials, and in some cases to coerce reluctant victims.

114.   Fraudulent telemarketers often operate under the guise of fictitious or sham companies, and often use false names.  These tactics frustrate victims' and law enforcement officials' ability to identify wrongdoers.  Moreover, victims can only identify fraudulent telemarketers by voice, if at all.

115.    The most common victims of fraudulent telemarketers are older Americans.  This is so because older Americans are more likely than others to be home to receive a telemarketer's call, and are often too polite to hang up on a telemarketer.

116.    The American Association of Retired Persons, the National Association of Attorneys General, and the Federal Trade Commission, have estimated that 85 percent of the victims of telemarketing fraud are age 65 or older.  See 148 Cong. Rec. S. 5055 (daily ed. June 5, 2002 (Statement of Senator Collins)).

117.    Fraudulent telemarketing schemes rob America's seniors not only of their hard-earned savings, but also of their self-respect and dignity.

118.    Fraudulent telemarketers and their accomplices often trade in lists of prospective victims, including repeat victims who are likely to become a victim of another fraudulent scheme.

119.    Cross-border fraudulent telemarketing is common and is particularly difficult for law enforcement officials to investigate and prosecute because of jurisdictional limitations, differences in laws and available investigative tools, and because victims are dispersed geographically.

## UNSIGNED BANK DRAFTS ARE AN IMPORTANT PART OF CONSUMER FRAUD

120.    The success of direct marketing fraud – and in particular cross-border telemarketing fraud – is dependant upon entities known as payment processors to facilitate the banking procedures by which money is taken from victims' bank accounts and transferred to the perpetrators of fraud.

121.    With respect to telemarketing fraud, the schemes require telemarketers, also known as merchants and originators, to contract with payment processors – like PPC – to collect and transmit money, among other services.

122.    A payment processor establishes an account with a bank.  As happens in PPC's schemes, the telemarketer provides the payment processor with victims' bank account information and other information, such as the amount of a purported "sale" or "commitment."

123.    The payment processor uses the information received from the telemarketer to debit the victims' bank accounts through one of two methods:  (1) an Automated Clearing House debit ("ACH"); or (2) a demand draft.

124.    An ACH debit refers to an electronic withdrawal of funds from a consumer's account.  ACH transactions are subject to the rules of the National Automated Clearing House Association ("NACHA").  Those rules prohibit processing of ACH transactions on behalf of businesses engaged in outbound telemarketing calls to consumers with whom they have no existing relationship.

125.    A demand draft refers to the submission to a bank of a paper in the form of a bank check.  A demand draft is prepared and printed by the payment processor, using the victim's bank routing and account information, as provided by the telemarketer.

126.    A demand draft is not signed.  In the case of PPC, demand drafts have a legend stating, for example: "Authorized By Your Depositor No Signature Required Reference #2265814."

127.    Examples of defendant PPC's bank drafts (with account numbers and personal information redacted) are attached hereto as Exhibit A.

17

128.    A payment processor such as PPC makes the bank draft payable to the telemarketer, but the bank draft is deposited into the bank account of the payment processor.

129.    The payment processor's bank — for PPC it is Wachovia Bank – treats the bank draft like an ordinary signed check and causes the bank draft to be submitted to the victim's bank for payment from the victim's account.

130.    Typically, a payment processor will forward funds received as a result of a bank draft transaction to the telemarketer, minus fees for the payment processor.

131.    A consequence of  NACHA rules governing ACH transactions is that fraudulent telemarketers are more likely to use bank draft payment processing compared to ACH payment processing.

132.    Unsigned bank drafts are widely known by law enforcement and banking officials to be used to perpetrate consumer fraud.

133.    In May 2005, Attorneys General of 35 states, as well as the Attorneys General of the District of Columbia and American Samoa, informed the Board of Governors of the Federal Reserve System that "demand drafts are frequently used to perpetrate fraud on consumers" and that "such drafts should be eliminated" in favor of other forms of payment.

134.    The Attorneys General's request to the Federal Reserve that it ban the use of unsigned bank drafts is consistent with the decision of the Canadian Payments Association, which has prohibited pre-authorized debits, including demand drafts not supported by an underlying written authorization.

135.    Wachovia Bank, N.A., which provides banking services to PPC in connection with PPC's bank draft business, recognizes that unsigned demand drafts are often used as

instruments of fraud.

136.     Wachovia's publication "A Guide to Checks and Check Fraud" published in 2003

states:

> <u>Demand drafts can be misused to commit check fraud.  This
> practice involves the misuse of account information to obtain funds
> from a person's bank account without that person's signature on a
> negotiable instrument</u>.  Other terms for demand drafts are
> "preauthorized drafts" and "telephone drafts."  While there are
> many legitimate business uses of demand drafts, such as quick-
> turnaround telephone transactions initiated by airlines and car
> rental companies, <u>demand drafts have been used by deceptive
> telemarketers who obtain bank account information and withdraw
> unauthorized funds from consumers' bank accounts, without their
> realizing that such withdrawals are occurring</u>. . . . While rules and
> laws help, consumers (and businesses) still need to use demand
> drafts cautiously and provide account information only to known
> reputable payees. (underline added)

137.     As a bank draft payment processor, PPC is a critical and necessary participant in a

large number of fraudulent direct marketing schemes.  In these schemes, victims are induced by

misrepresentations and false promises to provide their bank account numbers and other personal

data to a direct marketer, who then provides the information to PPC.  PPC creates bank drafts

using victims' bank account information, and completes the scam by causing money to be

withdrawn from the victims' bank accounts and deposited in its own bank account, before being

transferred to defendants, PPC merchant-clients, and vendors.  Attached as Exhibit B hereto is a

diagram of the architecture of the fraud perpetrated by the defendants.

138.     A.K., of Othello, WA, is a typical PPC victim.  On or about July 19, 2005, A.K.

received an unsolicited telephone call from a telemarketer who promised a "medical benefit

refund" of $399.00 to be applied to A.K.'s bank account.  A.K. was made to understand by the

telemarketer that by providing her bank account information, she would receive a bank credit of

$399.00 to be used for medical needs.  A.K. believed the telemarketer's promises and so she

provided the telemarketer with her bank account information.

139.    A.K. did not receive a bank credit of $399.  Without authorization, on or about

July 20, 2005, the defendants caused a debit of $399 to A.K.'s bank account.  A bank draft, made

payable to an entity called "Meditech," was processed by PPC and deposited into PPC's bank

account.  In a letter to PPC, A.K. wrote:

> Since I am on Medicare I thought it was a refund on my account.
> Instead of that they took $399 out of my account and throw me for
> a loop  – as I asked several times about this being a medical <u>refund</u>.
> And they always said it would not cost me anything & I'd get $399
> <u>added</u> to my account – instead it was taken out.
>
> The innocent always "get took" & you guys fly wide & far.  They
> can put people on the moon but can't stop the "<u>gauging</u>
> telemarketing."

140.    In a letter to the Better Business Bureau, A.K. explained how during the

telemarketer's pitch she became concerned that her failure to answer the telemarketer's questions

would adversely affect her Medicare benefits:

> When they came at me with these health issues I am concerned – as
> I am 88 and no big insurance to fall back on – so that leave[s] me
> gullible – of course.  I do not want to mess my [with my]
> Medicare.
>                         *         *         *
> When they kept saying credit me – and talked about Medicare I
> listened – Some times if you don't respond to some of these things
> you are cut off & I did not want anything done to my Medicare.

141.    Only after the intervention of the Better Business Bureau did A.K. recover $399

from PPC.  A.K.'s letters referenced above are attached to the Amended Complaint as Exhibit C.

## THE DEFENDANTS HAVE KNOWN OR HAVE REMAINED
## WILLFULLY BLIND TO CONSUMER FRAUD

142.    The defendants know – or have been intentionally ignorant of and willfully blind to the fact – that the telemarketers and other merchant-clients for whom they process bank drafts are engaged in fraud to induce victims to purchase products and services of negligible value, or of wildly exaggerated value, or to otherwise relinquish their bank account information.

143.    Despite the defendants' attempts to create the false impression that they are unaware of their merchant clients' illegal activities – a transparent effort to create plausible deniability – strong evidence that PPC is enabling a massive consumer fraud has been in the defendants' hands, and before their eyes.

144.    The defendants have intentionally ignored or have remained willfully blind to unreasonably high return rates – reaching more than 50 percent in some cases.

145.    A "return" refers to a bank draft refused or dishonored by the consumer's bank.

146.    Banks return bank drafts where they suspect the bank draft is not authorized by the consumer, where they suspect fraud, where there are insufficient funds in the consumer's account, where the consumer has closed his or her bank account, or other similar reasons.

147.    Return rates that deviate substantially from normative rates are often indicia of fraud.  In many cases, high return rates reflect a lack of payor authorization for bank drafts.

148.    PPC's bank draft return rates are warning that its merchant-clients are engaged in consumer fraud.  As further described below, on a dollar basis, PPC's bank draft return rates for two of its depository accounts at Wachovia Bank were 60 percent and 58 percent, respectively.

149.    In other words, of the approximately $142 million deposited into the two

21

depository accounts from April 2005 until December 2005 – an eight month period – approximately $84.1 million eventually was returned, i.e., never cleared the consumers' banks.

150. Approximately $57.9 million of the fraudulently-obtained money did clear, and most of it was paid to the defendants, PPC's employees, PPC's merchant-clients, and vendors.

