**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CIVIL ACTION** |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **PAYMENT PROCESSING CENTER, LLC,** | : | **NO. 06-0725** |
| et al., | : | |
| Defendants | : | |

**MEMORANDUM OPINION**

**TIMOTHY R. RICE**
**UNITED STATES MAGISTRATE JUDGE**                    **August 14, 2006**

      Claiming the government's use of a civil injunction under 18 U.S.C. § 1345 and its

parallel criminal investigation have placed them in "an extraordinarily difficult spot," defendant

Payment Processing Center, LLC ("PPC") and all individual defendants seek an order compelling

the United States to immunize the individual defendants and preclude use of their testimony in

any subsequent criminal proceeding.  Defendants' petition seeks extraordinary relief implicating

separation of powers issues and is denied for the following reasons.

    I.       Background

      On February 21, 2006, the Hon. John R. Padova, United States District Court

Judge, entered an Amended Temporary Restraining Order ("TRO") under § 1345 enjoining PPC's

business operations and restraining approximately $10.1 million.  The TRO was converted to a

Stipulated Preliminary Injunction Order on April 7, 2006.   The government's Amended Verified

Complaint for Injunctive Relief, filed July 6, 2006, alleges PPC processed $50 million of victims'

"fraud-tainted money" for various merchant-clients engaged in telemarketing, direct marketing, and mail solicitations between April, 2005 and December, 2005.

The government seeks to permanently enjoin defendants from alleged unlawful activities and to preserve sufficient property as restitution for the alleged victims. On July 26, 2006, PPC defendants were granted the right to seek restrained property to pay legal counsel upon a showing that they had insufficient resources to finance their defense. A final hearing on the government's complaint is scheduled for October 5, 2006. The government has filed notice to depose the individual defendants, along with PPC's corporate representatives pursuant to Fed. R. Civ. P. 30(b)(6). Defendants' request that I direct the government to immunize any testimony provided by the defendants individually or in their role as corporate representatives, or face the sanction of dismissing the § 1345 suit. Pending resolution of its immunity request, PPC has refused to produce any witnesses, as required by Rule 30(b)(6).

II.      Discussion

Authority to grant immunity is vested in the Executive branch and "no court has the authority to immunize a witness." Pillsbury Co. v. Conboy, 459 U.S. 248, 260-61 (1983); 18 U.S.C. § 6002, 6003. Central to our constitutional scheme is the principle that "one branch of the Government may not intrude upon the central prerogatives of another," or impair another branch "in the performance of its constitutional duties." Loving v. United States, 517 U.S. 748, 757 (1996) (citations omitted). The constitutional separation of powers is based on the notion that Congress is "most capable of responsive and deliberative lawmaking," the Executive "is designed for prompt and faithful execution of the laws," and the Judiciary maintains "tenure and authority independent of direct electoral control." Id. at 757-58.

2

A court may encroach on the Executive function of immunizing witnesses only in extraordinary circumstances and to avoid a constitutional violation involving prosecutorial misconduct in the immunity process itself.  See United States v. Ebbers, 2006 WL 2106634 at *7, 8 (2d Cir. July 28, 2006) (denying claim that defendant was deprived of a fair trial because the government engaged in selective immunization by withholding immunity from witnesses whose testimony would exculpate defendant).   Thus, for example, the defendant must show the government has used immunity in a discriminatory way, has forced a potential defense witness to invoke the Fifth Amendment through "overreaching," or has deliberately denied "immunity for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation."  Ebbers, 2006 WL 2106634 at *8 (quoting United States v. Diaz, 176 F.3d 52, 115 (2d Cir. 1999)).