151. In September 2005, Wachovia Bank informed law enforcement authorities that it was investigating suspicious activity in PPC's bank accounts.

152. Neither the banking industry nor the Federal Reserve Bank maintains information about reasonable bank draft return rates. However, substantial information is available concerning reasonable return rates for similar consumer payment transactions.

153. For example, rules established by NACHA require investigative action where the unauthorized return rate on ACH transactions initiated by telephone to consumers with whom the originator has an existing relationship appear to exceed two and one-half percent.

154. VISA and MASTERCARD use a chargeback limit of two and one-half percent of total monthly dollar volume as the rate over which heavy fines are imposed on certain high risk e-businesses. In fact, VISA warns merchants that chargebacks exceeding one percent are considered excessive.

155. PPC markets itself to the telemarketing community through its Internet website as having the capability to process "Bank Draft origination for telephone transactions that may be prohibited by NACHA rules."

156. PPC anticipated and planned for at least one of its merchant-clients to have a return rate of fifty percent or more. For example, PPC expected the operators of a grant scheme based in Montreal, Canada, to have a return rate exceeding fifty percent.

157.    PPC provides refunds to victims who complain sufficiently and demand their money be refunded.

158.    From April 2005 until December 2005, upon information and belief based upon analysis of bank records, PPC issued 8,202 separate refund checks with an aggregate value of $1.54 million to telemarketing victims.  The average refund was approximately $188.

159.    Victims have reported that they have had to wait months before receiving refunds promised by PPC.

160.    Since February 21, 2006, pursuant to orders of the Court, PPC has paid victim refunds in the amount of approximately $148,500.

161.    Upon information and belief, a large number of PPC's victims do not obtain refunds because they are intimidated or daunted by the challenge of demanding a refund, or because they are unaware that they were victims of fraud.

162.    PPC earns a fee from its merchant-clients for responding to each complaint or refund demand receives from a victim.

163.    The defendants also know – or have remained intentionally ignorant of and willfully blind to the fact – that the telemarketers for whom they process bank drafts use false, misleading, and high-pressure sales scripts to induce victims to agree to purchase products and services of negligible value, or of wildly exaggerated value.

164.    PPC reviews its merchant-clients' sales scripts.

165.    On November 4, 2005, PPC's special regulatory counsel represented to the Attorney General of North Dakota that PPC "undertakes a due diligence investigation" of its merchant-clients to assure that they comply with applicable laws.

166.     As part of that due diligence investigation, PPC admits that it reviews its clients' "[m]arketing [m]aterials including sales and verification scripts," among information concerning its clients' business histories and legal statuses.

167.     Moreover, records produced by PPC to the Attorney General of North Dakota included various fraudulent telemarketing sales scripts, and e-mails referring to PPC's review of telemarketing sales scripts.

168.     The sales scripts reviewed by PPC are misleading and are intended to induce victims to provide personal bank account information to fraudulent telemarketers based upon a false hope that they will receive something of value in return.

169.     For example, on August 18, 2005, Trost received from Advantage America, a fraudulent telemarketer based in Nassau, Bahamas, a script to be used by telemarketers to entice victims to provide their bank account information.  See Exhibit D, hereto.

170.     The script directs telemarketers to offer victims government grants of "up to $12,500 or more per year which never needs to be paid back."

171.     The script also directs telemarketers to include in the offer membership in the "Health Works Health Care Plan," through which the consumer purportedly will receive "access to over 300,000 health care professionals who offer huge savings on basic health care needs and much more for only $19.95."  The script further directs telemarketers to offer consumers the following inducement:

> As a special gift for looking at our risk-free 7-day review we are
> going to send you $500 in Groceries of your choice.  Now, after
> reviewing the letter if you decide that you could use the extra cash
> with government grants you will be billed $299.95.  But, if you
> decide the program is not for you simply call the toll-free number

located in your letter and will not be billed.  Either way the $500 in
Groceries are yours to keep.

We are so confident here at Advantage America which state [sic],
if you don't receive up to $12,500 in government Grant money
within 7 months you will received a refund, no questions asked.

For your convenience we have made arrangements for you to
process the one-time processing fee of $49.95 through a bank-to-
bank transfer.  Therefore, I will need some additional information.

See Exhibit D, hereto.

172.    The defendants knew when they received the script from Advantage America – or

remained intentionally ignorant and willfully blind of the fact – that the script would be used to

defraud consumers, and that victims of the scheme would not receive the benefits and values

offered by Advantage America.

173.    On November 10, 2005, the Attorney General of North Dakota issued a Cease and

Desist Order against Advantage America (and other companies) on the ground that Advantage

America has been engaging in deceptive acts or practices during telephone solicitations.

174.    As recently as November 10, 2005, PPC processed bank drafts for Advantage

America.

175.    PPC's gross revenue from Advantage America accounted for 10.17 percent of

PPC's total gross revenue.

176.    D. Hellinger managed the Advantage America account for PPC.

177.    The defendants reviewed a facially fraudulent script used by their telemarketing

merchant-client Grant Information Guide.com.  That script directed telemarketers to inform

victims that their names had "come up on a list of individuals who could qualify for a **New**

25

**Federal Government Grant** up to $5,000." To further misleadingly induce victims, the script

directed telemarketers to offer a "special bonus" – a "**certificate for $500 in emergency cash**

**and a Identity Theft certificate absolutely free**." See Exhibit E, hereto (emphasis in original).

178. The defendants knew when they received the script from Grant Information

Guide.com – or they remained intentionally ignorant of the fact – that the script would be used to

defraud consumers, and that victims of the scheme would not receive the benefits and values

offered by the fraudulent telemarketers.

179. PPC caused at least $249 to be withdrawn from the bank accounts of each of the

victims of this fraudulent scheme.

180. The script PPC received from a telemarketing client for use in a scheme known as

"Dream Vacations" was misleading and fraudulent. The Dream Vacations telemarketing fraud

involves cold-calls originating in boiler rooms in Mumbai (Bombay), India. In the Dreams

Vacation scheme, victims are informed:

> WE ARE HAVING A PROMOTION FOR OUR NEW TRAVEL
> AGENT ID PROGRAM. You (mr. jones) HAVE BEEN
> RANDOMLY SELECTED TO RECEIVE 800.00 DOLLARS IN
> AIRLINE VOUCHERS AND3 FREE NIGHTS HOTEL
> ACCOMODATIONS, ALL THAT WE ASK IS THAT YOU PAY
> 3 DOLLARS AND 95 CENTS FOR POSTAGE.

See Exhibit F, hereto.

181. After establishing that the victim has a checking account, the telemarketer states

to the victim:

> NOW TO GIVE YOU A LITTLE BRIEF REGARDING THE
> USAGE OF THIS PACKAGE INCLUDING IN THIS PACKAGE
> YOU WILL GET

1.)   $800 IN AIRLINE VOUCHERS FOR INTERNATIONAL AND DOMESTIC FLIGHTS.  THESE ARE VALID FOR ALL MOST ALL THE AIRLINE'S WHICH YOU CAN THINK OF....

2.)   YOU ALSO GET A HOLIDAY ADVENTURE FOR 2 ADULTS FOR THREE DAYS AND TWO NIGHTS TO ALL THE FINEST HOTELS IN WHICH WE PROMISE YOUR SATISFACTION.  WE ALSO GIVE AN OPTION TO CHOOSE YOUR DESTINATIONS FROM THE FOLLOWING PLACES LIKE (Anaheim CA)(Reno NV)(Scottsdale, Sedona, AZ)(Orlando and Miami FL) (Wisconsin Dells WI) and many more exotic Destinations,

3.)   Apart from this you ARE ALSO GETTING 3 TO 7 night's OF Carnival Cruises like IMAGINATION-FASCINATION MIAMI, ECSTACY, ELATION LA, WHICH EVER YOU CHOOSE YOU AND YOUR COMPANION WILL ENJOY 3 TO 7 NIGHTS OF FABULOUS FOOD AND PAMPERED SERVICE AND CARE FREE FUN ABOARD A CARNIVAL LUXURY CRUISE

4.)   AS YOU ARE OUR PRESTIGIOUS CUSTOMER WE WOULD ALSO LIKE TO OFFER YOU OUR VIP GOLD MEMBERSHIP CARD WORTH $500.  THIS HELPS YOU IN GETTING 50% DISCOUNT ON HOTELS, CAR RENTALS, AIR, CRUISES AND MANY MORE, WE ARE ALSO PROVIDING YOU A WORD WIDE DIRECTORY OF MEMBER HOTELS WHICH INCLUDES THE NAMES AND TELEPHONE NUMBER FOR OVER 3000 HOTELS WHERE THIS GOLD CARD CAN BE USED WHICH CAN BE USED IN INTERNATIONAL HOTELS AS WELL.

IF YOU DECIDE THAT THE PACKAGE IS FOR YOU, YOU WILL BE SET UP FOR $19.95 PER MONTH: WITH A ONE TIME SET UP FEE OF $79.95.  IF YOU DECIDE THAT THE PACKAGE DOES NOT BENEFIT YOU, SIMPLY CALL THE TOLL FREE NUMBER IN YOU PACKAGE WITHIN 10 AFTER RECEIVING THE PACKAGE AND YOU WILL NEVER BE BILLED.  OK!
AND YOU STILL GET TO KEEP AIRLINE VOUCHERS AS WAY OF SAYING THANKS FOR USING OUR SERVICES. OK!

See Exhibit F, hereto.