The United States Court of Appeals for the Third Circuit has also held that if the prosecution acts with "the deliberate intention of distorting the judicial fact finding process," a court may direct the Executive branch to choose between conferring use immunity[1] on a witness or having its case dismissed.  Government of the Virgin Islands v. Smith, 615 F.2d 964, 968 (3d Cir. 1980) (citing United States v. Herman, 589 F.2d 1191, 1204 (3d Cir. 1978)).  In Smith, the court also delineated "strictly circumscribed authority," United States v. Leary, 2005 WL 1385142 (D. Del. 2005),  from which courts may confer "judicially fashioned immunity," Smith, 615 F.2d at 969, based on a five-factor test requiring proof of clearly exculpatory defense testimony and the

---

[1]  "Use immunity" involves granting immunity from the prosecution's use of compelled testimony and evidence derived therefrom, whereas "transactional immunity" involves granting immunity from prosecution for offenses to which the compelled testimony relates.  See Paul S. Diamond, Federal Grand Jury Practice & Procedure, § 8.02, at 225 (4th ed. 2001) (citing Kastigar v. United States, 406 U.S. 441, 443 (1972)).

absence of a strong governmental interest granting immunity.  Id. at 972.

Smith built upon dicta from United States v. Morrison, 535 F.2d 223, 229 (3d Cir. 1976) and United States v. Herman, 589 F.2d 1191, 1204 (3d Cir. 1978).  See Smith, 615 F.2d at 968.  In Morrison, the court suggested that due process could justify a court directing the government to immunize a key defense witness or risk entry of a judgment of acquittal if a prosecutor engaged in misconduct by harassing a witness into invoking the Fifth Amendment.  Such misconduct, the court noted, would deprive the jury of exculpatory evidence. In Herman, 589 F.2d at 1204, the court recognized the possibility of judicial immunity for an essential defense witness flowing from the due process clause, but rejected its application in that case.  See Smith, 615 F.2d at 966.

Upon this foundation, the court added legal authority recognizing "a defendant's due process right to have exculpatory evidence presented to the jury,"  Smith, 615 F.2d at 970 (citing Chambers v. Mississippi, 410 U.S. 284, 297 (1973)), and the fair trial right to present an effective defense.  Smith, 615 F.2d at 971 (citations omitted).   The court then determined that Simmons v. United States, 390 U.S. 967 (1968) (precluding government's use of a defendant's suppression hearing testimony to establish guilt), provided it with "inherent judicial power to grant witness immunity in order to vindicate constitutional rights."  Smith, 615 F.2d at 971. Accordingly, the court in Smith concluded the judiciary had authority to direct the government to grant immunity to avoid a constitutional violation, as well as inherent authority to confer judicial immunity upon a witness whose testimony is essential to an effective defense.  Smith, 615 F.2d at 969.

Smith, albeit precedential, retains limited vitality.  The Third Circuit has

consistently distinguished the decision or limited it to its facts, which "reeked of prosecutorial misconduct done 'with the deliberate intention of distorting the judicial factfinding process,'" United States v. Sampson, 661 F.Supp. 514, 518 (W.D. Pa. 1987) (citing cases). For example, in United States v. Santtini, 963 F.2d 585, 598 n.6 (3d Cir. 1992), the court recounted its progressively restrictive interpretation of Smith, and recognized Smith's universal criticism by other federal courts. Id. ("other courts of appeals to consider the possibility of a court's inherent authority to immunize a witness have flatly rejected the result reached in Smith"); Diamond, supra, § 8.02(E), at 238 ("although some courts have acknowledged the theoretical possibility that a situation could exist in which the conferral of judicial immunity would be required to ensure a fair trial, others have simply rejected Smith outright"); see generally Curtis v. Duval, 124 F.3d 1, 9 (1st Cir. 1997).[2]

Assuming Smith's recognition of judicial authority to immunize a witness can be reconciled with the Supreme Court's observation that "no court has authority to immunize a witness," Pillsbury, 459 U.S. at 261; accord id. at 254 n.11, Smith's reach is most likely limited to misconduct involving the government's use of the immunity process itself. Such misconduct would include an intentional attempt to distort the fact finding process by harassment or intimidation of potential defense witnesses, or deliberately withholding immunity to conceal exculpatory evidence from the jury, i.e., a governmental distortion of the truth-seeking process at trial. See, e.g. Morrison, 535 F.2d at 229. For example, as the Third Circuit has recognized, the facts in Smith presented "a probable certainty" that a potential defense witness would exonerate

---

[2] Nevertheless, the Third Circuit recently applied Smith in a non-precedential opinion in which it upheld the district court's refusal to direct the government to immunize a defense witness. See United States v. Gaudelli, 134 Fed. Appx. 565 (3d Cir. 2005).

the defendants.  The witness had been mysteriously sequestered by the government after it had

refused to honor a state request to immunize the witness.  See United States v. Lowell, 649 F.2d

950, 965 (3d Cir. 1981).  As the court noted in Smith, such conduct suggested the prosecution

"deliberately intended to keep this highly relevant, and possibly exculpatory, evidence from the

jury."  Smith, 615 F.2d at 969.