27

182.    The defendants know when they receive false and misleading sales scripts that the scripts will be used to defraud victims, that victims will not receive the benefits and values offered by the fraudulent telemarketers, and that the telemarketers will provide PPC with the victims' bank account information so that PPC can process bank drafts – or they remain intentionally ignorant of and willfully blind to these facts.

183.    Upon information and belief, PPC has responded to victims' complaints, law enforcement inquiries, or consumer protection agency inquiries, concerning many of its telemarketing clients.

184.    PPC's purported policy of providing refunds to victims who contact PPC to lodge complaints about unauthorized bank draft withdrawals is designed and intended merely to minimize victims' complaints to law enforcement authorities and consumer protection agencies, and to evade scrutiny of its own fraudulent practices.

185.    In connection with a complaint from a fraud victim, Weisberg sent an e-mail to a PPC telemarketing client concerning a grant scheme:  "Here is another person that was promised a grant for 5K and the money was being but [sic] into his account for 249.00, which of course he never received. . . . [We] have sent him a refund letter.  I hope that this room did not send many transactions, or it could be very big problems."

186.    Trost reminded one fraudulent telemarketer:  "You know as well as me that if the consumer is unable to reach customer service it puts red flags up."

187.    Trost communicates on behalf of PPC with state law enforcement officials in connection with investigations of PPC's telemarketing clients.  Trost has misrepresented to law enforcement officials that PPC complies with a policy that no charges are issued to a consumer's

account unless "independent" verification is conducted with the consumer.  Trost knew at the time of her misrepresentations that consumer verifications often were conducted by the telemarketer itself, the verification script was created by the telemarketer, and/or the telemarketer participated in the verification process.

188.    PPC does not assure that independent verifications are conducted of customer orders.  PPC knows that the "verifications" that it relies upon are not independent, and that they are neither designed nor conducted to protect consumers from fraudulent telemarketers.  On the contrary, PPC's purported "independent verifications" are designed and conducted to further mislead victims and to evade scrutiny from law enforcement officials and consumer protection agencies.

189.    Often, the so-called "independent verifications" are little more than "upsales" where new offers are introduced to the victim though fast-paced, confusing and high-pressured tactics.  Instead of independent verifications to protect consumers – the verifications PPC relied upon generally were intended to confuse and further manipulate consumers.

190.    PPC did not have a compliance manual to assure adherence with consumer protection laws.

191.    PPC received legal compliance advice from its purported in-house counsel, Richard Meltzer, a felon serving a federal sentence.

192.    During the time Meltzer provided legal advice to PPC, PPC knew that Meltzer held a suspended law license.

29

### THE DEFENDANTS ARE DEEPLY ENGAGED IN
### MANY CONSUMER FRAUD SCHEMES

193.    Since December 2004, PPC has performed demand draft processing – causing debits to be applied to victims' bank accounts and corresponding credits to be applied in its own bank account – on behalf of numerous deceptive and abusive telemarketers, many of which are based in Canada, India and the West Indies.

194.    PPC's largest merchant-clients receiving bank draft services, and upon information and belief a large majority of PPC merchant-clients, are engaged in deceptive sales practices.

195.    PPC uses victims' private bank accounts and other information to create bank drafts in varying dollar amounts.  PPC deposits the bank drafts into its own bank account, causing withdrawals from the victims' bank accounts either without the victims' knowledge or consent, or in dollar amounts greater than previously agreed to by the victims.

196.    The bank drafts created by PPC – whether made payable to a merchant-client or a sham entity – bear the name and address of PPC, and are traceable to PPC through Wachovia Bank.

197.    PPC advertises on its Internet website that it can process payments for companies that are prohibited under NACHA rules from using ACH transactions, and states: "Payment Processing Center can provide Bank Draft origination for telephone transactions that may be prohibited by NACHA Rules."

198.    PPC often processes within a short span of time multiple unauthorized bank drafts against a victim's bank account.  This practice decreases the risk that a bank draft for a large

30

amount of money will not be honored by the victim's bank because of insufficient funds, and increases the likelihood that the defendants can deplete a victim's bank account before the fraud is discovered.

199.    Numerous victims have lodged complaints against PPC with governmental consumer protection agencies and the Better Business Bureau.  The complaints allege generally schemes in which the defendants cause unauthorized debits against victims' bank accounts following unsolicited contact with a direct marketer.  Among the direct marketing entities referenced in complaints are:  Health Network USA, Consumer Reward Network, K-mart Consumers Reward, GSI Grant Services, Net4ever, Mega Movie Club, Buyers Union, Premier Benefits, CDSVC, Meditech, GE International, and Profile Protection.  PPC provides, or has provided, payment processing services to the telemarketers identified in this paragraph.

200.    PPC's participation in consumer fraud runs wide and deep.

201.    One of PPC's largest merchant-clients is Brian MacGregor, who with others owns and/or controls a network of telemarketing companies, including:  Universal Premium Services, Inc. (a/k/a Premier Benefits, Inc.); Consumer Rewards Network, Inc.; Star Communications LLC; Membership Services Direct, Inc. (a/k/a Continuity Partners, Inc.); Connect2USA, Inc.; Merchant Risk Management, Inc., All Star Access, Inc., Prime Time Venture, Inc., Pantel One Corporation and (collectively "Star Communications Companies").

202.    PPC's gross revenue from Star Communications Companies accounted for 37 percent of PPC's total gross revenue.

203.    At all times relevant to the government's claims, the Star Communications Companies were engaged in deceptive and abusive telemarketing campaigns.

31

204. On March 15, 2006, after a hearing, Honorable Judge S. James Otero of the United States District Court for the Central District of California entered an order granting the Federal Trade Commission's application for a preliminary injunction.

205. Judge Otero froze the defendants assets and appointed a permanent receiver over the Star Communications Companies. See Exhibit G, hereto.

206. The FTC alleged that the Star Communications Companies engaged in deceptive acts and practices in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a), and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

207. Judge Otero found that the FTC is likely to succeed on the merits of its action. Judge Otero found that the Star Communications Companies engaged in deceptive business practices by offering consumers valuable items that did not exist, such as $200-$500 gift cards, movie passes, shopping sprees, and gas vouchers.

208. PPC processed bank drafts for many of the schemes perpetrated by the Star Communications Companies. For example:

*Star Communications/Family Fun Pass*

209. PPC processes bank drafts for fraudulent telemarketer Star Communications/ Family Fun Pass.

210. J.W. of Siloam, AK, is a victim of PPC and Star Communications/ Family Fun Pass. J.W. received an unsolicited telemarketing call from Star Communications/Family Fun Pass. The telemarketer induced J.W. to provide her bank account information by offering information about a $500 shopping spree at no cost. The telemarketer further informed J.W. that she would have ten days to review information about the shopping spree.

211.    J.W. never received the promised information.  The defendants nonetheless caused debits to J.W.'s bank account totaling of $259.80.  The debits were deposited into a PPC bank account.

212.    Other victims of the same scheme by PPC and Star Communications/ Family Fun Pass are know to reside in Texas, California, Connecticut, South Carolina, Illinois, Maine, and Washington, DC.

213.    From April 2005 until December 2005, PPC wired approximately $5.5 million to Star Communications, LLC.

*Consumer Reward Network*

214.    PPC processes bank drafts for fraudulent telemarketer Consumer Reward Network,  a California-based company that falsely promises its victims vouchers for amounts up to $500 redeemable at Wal-Mart and other retail outlets, medical discounts plans, free movie passes, and other benefits, in exchange for a payment of $4.95 to be withdrawn from the victim's bank account.  After Consumer Reward Network has obtained a victim's bank account information, the defendants cause unauthorized withdrawals of hundreds of dollars from the victim's bank account.  The victims do not receive vouchers or the other benefits offered by Consumer Reward Network.

215.    For example, B.L. of Caldwell, ID, is one of many victims of Consumer Reward Network.  B.L. received an unsolicited telephone call from a telemarketer associated with Consumer Reward Network.  B.L. authorized $4.95 to be withdrawn from her bank account in exchange for what she understood to be an upgrade to her automobile road service.  From approximately May 18, 2005, through July 5, 2005, PPC caused six separate bank draft

33

withdrawals from B.L.'s bank account, totaling approximately $408.85, without additional authorization.  The proceeds of the bank drafts were deposited into a PPC bank account.

216.     Other victims of Consumer Rewards telemarketing fraud are known to reside in Oklahoma, Texas, and New York, among other states.

217.     From April 2005 until December 2005, PPC wired approximately $4.9 million to Consumer Reward Network.

*Premier Benefits*

218.     PPC processes bank drafts for fraudulent telemarketer Premier Benefits.  Victims allege that Premier Benefits telemarketers offer movie passes or shopping coupons to known companies, such as Home Depot, in exchange for $3.95 (or a like amount) to be paid by bank draft to pay for shipping.  The victims of this scheme do not receive movie passes or shopping coupons of value, and their bank accounts are debited an amount exceeding the originally agreed-upon "shipping fee."

219.     D.B. of Brooklyn, NY, is one of many victims of PPC and Premier Benefits.  D.B. agreed to pay $3.95 for shipping for movie passes and shopping coupons that a Premier Benefits telemarketer informed him he had won.  D.B. did not receive movie passes or shopping coupons. The defendants, however, caused  $3.95 to be withdrawn from D.B.'s bank account on two separate occasions, as well as a withdrawal of $199, and another withdrawal of $140.