       This more limited judicial role in the immunity process has received general

acceptance in the courts, see, e.g. Curtis, 124 F.3d at 9; Ebbers, 2006 WL 210634 at *8, and is

consistent with the constitutional separation of powers, i.e., reserving judicial intervention only

when necessary to address a constitutional violation that distorts the fact finding process.

       Moreover, this approach recognizes the inherent difficulties created with any grant

of immunity, which the Executive is uniquely qualified to assess.  A subsequent prosecution of an

immunized witness imposes a "heavy burden" on the prosecution to prove all of the evidence it

proposes to use in the criminal prosecution "was derived from legitimate independent sources."

Kastigar, 406 U.S. at 461-62; accord United States v. Hubbell, 530 U.S. 27, 40 & n.22 (2000).

This standard often renders subsequent criminal prosecutions difficult since "the government must

prove in every particular, and the trial court must explicitly find, that each of the prosecution's

witnesses is free from taint."  See Diamond, supra, § 8.02(C), at 230 (citing United States v. North,

920 F.2d 940 (D.C. Cir. 1990)).[3]  Assessing the risks and strategy involved in the decision to

immunize a witness falls within the special province of the Executive branch, which is charged

with enforcing the law, and the federal grand jury, which has investigative powers and charging

---

     [3]  The court in Smith failed to fully appreciate the significant burdens inherent in a
Kastigar proceeding.  See Smith, 615 F.2d at 973 (use immunity is "virtually costless to the
government").

authority.  See Diamond, supra, § 1.01, at 1 (discussing the grand jury's "extraordinary" investigative power).

Here, the PPC defendants have cited no constitutional violation implicating a deliberate intent to distort the judicial fact finding process.  Nor have they alleged, even under the broadest reading of Smith, that judicial intervention is mandated to immunize a witness with clearly exculpatory testimony and the government has no countervailing interest in opposing such immunized testimony.  Rather, they allege, the government's parallel use of criminal and civil remedies is unfair and places them in an untenable position of damaging their ability to effectively defend the civil case or risking possible self-incrimination during a criminal probe.  This claim fails to merit the extraordinary remedy of judicially conferred immunity or intruding on the Executive's immunity decision.

The PPC defendants must live with the consequences of their choice.  If questioned in the § 1345 action, they may assert their Fifth Amendment right not to incriminate themselves, but if they do, the factfinder, Judge Padova, is entitled to draw an adverse inference from the assertion.  Baxter v. Palmigiano, 425 U.S. 308, 318-20 (1976).  The result is the same even if PPC elects to designate individual defendants as its corporate representatives under Rule 30(b)(6).  PPC has no Fifth Amendment rights, see Braswell v. United States, 487 U.S. 99, 116 (1988), but the individual defendants may assert a Fifth Amendment right in their personal capacity.  See Curcio v. United States, 354 U.S. 118, 121 (1957) (individual representative of collective entity cannot be compelled "to condemn himself by his own oral testimony").  However difficult the dilemma defendants face, it is one Congress envisioned and the Constitution allows.  By enacting § 1345, Congress intended to prevent alleged fraud schemes by arming prosecutors with broad

equitable civil injunctive remedies to preserve the status quo during an ongoing criminal investigation.  This case involves just such a scenario.

Nevertheless, the PPC defendants maintain that in similar contexts, courts have made special efforts so defendants "should not be compelled to choose between the exercise of their Fifth Amendment privilege and the substantial sums of money which are the subject of this" civil action.  See Defendant's Br. at 6 (citing United States v. U.S. Currency, 626 F.2d 11, 15 (6th Cir. 1980).  Defendants rely on a series of civil forfeiture and tax collection cases in which courts crafted procedures, such as protective orders, to accommodate defendants who sought to exercise their Fifth Amendment rights.  See, e.g., United States v. Certain Real Property and Premises, 55 F.3d 78, 83 (2d Cir. 1995); United States v. Parcels of Land, 903 F.2d 36, 44 (1st Cir. 1993); Shaffer v. United States, 528 F.2d 920 (5th Cir. 1975).