220.     From April 2005 until December 2005, PPC wired approximately $2.3 million to Premier Benefits.

*Continuity Partners*

221.     PPC processes bank drafts for fraudulent telemarketer Continuity Partners, a

34

company that offer victims a package of benefits, including gasoline vouchers and other benefits, in exchange for a token amount of money to be withdrawn from the victims' bank accounts. Continuity Partners does not provide victims with the benefits offered by the telemarketer.  PPC nonetheless cause withdrawals from victims' bank accounts, purportedly on behalf of Continuity Partners.  For example, after Continuity Partners informed A.S. of Hempstead, TX, that it would withdraw only $1.95 from his bank account, PPC caused $1,200 to be withdrawn from A.S.'s bank account.

222.    From April 2005 until December 2005, PPC wired approximately $1.3 million to Continuity Partners.

223.    Attached as Exhibit H to the Amended Complaint is the Report of the Temporary Receiver concerning the fraudulent schemes perpetrated by the Star Communications Groups, which refers to schemes described herein.

224.    Following are examples of other fraudulent schemes directed at victims in the United States for which PPC provided bank draft services:

*GSI Grant Service*

225.    PPC processes bank drafts for fraudulent telemarketer GSI Grant Service, a Barbados-based entity that misleadingly advises its victims that they are entitled to a guaranteed grant of thousands of dollars in exchange for a "processing fee" of $298, or a similar amount of money.  After victims agree to a payment, they receive at most a booklet listing names of agencies that provide grants.

226.    For example, D.K. of Church Hill, TN, is a victim of PPC and GSI Grant Service. D.K., who is disabled and lives alone, is attending vocational college.  Her only income is $597

per month in Social Security and Social Security Insurance payments.

227.     GSI Grant Service contacted D.K. by telephone and informed her that "President Bush had allocated money to help the needy" with grants to be used for education, housing and auto-repair only.  D.K. was told that – specifically because of her status as a low income disabled person – she qualified for a $5,000 payment.  D.K. was informed she would never have to repay the government as long as she retained receipts to prove that she used the money for the designated purposes.

228.     D.K. specifically questioned the telemarketer whether she would be provided a grant of money, or merely a directory of grants.  The telemarketer assured D.K. that she would receive a cash grant and not merely a directory of grants.  D.K. called GSI Grant Services' customer service number to verify that she would receive a cash grant if she accepted the telemarketer's offer.  The GSI Grant Services customer service representative assured D.K. that she would receive "actual money, from a grant backed by the US Government."

229.     Based upon these assurances, D.K. provided her bank account information to GSI Grant Services.  After the defendants caused a $298.00 bank draft withdrawal from D.K.'s bank account, D.K. received in the mail a grant directory.

230.     Victims of the GSI Grant Service–PPC fraud are known to reside at least in Texas, Washington, D.C., Minnesota, and Georgia.

231.     From April 2005 until December 2005, PPC wired approximately $1.5 million to GSI Grant Direct.

232.     PPC's gross revenue from GSI Grant Service accounted for 3.16 percent of PPC's total gross revenue.

36

*AEZ Global Marketing*

233.    PPC provides payment processing services to fraudulent direct marketer AEZ

Global Marketing, a company engaged in fraudulent sweepstakes schemes.

234.    One of PPC and AEZ Global Marketing's victims is W.P. of Roanoke, VA.  W.P.

received an unsolicited communication from TR Lansing & Associates, an affiliate of AEX

Global Marketing.  The telemarketer informed W.P. that she had won $300,000 in a lottery.  As

requested, W.P. provided her bank account information to the telemarketer.  AEZ instructed

W.P. to make the following payments to secure her lottery winnings:  $1,700 as an attorney fee;

$3,800 to pay for transfer of the lottery winnings over state lines; and $3,800 to resolve

unspecified problems.  W.P. transferred $9,309.99 to TR Lansing & Associates.  She did not

receive her purported lottery winnings.

235.    Another victim of the PPC-AEZ Global Marketing scheme is C.F. of West Lynn,

MA.  In May 2005, AEZ Global Marketing called C.F., requesting to speak to C.F.'s mother,

aged 93 years.  The AEZ Global Marketing telemarketer stated that C.F.'s mother had won

$375,000 in an Australian sweepstakes.  To collect the money, the telemarketer instructed C.F. to

pay one percent of the winnings – $3,750 – as insurance on a cashier's check.  To further induce

C.F. to participate in the fraudulent scheme, AEZ Global Marketing reduced to $2,700 the

amount that C.F. was required to pay, and further misleadingly stated that all but $150 would be

returned to C.F. with her mother's winnings.  The check with the winnings never arrived.

236.    From April 2005 until December 2005, PPC wired approximately $1 million to an

account at the Bank of America for the benefit of AEZ Global Marketing.

37

*Your Choices, Inc.*

237.    PPC processes bank drafts for fraudulent telemarketer Your Choices, Inc.

238.    PPC's revenue from Your Choices, Inc. accounted for 8.35 percent of PPC's total

gross revenue.

239.    In November 2005, the Attorneys General of Vermont, Florida, North Carolina

and Ohio obtained a Consent Judgment and Permanent Injunction against bank draft payment

processor AmeriNet and its owner, David Kerlin.   The Attorneys General's allegations were

based upon AmeriNet's relationship with Your Choices, Inc., and another fraudulent

telemarketer.   The Attorneys General alleged that AmeriNet improperly continued to provide

check processing services to Your Choices despite a high return rate.

240.    From April 2005 until December 2005, PPC wired approximately $2.7 million to

Your Choices, Inc.

*Business Resource Network*

241.    PPC processes bank drafts for fraudulent telemarketer Business Resource

Network.   During unsolicited telephone calls, Business Resource Network telemarketers induce

victims – both businesses and individuals – with misleading offers of $25,000 loans, and in some

cases internet services.   Business Resource Network representatives request that victims provide

bank account information for purposes of verifying qualifications for the purported benefit.   After

the victims produce bank account information to the telemarketer, the defendants cause

unauthorized withdrawals of hundreds of dollars each from victims' bank accounts.

242.    From April 2005 until December 2005, PPC wired approximately $499,000  to

Business Resource Network.

*AIG Limited*

243.    PPC processes bank drafts for fraudulent direct marketer AIG Limited.  Victims

have complained that AIG Limited, operating under its own name and as Fundamental Consumer

Strategies and Everest Consumers and Service, offered credit cards or credit repair for a fee of

$299.  After the defendants cause bank draft deductions from victims' accounts, no credit cards

or services are provided.  Generally, victims' attempts to contact AIG Limited (and its front

companies) are not successful.

244.    On November 10, 2005, the Attorney General of North Dakota issued a Cease and

Desist Order against AIG Limited (and others) as a result of an investigation into complaints that

AIG Limited engaged in deceptive acts or practices during telephone solicitations by falsely

promising victims guaranteed grants.

245.    From April 2005 until December 2005, PPC wired approximately $377,000 to

bank accounts for the benefit of AIG Limited, including bank accounts at Bank of Nevis in the

West Indies.

*American Select*

246.    PPC processes bank drafts for fraudulent telemarketer American Select.  Victims

have complained that American Select telemarketers have offered travel and vacation

opportunities, sweepstakes and prizes in exchange for bank account information.  Victims have

reported that following telephone contact with American Select, the defendants have caused

withdrawals of several hundreds of dollars from the bank accounts of their victims.

247.    Law enforcement agencies have received numerous complaints against American

Select Getaway Vacations.  For example, F.S. of Enda, PA, complained that after a telephone

39

contact with American Select, the defendants caused three separate unauthorized bank draft withdrawals from his bank account for $497, $398 and $479, respectively.

248.     From April 2005 until December 2005, PPC wired approximately $266,000 to American Select, which the government believes is affiliated with American Select Getaway Vacations.

*Free Medicine Direct*

249.     PPC processes bank drafts for fraudulent telemarketer Free Medicine Direct.

250.     Free Medicine Direct is the subject of numerous victim complaints to the United States Postal Inspection Service, the Federal Trade Commission, and the Better Business Bureau.

251.     Free Medicine Direct uses television commercials to offer free medicine to people in the United States without health insurance.  Free Medicine Direct uses the United States mail to obtain bank account information from its victims.

252.     Victims of Free Medicine Direct's fraudulent inducements do not receive free medicine or any other benefit of value.  The defendants, however, cause bank draft withdrawals from the victims' bank accounts.  For example, R.W. of Houston, TX, was defrauded of $199.99 by Free Medicine Direct, and M.P. of Dekalb, TX, was defrauded of $499.99 by Free Medicine Direct, as described above.

253.     From April 2005 until December 2005, PPC wired approximately $183,000 to Free Medicine Direct.

*Travel Exchange Unlimited*

254.     PPC processes bank drafts for fraudulent telemarketer Travel Exchange Unlimited.  Travel Exchange Unlimited telemarketers misleadingly offer victims vacation

40

packages in Florida and request that victims provide bank account information in order to transact a small "processing fee." After the telemarketer obtains victims' bank account information, the defendants cause unauthorized bank draft withdrawals from victims' bank accounts.

255. Victims of the fraudulent scheme perpetrated by the defendants and Travel Exchange Unlimited reside in many states, including New Mexico, Hawaii, Maryland, and Michigan.

256. From April 2005 until December 2005, PPC wired approximately $129,000 to Travel Exchange Unlimited.

*Denarius Financial*

257. PPC provides payment processing services to Denarius Financial. Denarius Financial is believed to be located in and operate from Montreal, Canada.