These authorities do not justify the extraordinary relief defendants seek.  For example, in U.S. Currency, 626 F.2d at 16, which involved the forfeiture of gambling proceeds, the government had suggested on appeal that it may consider granting immunity to avoid dismissal of its forfeiture case; the court did not order the government to confer immunity, as the PPC defendants propose.  Moreover, the court explained, its decision to explore options to accommodate defendants' Fifth Amendment interests was limited to the "posture of a forfeiture proceeding, in which the defendant actually has the burden of proof."  Id. at 15.   In United States v. Certain Real Property and Premises, 55 F.3d at 83, the court also emphasized the unique nature of civil forfeiture proceedings in crafting procedures to protect a claimant's Fifth Amendment rights.  It recognized the tension between self-incrimination concerns and the right to testify "may be especially acute for claimants in civil forfeiture proceedings" who bear the burden of proof but

8

also face criminal prosecution for the conduct underlying the forfeiture.  Id.; accord United States v. Parcels of Land, 903 F.2d at 44 (protective order entered to accommodate a claimant's interest in a forfeiture proceeding).[4]

To the extent these cases suggest courts must accommodate all defendants in any government-initiated civil suits, see Certain Real Property and Premises, 55 F.3d at 84 & n.5 ("courts should seek out those ways that further the goal of permitting as much testimony as possible to be presented in the civil litigation"), the PPC defendants do not warrant such relief because the government – not the PPC defendants – retains the burden of persuasion in its § 1345 complaint.  Although defendants' Fifth Amendment assertion is not without cost, it will not preclude defendants from meeting a statutory burden, as it would in the forfeiture cases defendants cite.

Thus, judicial intervention to accommodate defendants' Fifth Amendment concerns is properly limited to litigation in which defendant has the burden of persuasion.  For example, in United States v. Perry, 788 F.2d 100, 115 (3d Cir. 1986), the Third Circuit recognized

---

[4]  The other case relied upon by defendants, Shaffer, 528 F.2d at 921, involved a taxpayer's suit for refund of a wagering tax assessment. The court concluded the taxpayer's suit should not have been dismissed when the taxpayer refused to be deposed after invoking his Fifth Amendment rights.  Rather, the court suggested, the government should seek immunity or risk dismissal.  Id. at 922. This decision was entered before the Supreme Court's decision in Baxter, which recognized the less draconian remedy of permitting an adverse inference instead of an outright dismissal of defendant's refund suit.  Moreover, the court in Shaffer expressed concern that the government's tax assessment procedure had "been instituted to coerce the taxpayer to incriminate himself." Id.  That concern is not present here.  There is no suggestion the government has somehow misused § 1345's civil injunction tools to coerce defendants into incriminating themselves.  See, e.g. United States v. Kordel, 397 U.S. 1, 12 (1970) ("We do not deal here with a case where the government has brought a civil action solely to obtain evidence for its criminal prosecution").

that the burden-shifting provisions in the Bail Reform Act, 18 U.S.C. 3145, which required the defendant to rebut a presumption of dangerousness, put the defendant in the "position of risking self-incrimination or suffering the grave civil disability of preventive detention."  Nevertheless, the availability of immunity to protect a testifying defendant from self-incrimination allowed the court to hold that § 3145 did not violate the Fifth Amendment's due process and self-incrimination clauses.  Id. at 116.  The decision in Perry was grounded on the rationale of Simmons, 390 U.S. at 393-94, which precluded a defendant's testimony in support of a Fourth Amendment suppression claim from being used against him to prove his guilt.  Id. at 115.