258. The father of P.S. of Dover, MA was the victim of a fraud perpetrated by Denarius Financial. A telemarketer representing Denarius Financial fraudulently induced P.S.'s father to authorize wire transfers totaling $102,000 from P.S.'s father's bank account to a New York bank.

259. From April 2005 until October 2005, PPC wired approximately $89,000 to Denarius Financial.

*          *          *

260. In processing bank drafts on behalf of direct marketing businesses identified in the preceding paragraphs, and on behalf of numerous other deceptive or abusive direct marketers, PPC has caused tens of millions of dollars to be drawn from the bank accounts of unwary consumers.

41

261.    As compensation for its bank draft services, PPC retains a portion of the money it receives from victims' bank accounts, plus services fees.

262.    PPC processed bank drafts for direct marketers knowing – or willfully blind and intentionally ignorant of the fact – that the direct marketers were engaged in massive and pervasive fraudulent schemes to induce victims to provide their bank account information for the benefit of PPC and its merchant-clients.  The defendants engaged in mail fraud and/or wire fraud in connection with their fraudulent schemes, and those violations affected financial institutions.

## CONSUMERS' BANKS HAVE BEEN ADVERSELY AFFECTED BY THE DEFENDANTS' FRAUD

263.    The defendants' fraudulent conduct, as described herein, has adversely affected banks throughout the United States.

264.    Every victim that complained to his or her bank about an unauthorized PPC bank draft caused that victim's bank to expend resources to investigate the fraud.

265.    In many cases, victims' banks were forced to initiate procedures to dishonor PPC bank drafts.

266.    According to Wachovia Bank, since February 21, 2006, it has received claims in excess of $250,000 from banks that have dishonored PPC bank drafts on the ground of suspected fraud or a similar reason.  Where Wachovia has refused to credit these banks, the banks have suffered losses.

267.    Returned or dishonored PPC bank drafts have placed administrative burdens on victims' banks.

268.    An employee at Wachovia describing PPC's returned bank drafts stated that the "volumes are tremendous" and noted that Wachovia had created a process for handling the returns that was different than its ordinary process for handling returned items.

269.    On January 13, 2006, a senior representative of a bank located in Philadelphia complained to Wachovia that it was being flooded by unauthorized bank drafts issued by PPC. The bank representative  wrote:

> The purpose of this message is to *put your bank on notice* of this situation and to ask for your assistance in trying to shut down this scam . . . we would ask that you kindly instigate an investigation into whether [PPC is] conducting legitimate business and whether [Wachovia is] getting a high volume of return items on those accounts (that should place your bank on notice of potential fraud).

270.    Wachovia responded that "overzealous" telemarketers were responsible for the problems with PPC bank drafts.  The Philadelphia bank senior representative responded:

> But I must still respectfully disagree that this is a case of 'overzealous' telemarketers.  We have interviewed a large number of our customers whose accts have been hit by multiple drafts of this nature for varying amounts.  They have absolutely no recollection of ever having authorized any multiple hits (let alone for the highly inflated amounts) . . . and where they have authorized the $4.95 hit, they claim that they were subjected to incredible sales pressure.

271.    Other banks also have complained to Wachovia of large numbers of consumer complaints arising from PPC's bank drafts.

272.    PPC's fraudulent schemes also harmed banks by causing victims to close accounts, and by confusing vulnerable consumers about bank practices.

273.    For example, PPC's processing of unauthorized bank drafts for a merchant-client scamming elderly victims in Louisiana harmed victims and their banks.

43

274.    On February 21, 2006, the Ruston Police Department in Lincoln Parish, Louisiana, received a telephone call from S.B, age 69. S.B. reported that she had received a call from someone claiming to be from her bank's security department. The caller stated that it was suspected that her account information had been compromised. The caller asked S.B. to read her account and routing information from the bottom of one of her checks.

275.    S.B. gave the caller her account information. After hanging up, however, she became suspicious. She contacted her bank and learned that no one from the bank would need to get such information from her. S.B. closed her bank account and opened a new one to prevent unauthorized charges.

276.    The Ruston Police Department received approximately 50 calls over the next several days from elderly citizens residing in and around Ruston who had received calls identical to the one S.B. received. Many of the complainants who contacted the Ruston Police Department were elderly, including N.S. (age 82), M.D. (age 86), V.R. (age 79), W.B. (age 79), M.G. (age 86).

277.    On February 24, 2006, a Ruston fraud detective was contacted by Richland State Bank and informed that a draft in the amount of $299.00 had attempted to post against an account of W.B. The draft had been printed with W.B.'s routing and account information and had been deposited into a Wachovia Bank Account No. 2000018853797 – a PPC account.

278.    On March 2, 2006, after the Ruston fraud detective traced the unauthorized bank draft back to PPC, he spoke with PPC's Danielle Diamond. Diamond acknowledged that her office is located at 121 Friends Lane, Suite 200, in Newtown, PA.

44

**FIRST LIBERTY PROVIDES PPC WITH MATERIAL SUPPORT
FOR PPC'S BANK DRAFT OPERATION, AND ALSO MISLEADINGLY
OFFERS BENEFIT "CLUB MEMBERSHIPS" TO CONSUMERS**

279.    First Liberty is a PPC merchant-client that uses PPC's bank draft services.

280.    First Liberty, LLC, is closely-related to D. Hellinger and PPC.

281.    Carol Soble purports to be First Liberty's owner and President, and its only employee.

282.    During the time period relevant to this action, DeBoyace and Soble managed First Liberty's day-to-day operations, along with performing various duties for PPC.

283.    First Liberty provides material support to PPC's bank draft operation.

284.    First Liberty shares office space, accounting systems, personnel, computers and other equipment with PPC.

285.    First Liberty owns the elaborate telephone system used by PPC, including the PPC customer services lines.

286.    PPC's e-mail system operates from First Liberty's server.

287.    On behalf of PPC, First Liberty contracted with telephone services providers to provide PPC with toll free numbers for PPC merchant-clients.

288.    PPC perpetrates its schemes by printing bank drafts from stock paper using high-capacity printers connected to First Liberty's server.

289.    Soble personally assists in the operation of PPC.

290.    Approximately seventy percent of First Liberty's profits are paid to D. Hellinger through an entity identified as Business Development Services, which he owns.

291.    Accordingly to DeBoyace, Pearlman and Quigley also receive a portion of the

45

profits generated by First Liberty.

292.    D. Hellinger directed the installation of computer and telephone equipment at First Liberty's former office located on State Street in Newtown PA.  The offices were under lease to an entity controlled by D. Hellinger.

293.    First Liberty's outside accountant characterizes transactions between First Liberty and other entities controlled by Donald Hellinger as "intercompany" transactions.

294.    First Liberty uses the United States mails to offer consumers memberships in plans that purportedly provide medical benefits, road assurance, and pharmaceutical savings.

295.    First Liberty also: (a) offers "adult DVD" products through direct response television advertisements (or, as recently as November 2005, intended to offer such products); (b) provides product fulfillment and transaction management, including the management of consumer data, for other entities; and (3) co-markets "products" with other merchants.

296.    First Liberty "joint ventures" with other entities to obtain "lead names" for its direct mail operations, and for the provision of any product underlying the mail offer.

297.    D. Hellinger is responsible for establishing First Liberty's joint ventures.

298.    First Liberty uses "incentive checks" to induce unwary consumers.

299.    The deposit of an incentive check, which is drawn on a First Liberty's account, automatically "activates" a consumers membership.  See samples of First Liberty offers for memberships to Medications-4-Less, PharmaAssist and Family Health Solutions, attached as Exhibit I..

300.    Once the incentive check is deposited, First Liberty has access to the victims' bank account information.

301.    First Liberty offers consumers products and/or services purportedly made available by other companies.  These companies include Mediflex, Meds-4-Less, World Assist, Family Health Solutions, Senior Savings, Family Health Solutions, Preferred Shoppers Edge and Sweepstake Advisory.

302.    Based upon available victim complaints, First Liberty's offers are false and deceptive.  The offers purport to provide consumers with benefits that are not available as represented.

303.    D. Hellinger maintains business relations with companies that provide products that First Liberty offers to consumers.  For example, based upon documents obtained by the government, D. Hellinger has prepared telemarketing scripts for MediFlex in which he described a program to reduce medical expenses by up to 60 percent.

304.    D. Hellinger is the administrative and technical contact for the Internet domain name [www.MediFlexBenefits.com](www.MediFlexBenefits.com).

305.    MediFlex was a merchant-client of the Newtown Platform.  During that time, some of the Newtown Platform's sub-accounts for MediFlex experienced returns exceeding 50 percent.

306.    Family Health Solutions was a merchant-client of the Newtown Platform.  During the period March 2004 to August 2004, Family Health Solutions experienced returns exceeding 50 percent.

307.    Meds-4-Less was a merchant-client of the Newtown Platform.  During the period May 2004 to September 2004, Meds-4-Less experienced returns exceeding 50 percent.

308.    The trade name Meds-4-Less is used by a Canadian company identified as 9107-

5424 Quebec, Inc.  On February 21, 2006, DeBoyace received at 121 Friends Lane an invoice

from  9107-5424 Quebec, Inc. for "Meds-4Less Fulfillment."

309.    First Liberty also offers products from an entity identified as Freedom Benefits.

D. Hellinger is a one-third owner of Freedom Benefits.

310.    Soble's name appears on First Liberty's direct mail solicitations, and Soble is

responsible for demands by consumers for refunds.


**PPC PROCESSES BANK DRAFTS FOR FRAUDULENT
DIRECT MARKETING SCHEMES BASED IN CANADA**

311.    Canada has been identified by the United States government as a country with

substantial fraudulent telemarketing activity directed at victims in the United States.

312.    In 1997, United States President Clinton and Canadian Prime Minister Chretien

directed officials to examine ways to counter the serious and growing problem of Canada-United

States telemarketing fraud.  Montreal, Toronto and Vancouver have been identified as Canadian

cities with particularly active fraudulent telemarketing operations.

313.    During the period April 2005 until December 2005, in addition to the transfers to

fraudulent telemarketers already identified in this Amended Verified Complaint, PPC wired more

than $5 million to accounts in Canadian banks, including many accounts identified only by

numbers.  Upon information and belief, the money PPC wired to Canadian banks is the proceeds

of cross-border telemarketing fraud.

**THE DEFENDANTS OPERATED THE NEWTOWN
PLATFORM – ANOTHER PAYMENT PROCESSOR THAT
SERVICED ALLEGEDLY FRAUDULENT TELEMARKETERS**

314.    From approximately 2001 until May 20, 2004, D. Hellinger, Weisberg, Pearlman,

Quigley, and R. Hellinger, operated another payment processor operation that serviced allegedly

fraudulent telemarketers.

315.    The payment processing operation, referred to here as the Newtown Platform,

consisted of:  (1) Netchex, a demand draft service provider;  (2) Universal Payment Solutions, an

automated clearing house (ACH) service provider;  and (3) Check Recovery Systems, a provider

of software and services for the funds recovery industry.

316.    D. Hellinger was the founder of the Newtown Platform.  The Newtown Platform

operated out of a common location in Newtown, PA, under common ownership, management

and control.  Pearlman served as Chief Operating Officer; Quigley served as Chief Financial

Officer; and, D. Hellinger performed duties as founder.  R. Hellinger and Weisberg were

employed by the Newtown Platform as key sales and technical personnel.

317.    The Newtown Platform, through Netchex, performed bank draft payment

processing services for telemarketers in a manner the same or similar to how PPC now operates.

On or about June 6, 2003, Netchex opened Wachovia Bank Account No. 2000011522041 as a

depository account.  From its opening until August 2004, Netchex deposited approximately $58

million into that account.  The deposits ranged from $100,000 to $300,000, and consisted

primarily of thousands of demand drafts, drawn on the accounts of consumers at the direction of

numerous telemarketers.   This account experienced a significant number of return deposit items.

318.    Many merchant-clients of the Newtown Platform that have been engaged in

49

fraudulent schemes, including, for example, Continuity Partners, AIG Limited, and Denarius

Financial – receive payment processing services from PPC.

319.    A large number of the Newtown Platform's former merchant-clients have been the

subject of federal and state law enforcement actions for alleged consumer fraud.  For example,

Netchex processed bank drafts for Consumer Grants USA from April 2004 until August 2004.

During that time period, the return rate for Consumer Grants USA's purported sales was

approximately 55 percent.  On or about April 12, 2005, the Attorney General of North Carolina

filed an action for injunctive relief against Consumer Grants USA.  On July 29, 2005, a court

entered a default judgment against Consumer Grants USA in that matter.

320.    Similarly, Netchex and then PPC – processed bank drafts for Continuity Partners,

Inc. –  ironically, doing business as "American Values"  – from March 2004 until April 2005.

During that time, the return rate for Continuity Partners' purported sales was approximately 32

percent.  On or about January 18, 2006, the Attorney General of Ohio entered a Consent

Judgment against Continuity Partners, which included findings that Continuity Partners had

engaged in various fraudulent conduct against consumers, including specifically causing

deductions from "consumers bank accounts when those consumers did not authorize those

transactions."

321.    Other actions against Netchex merchant-clients concerning consumer fraud

include:  FTC v. Diversified Marketing Services, et al., Civ. No. 96-388 M (W.D. Okla 1996);

FTC. v. H.G. Kuykendall, Jr. et al., Civ-96-388-M (Motion for Contempt, January 2002;

Stipulated Order for Contempt, Feb. 22, 2005);  FTC v. Capital Choice Consumer Credit, Inc., et

al., No. 02-21050-CIV (S.D. Fla 2002);  FTC v. Sun Spectrum Communications Organization, et

al., No. 03-81105-CIV-COHN/SNOW (S.D. Fla 2003);  FTC v. Xtel Marketing, Inc., et al., No.

04C 7238 (N.D. Ill. Nov. 19, 2004);  FTC v. 120194 Canada, Ltd., et al., ("Prime One"), No. 04C

7204 (N.D. Ill. Nov. 8, 2004);  FTC v. Frankly Speaking, et al., Civ. No. 1:05-CV-60 (WLS)

(M.D. Ga. 2005);  FTC v. Oleg OKS, et al., No. 05C 5389 (N.D. Ill. September 19, 2005); and

State of North Carolina v. Consumer Grants USA, Inc. et al., (File Nov. 05 CVS 04732 (Wake

County, NC).

322.    On or about May 20, 2004, D. Hellinger, Pearlman and Quigley entered into an

Asset Purchase Agreement to sell the assets of the Newtown Platform to YMA Company LLC

("YMA") for more than $3.825 million.

323.    As part of the transaction, YMA hired defendants D. Hellinger, Pearlman,

Quigley, R. Hellinger and Weisberg to continue to provide services for and operate the Newtown

Platform under YMA's ownership.

324.    On May 16, 2005, YMA filed a civil action against D. Hellinger, Pearlman,

Quigley, R. Hellinger, Weisberg, and others, in Florida state court.  YMA asserts 48 counts

against the defendants, including fraud in the inducement, and a variety of contract and tort

claims.

325.    YMA alleges in its complaint that D. Hellinger (and Business Development

Services Corp., an entity he controls), Pearlman, Quigley, R. Hellinger and Weisberg breached

fiduciary duties to YMA and covenants not to compete by establishing PPC as a rival business

and soliciting the Newtown Platform's former merchant clients to leave YMA and to contract

with PPC for payment processing services.

326.    YMA also alleges that D. Hellinger, Pearlman, Quigley, R. Hellinger and

51

Weisberg deceived YMA during due diligence by failing to disclose correspondence and filings with government entities concerning investigations into the business practices of the defendants' clients.  YMA alleges that the defendants failed to disclose that: (1)  the defendants had received a request from an enforcement entity to freeze the assets of certain merchants for whom defendants performed services;  (2)  one of the defendants' largest merchant clients was the subject of an ongoing investigation by the Attorney General of Iowa;  (3) the Attorney General of Vermont had initiated an investigation of the defendants with the issuance of a Civil Investigative Subpoena;  (4) a Social Security Administration investigator had requested information from Netchex about Pearlman.

327.    The day after the consummation of the YMA-Newtown Platform transaction, YMA allegedly learned that the Attorney General of North Carolina had initiated an investigation into the business practices of merchant-clients of the Newtown Platform.  That investigation included a subpoena directed to D. Hellinger.

328.    Following the consummation of the YMA-Newtown Platform transaction, YMA allegedly learned of investigations by four federal agencies, three additional states, and three local government units, relating to the business practices of the defendants and/or their merchant-clients.  Nine of the Newtown Platform's fourteen largest merchant-clients allegedly were named in information requests received by YMA in connection with the investigations.

## DONALD HELLINGER HAS SUBSTANTIAL
## EXPERIENCE PERPETRATING CONSUMER FRAUD

329.    D. Hellinger has a long history of operating illegal consumer fraud schemes.

330.    In 1989, D. Hellinger was convicted of tax evasion and mail fraud in connection

with a "cents off coupon" consumer fraud scheme.

331.    In July 1995, D. Hellinger settled Federal Trade Commission allegations that he

had engaged in the deceptive promotion of credit cards and other products via "900 numbers."

332.    D. Hellinger's settlement with the FTC prohibits him from engaging in consumer

fraud, and in assisting others that he knows, or should know, are engaged in consumer fraud.

333.    The settlement agreement also required D. Hellinger to obtain a $250,000 bond to

protect his customers before engaging in further telemarketing activities.

334.    D. Hellinger is the owner of Choices Unlimited, LLC, an entity in the business of

generating and trading in telemarketing prospect lists.

335.    Upon information and belief, D. Hellinger provides fraudulent telemarketers,

including entities identified in this Amended Verified Complaint, with names and telephone

numbers of individuals who already have been victimized by fraudulent telemarketers and who

are believed to be susceptible to other fraudulent schemes.

336.    Choices Unlimited's address is 121 Friends Lane, Newtown PA – the same

address as PPC.

337.    From 1998 until 2004, Choices Unlimited was located at 395 Brownsburg Road,

Newtown, PA, a single-family residence owned by D. Hellinger.

338.    The 395 Brownsburg Road address is associated with several other entities,

including Check Recovery Systems, Inc., Universal Payment Solutions, and Business

Development Services Corp., which processed payments for fraudulent direct marketers.

339.    D. Hellinger previously has misled government investigators concerning a

business relationship with a telemarketer.  D. Hellinger falsely represented to federal

investigators that he had stopped conducting business with a particular Montreal-based

telemarketing company in 1999.

340.    At the time of his misrepresentation to investigators, D. Hellinger continued to be

associated with the same Montreal-based company in connection with a sweepstakes scheme

known as "Office of Disbursement."

341.    Wachovia Bank prepared a due diligence report about Donald Hellinger in

September 2004.  The report stated:

> Our investigation discovered articles regarding a coupon scam in
> 1989 and a 900-Line scam in 1991 involving a Donald Hellinger.
> The accused pled guilty to the coupon scam on October 24, 1989
> for which he would face 8 years imprisonment and a $500,000 fine.
> No records were found relating to the sentencing.  Information was
> also found regarding a suit filed by the FTC allegedly involving a
> company owned by a Donald Hellinger.  The charges made against
> the company and its owner was for deceptively promoting credit
> cards and other products via 900 numbers.

342.    Wachovia's investigators correctly matched Hellinger's birthdate and his tax

identification number.  Wachovia's report concluded, nonetheless, that its "investigation could

not positively identify the accused entity or company to be that of our customer."

343.    D. Hellinger travels frequently to Montreal, Canada, where, upon information and

belief, he conducts business with Canada-based fraudulent telemarketers.

54

## QUIGLEY HAS SUBSTANTIAL EXPERIENCE
## PERPETRATING CONSUMER FRAUD

344.     Quigley has a long history of operating illegal consumer fraud schemes.

345.     Doing business as Prophets, Inc., Quigley conducted a fraudulent direct mail marketing scheme under the names "Madame Arielle Dupont," "Institute of Astrological Research," and "Sweepstakes Claim Center" – all out of 301 Oxford Valley Road, Yardley, PA.

346.     Quigley's "Madame Arielle Dupont" scheme misrepresented to its victims that for a fee of $20, the allegedly clairvoyant Madame Dupont would provide the victim with winning lottery numbers.

347.     Quigley's "Sweepstakes Claim Center" scheme misrepresented to its victims that they were the winners of a valuable prize and that a fee paid in advance by the victim was required to insure handling of the prize.   This scheme is substantially similar to schemes conducted by fraudulent telemarketers for which PPC processes bank drafts.

348.     After an investigation by the United States Postal Inspection Service, and pursuant to a civil seizure warrant, Quigley relinquished $92,527 of proceeds from her fraudulent schemes.


## PPC'S BANK ACCOUNTS ARE TAINTED WITH
## PROCEEDS OF CONSUMER FRAUD

349.     PPC deposits bank draft proceeds obtained in connection with fraudulent telemarketing schemes into accounts at Wachovia Bank.

350.     On or about March 24, 2005, Weisberg opened Wachovia Bank Account No. 2000018538232 ("Depository Account '232") on behalf of PPC.  Weisberg and Trost are the

signatories for Depository Account '232.

351.    From April 2005 until December 2005, the defendants deposited more than $88 million into Depository Account '232.

352.    The defendants' individual deposits into Depository Account '232 ranged in amounts between $100,000 and $1 million.  The individual deposits were comprised of hundreds or thousands of individual bank drafts.  Upon information and belief, the vast majority or all of bank drafts were drawn on accounts of the victims of fraudulent telemarketers.

353.    From April 2005 until December 2005, Wachovia was required to return more than $52.8 million – or approximately sixty percent – of the defendants' deposits into Depository Account '232.  The reasons for the returns included claims by victims that the bank drafts had not been authorized, allegations by victims of fraud in connection with the bank drafts, and insufficient funds in the payors' accounts.

354.    In September 2005, Wachovia Bank informed law enforcement authorities that it was investigating suspicious activity in Depository Account No. '232.

355.    On or about September 27, 2005, PPC opened Wachovia Bank Account No. 2000018853548 ("Depository Account '548") on behalf of PPC.  Weisberg and Trost are the signatories of Depository Account '548.

356.    From November 2005 until December 2005, the defendants deposited more than $54 million into Depository Account '548.

357.    The defendants' individual deposits into Depository Account '548 ranged largely in amounts between $700,000 and $1.9 million.  The individual deposits were comprised of hundreds or thousands of individual bank drafts.  Upon information and belief, the vast majority

or all of bank drafts were drawn on accounts of the victims of fraudulent telemarketers.

358.    From April 2005 until December 2005, Wachovia was required to return more than $31 million – or approximately 58 percent – of the defendants' deposits into Depository Account '548.  The reasons for the returns included claims by victims that the bank drafts had not been authorized, allegations by victims of fraud in connection with the bank drafts, and insufficient funds in the payors' accounts.

359.    On or about December 27, 2005, PPC opened Wachovia Account No. 2000018853797 ("Depository Account '797").  Weisberg, Trost and Quigley are the signatories of Depository Account '797.

360.    At the time of the filing of this Amended Complaint, upon information and belief, the defendants use Depository Account '797 as the primary account for depositing of bank drafts relating to telemarketing fraud.

361.    PPC also has other accounts at Wachovia Bank that it uses in connection with fraudulent telemarketing schemes.

362.    On or about March 10, 2005, PPC opened Wachovia Account No. 2000013369422 ("Operating Account '422").  Operating Account '422 is used by the defendants to transfer money to their telemarketer clients, vendors, and themselves.  Weisberg and Trost are the signatories for Operating Account '422.

363.    From April 2005 until December 2005, the defendants caused the transfer of approximately $50 million from Operating Account '422 to numerous accounts at various banks for the benefit of fraudulent telemarketing entities (including GSI Grant Service, Your Choices, Inc., Health Advantage, Guardian Marketing, Premier Benefits, Inc., Consumer Reward

Network, Inc., SUI International, First Liberty, Business Resource Network, Travel Exchange, LLC, Continuity Partners, Inc, American Select, Star Communications, AIG Limited and Free Medicine Direct), telemarketing fraud vendors, and entities controlled by the defendants.

364.    PPC maintains Wachovia Account No. 2000013369448 as a "Check Clearing" account.  Weisberg and Trost are signatories of this account.  Since April 2005, the defendants have transferred approximately $4.5 million from this account to fraudulent telemarketers such as AEX Global Marketing and AIG Limited, and other companies that the government believes may be engaged in consumer fraud, such as Cashorama, Prize Paradise, Inc., Corporate Prize Headquarters, and Prize Advisory Corporation, and other entities.

365.    PPC uses Wachovia Account No. 2000013369529 (the "Reserve Account"), Wachovia Account No. 2000018538274 (the "Refund Account"), Wachovia Account No. 2000013369435, and Commerce Bank Account No. 0366843308, to further the fraudulent telemarketing schemes in which it is engaged.   Weisberg and Trost are signatories of all four of these accounts.

## PPC IS ALIENATING AND DISPOSING OF THE PROCEEDS OF FRAUD BY TRANSFERRING MONEY TO THE DEFENDANTS, TO FRAUDULENT DIRECT MARKETERS, AND TO VENDORS

366.    Until the Court entered an injunction on February 21, 2006, on a regular basis, the defendants alienated and disposed of the proceeds of consumer fraud.

367.    During the period April 2005 until December 2005, PPC transferred $50 million of fraud-tainted money from Operating Account No. '422 to the defendants, PPC's merchant-clients, and vendors.

368.    From April 2005 until December 2005, D. Hellinger received at least $218,000 that PPC wired into Wachovia Account No. 2000013367107 – an account opened by D. Hellinger for an entity identified as Choices Unlimited.

369.    Choices Unlimited is owned and controlled by D. Hellinger.

370.    D. Hellinger also received at least $56,000 that PPC wired to Firstrust Bank Account No. 70-1603797 – an account opened by D. Hellinger for an entity identified as Business Development Services Corp., a company D. Hellinger controls.

371.    From April 2005 until December 2005, Pearlman received at least $120,000 that PPC wired to Commerce Bank Account No. 0367576766 – an account opened by Jami Pearlman for an entity identified as JMP Consulting LLC, another company that Pearlman controls.

372.    From April 2005 until December 2005, D. Hellinger and Pearlman also received at least $267,909 that PPC wired to National Penn Bank Account No. 215699939 – an account opened by D. Hellinger and Jami Pearlman for an entity identified as DONJA.

373.    DONJA is controlled by D. Hellinger and Pearlman.

374.    From April 2005 until December 2005, Quigley received at least $120,000 that PPC wired to Commerce Bank Account No. 0367773447  – an account opened by Quigley for an entity identified as MOQ Financial LLC, which Quigley controls.

375.    From April 2005 until December 2005, Weisberg received at least $532,000 that PPC wired to PNC Bank Account Nos. 8400700053, 8995987881 and 8610434697, all of which were opened by Weisberg.

376.    From April 2005 until December 2005, R. Hellinger received at least $638,000 that PPC wired to Commerce Bank Account No. 0365738905 – an account opened by R.

59

Hellinger for an entity identified as Payment Processing Solutions LLC, a company R. Hellinger controls.

377.    Since April 2005, R. Hellinger transferred fraud-tainted money from Payment Processing Solutions' Commerce Bank Account No. 0365738905 to other bank accounts he controls, namely Commerce Bank Account Nos. 0365164011 and 0361941958.

378.    From April 2005 until December 2005, DeBoyace received at least $188,000 that PPC wired to Sovereign Bank Account No. 0721070116 – an account opened by DeBoyace for an entity identified as DM Capital Solutions LLC, an entity DeBoyace controls.

379.    DeBoyace, Quigley and Pearlman also received at least $77,679 that PPC wired to Wachovia Bank Account No. 2000018538902, an account opened by DeBoyace, Quigley and Pearlman for an entity identified as Transaction Support Services LLC.

380.    All of the individual defendants are members of Transaction Support Services LLC.

381.     PPC transferred at least $686,076 to Commerce Bank Account No. 0365739051, an account titled to First Liberty.  Pearlman controls the account as the current signer.

382.    PPC also has transferred proceeds of consumer fraud to vendors on behalf of merchant-clients to pay for services.  For example, during the period April 2005 through October 2005, PPC paid at least $411,285 to Helen IT Systems.

383.    Upon information and belief, Helen IT Systems is a St. Lucia-based company providing boiler room cold-call services to fraudulent telemarketers who prey on victims in the United States.

### THE RELIEF REQUESTED  BY THE GOVERNMENT
### IS NECESSARY TO PROTECT THE PUBLIC AND TO PROTECT
### THE PROCEEDS OF FRAUD FROM FURTHER DISSIPATION

384.    Absent the injunctive relief requested by the government and imposed by the

Court's order of February 21, 2006, and the Stipulated Preliminary Injunction dated April 7,

2006, the defendants' fraudulent conduct will continue, the vulnerable public will suffer more

losses, and fraudulently obtained money will be transferred out of reach of the Court.

385.    All of the conduct described in this Amended Verified Complaint was undertaken

with knowledge and intent to defraud unwitting victims – or with intentional ignorance and

willful blindness  – of consumer fraud perpetrated for the benefit of the defendants and others.

386.    The defendants' conduct and practices violate the provisions of federal law

designed to protect consumers by preventing the fraudulent use of the mail and wires, and

banking laws as defined by 18 U.S.C. §3322(d).

387.    Consumers throughout the United States of America have suffered, and will

continue to suffer substantial monetary loss as a result of the defendants' unlawful – and

unconscionable – acts and practices.

388.    During the period April 2005 until December 2005, the defendants caused

approximately $50 million to be withdrawn from victims' bank accounts, transferred from PPC's

depository accounts to PPC's Operating Account '422, and then transferred to the pockets of the

defendants, PPC's merchant-clients in the United States and abroad, and vendors.

389.    In addition to money improperly withdrawn by PPC from victims' bank accounts,

victims have suffered economic injuries in the nature of bank fees charged against their accounts

where they did not have funds sufficient to satisfy PPC's unauthorized bank drafts, and bank fees

resulting from their own checks being dishonored after PPC emptied their accounts.

390.    Absent injunctive relief as requested in this Amended Verified Complaint, the defendants are likely to continue to injure consumers and to harm the public interest.

## COUNT I
### (Against All Defendants)
### 18 U.S.C. § 1345 – INJUNCTIONS AGAINST FRAUD

391.    The United States incorporates here the allegations in paragraph nos. 1 through 389 of this Amended Verified Complaint.

392.    The defendants committed the acts alleged in this Amended Verified Complaint knowing that they engage in, and enable, the fraudulent schemes described above, or they remain intentionally ignorant of and willfully blind to this fact.

393.    The defendants use the United States mail and/or wires to defraud the victims of the telemarketing schemes described above.

394.    The defendants' use of the United States mail and wires to defraud the victims of telemarketing schemes affects financial institutions.

395.    The defendants are perpetrating an ongoing violation of the mail fraud statute, 18 U.S.C. § 1341, the wire fraud statute, 18 U.S.C. § 1343, and banking laws as defined by 18 U.S.C. §3322(d).

**WHEREFORE**, the United States requests of the Court the following relief:

(a)    injunctive relief  under 18 U.S.C. § 1345, based upon a finding that probable cause exists to believe that the defendants have violated, and are likely to continue to violate, mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, respectively, and banking laws

as defined by 18 U.S.C. §3322(d), enjoining the defendants, and all other persons and entities in active concert or participation with the defendants who receive actual notice of the Court's order, from:

(i)     processing bank drafts in all instances where the purported authorization for the bank draft has been obtained in connection with outbound telemarketing and/or mail solicitations;

(ii)    processing bank drafts in all instances where the return rate on deposited bank drafts for a merchant telemarketer exceeds two (2) percent in any one-week period;

(iii)   processing bank drafts for all merchants that are, or that have been within the past two years, the subject of an action or inquiry by any state or federal regulatory agency;

(iv)    processing bank drafts for all merchants owned by, or that employ, or that consult with, a person who is, or who has been within the past two years, the subject of an action or inquiry by any state or federal regulatory agency;

(v)     transferring, withdrawing, pledging, encumbering, disposing of, or otherwise using funds in any of the following bank accounts:

*PPC Accounts*

Wachovia Bank Account No. 2000018538232

Wachovia Bank Account No. 2000018853548

Wachovia Bank Account No. 2000018853797

63

Wachovia Bank Account No. 2000013369422

Wachovia Bank Account No. 2000013369448

Wachovia Bank Account No. 2000013369529

Wachovia Bank Account No. 2000018538274

Wachovia Bank Account No. 2000013369435

Commerce Bank Account No. 0366843308

*D. Hellinger Accounts*

Wachovia Bank Account No. 2000013367107

Firstrust Bank Account No. 70-1603797

*Weisberg Accounts*

PNC Bank Account No. 8400700053

PNC Bank Account No. 8995987881

PNC Bank Account No. 8610434697

*Pearlman Account*

Commerce Bank Account No. 0367576766

*D. Hellinger and Pearlman Account*

National Penn Bank Account No. 215699939

*Quigley Account*

Commerce Bank Account No. 0367773447

*R. Hellinger Accounts*

Commerce Bank Account No. 0365738905

Commerce Bank Account No. 0365164011

Commerce Bank Account No. 0361941958

*DeBoyace Account*

Sovereign Bank Account No. 0721070116

*Quigley, DeBoyace and Pearlman Account*

Wachovia Bank Account No. 2000018538902

*First Liberty*

Commerce Account No. 365739051

\*      \*      \*

(vi)    establishing any new bank accounts without informing the

government in advance;

(vii)   dissipating, transferring, selling, withdrawing, pledging,

encumbering, disposing of, or otherwise using, any personal or

business assets that were derived or obtained from telemarketing-

related activities and/or payment processing-related activities, or

that are co-mingled with money or other assets derived or obtained

from telemarketing-related activities and/or payment processing-

related activities;

(viii)  opening or attempting to open safe-deposit boxes and/or safes into

which proceeds of telemarketing-related activities and/or payment

processing-related activities have deposited, transferred or placed;

(ix)    concealing from plaintiff any assets, and requiring defendants to

disclose to plaintiff within two (2) days of the service of this injunctive order the identity of all banks, brokerage houses and/or other financial institutions, and respective account numbers, and the location of all safe-deposit boxes and/or safes, into which proceeds of telemarketing-related activities and/or payment processing-related activities have been deposited, transferred or placed; and

(x)     destroying or otherwise discarding any records (including electronically-stored information) relating to the business of Payment Processing Center, LLC, and any business activity related to telemarketing and/or payment processing.

(b)     an order directing that the defendants are permanently enjoined from the unlawful activities described in the Amended Verified Complaint, and that assets sufficient to compensate the victims of the fraud be set aside for restitution to them;

(c)     an order implementing a program of victim restitution for consumers who experienced unauthorized withdrawals from their bank accounts and/or lost funds by PPC's activities on behalf of deceptive PPC merchant-clients;

(d)      the appointment of a receiver to administer the injunction; and

(e)      such other and further temporary, preliminary and permanent relief as is

warranted to prevent injury to the public.

Respectfully,

PATRICK L. MEEHAN
United States Attorney

_____

_____VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division

_____

JOEL M. SWEET
Assistant United States Attorney

_____

MARK ANDERSON
Assistant United States Attorney

Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Tel.  215-861-8200
Fax. 215-861-8349

Dated: July 6, 2006

67

<u>VERIFICATION</u>

I, Jeffrey Braun, am a United States Postal Inspector assigned to the investigation of this matter.  I verify, under penalty of perjury, that the facts in the Amended Verified Complaint are true and correct to the best of my knowledge, and are based upon information obtained by me during an investigation conducted in my capacity as a United States Postal Inspector.


_____
JEFFREY BRAUN
United States Postal Inspector

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 6, 2006, a copy of the foregoing Amended Verified

Complaint for Injunctive Relief was filed electronically and made available to counsel on the

ECF system, and on July 7, 2006, a copy of the same was sent by first class mail to each of the

following:

Peter J. Scuderi, Esquire
1420 Walnut Street
Suite 1000
Philadelphia, PA 19102
FAX: (215) 790-9055

Andrew Lustigman, Esq.
The Lustigman Firm, P.C.
149 Madison Avenue, Suite 805
New York, NY 10016-6713
FAX: (212) 683-9181

Marc Durant, Esquire
Durant & Durant
325 Chestnut Street, Suite 1116
Philadelphia, PA 19106
FAX: (215) 592-9994

Stephen R. LaCheen, Esquire
LaCheen, Dixon, Wittels & Greenberg
1429 Walnut Street, Suite 1301
Philadelphia, PA 19102-3933
FAX: (215) 561-1860

Jack Meyerson, Esquire
Peter A. Greiner, Esquire
1700 Market Street, Suite 3015
Philadelphia, PA 101-3
FAX: (215) 972-0277

Gino J. Benedetti, Esquire
Alexandra C. Gaugler, Esquire
Miller Alfano & Raspanti, P.C.
1818 Market Street, Suite 3402
Philadelphia, PA 19103
FAX: (215) 981-0082

Jami Pearlman
4 Hampshire Drive
Warminister, PA 18974-1279

_____
JOEL M.  SWEET
Assistant United States Attorney