In Simmons, 390 U.S. at 394, the Court noted a defendant seeking to testify in support of a suppression motion faced the dilemma of either giving up a Fourth Amendment right or waiving his privilege against self-incrimination.  Accordingly, the Court precluded the government from using testimony at a suppression hearing directly against a defendant to establish guilt.  Id.  The Court contrasted the dilemma the defendant confronted in Simmons with the result in civil litigation, where a defendant who testifies for his own benefit enjoys no protection if the government seeks to use defendant's statements in a subsequent criminal prosecution.  Id. at 394 n.23.

Although Simmons rationale has been questioned by the Court, see McGautha v. California, 402 U.S. 183, 212 (1971),[5] the Third Circuit has continued to rely on its reasoning to

---

[5]  In McGautha, 402 U.S. at 212, the Court declined to apply the Simmons rationale to a state death penalty procedure that combined the guilt and penalty phase in a single proceeding. The defendant had argued he was unfairly forced to relinquish his right to testify in the penalty phase by invoking his constitutional right not to testify in the guilt phase.  The Court noted that the criminal process, like the rest of the legal system, is replete with situations requiring "'the making of difficult judgments.'"  Id. at 213 (quoting McMann v. Richardson, 397 U.S. 759, 769 (1970)).

accommodate defendant's who risk waiving Fifth Amendment rights to satisfy their burden of persuasion.  In United States v. Pavelko, 992 F.2d 32, 34 (3d Cir. 1993), the court precluded the government in the guilt phase of trial from using defendant's testimony required to qualify for court-appointed counsel.  Like the defendant in Simmons, the court held that the defendant in Pavelko faced a choice between waiving his right to counsel or his privilege against self-incrimination.  Id.[6]

Here, however, the PPC defendants face no such constitutional dilemma and they are not precluded from testing the government's proof and offering evidence to rebut such proof. Requiring defendants in a civil suit to choose between proceeding without the benefit of their own immunized testimony and invoking their Fifth Amendment privilege does not compromise a constitutional right.  Cf. Williams v. Florida, 399 U.S. 78, 83-84 (1970) ("choosing between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination").

This rationale also supports the denial of defendants' alternative requests that the § 1345 proceedings be sealed or that I issue a protective order barring the Department of Justice from using defendants' testimony in a criminal proceeding.  The net effect of these requests is the same: defendants' statements in the civil suit are effectively immunized since the government will be unable to use any statements, even for impeachment as permitted by the Simmons rationale. As a result, the government would be confronted with dealing with a Kastigar hearing if it opted

---

[6]  Tying the judiciary's limited role in the immunity process to the Simmons burden-shifting context is also consistent with the Third Circuit's basis for conceiving the judiciary's inherent authority to confer immunity.  Smith's rationale was built upon dicta from Herman, which based the judiciary's inherent authority to confer immunity on the reasoning of Simmons. See Herman, 589 F.2d at 1204.

to bring subsequent criminal charges against individual defendants.[7]

Finally, the government suggests a stay of the civil proceedings pending conclusion of the criminal investigation is a viable alternative to defendants' request for immunity or a protective order.  Although such action is authorized pursuant to the court's inherent authority, Landis v. North American Co., 299 U.S. 248, 254-55 (1936), defendants have not requested a stay, nor does it appear appropriate in this case.  A stay would give the government all, or a significant portion of, the relief it ultimately hopes to obtain if it prevails at the October 5, 2006 hearing on its § 1345 complaint.  A stay would allow the preliminary injunction to continue indefinitely and the merits of the government's complaint would remain unresolved.  Section 1345 contemplates preserving the status quo pending completion of a criminal investigation; a stay would accomplish the same objective and will not be entered absent a defense request.

An appropriate Order follows.

---

[7] Sealing the proceeding would also violate the public's right of access to court proceedings in this significant matter and would be inconsistent with the mandate of Pansy v. Borough of Stroudsburg, 23 F.3d 772, 781 (3d Cir. 1984).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PAYMENT PROCESSING CENTER, LLC,** | : | **NO. 06-00725** |
| **ET AL.** | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 14th day of August, 2006, upon consideration of defendants'

Motion to Preserve Individuals' Fifth Amendment Rights and the government's response thereto,

it is hereby ORDERED that the motion is DENIED for the reasons set forth in the attached

memorandum.


BY THE COURT:


 /s/ Timothy R. Rice
TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE