**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| PAYMENT PROCESSING CENTER, LLC, | : | NO. 06-00725 |
| et al., | : | |
| Defendants | : | |


**<u>MEMORANDUM OPINION</u>**


**TIMOTHY R. RICE**
**UNITED STATES MAGISTRATE JUDGE**                    **November 8, 2006**


Wachovia Bank, N.A. ("Wachovia") claims it owns $1,903,600 held in various accounts of its customer, defendant Payment Processing Center, LLC ("PPC"). The funds are included in approximately $10 million restrained by the Hon. John R. Padova, U.S. District Court Judge, based on the government's claim that PPC engaged in fraud as a processor of unlawful telemarketing payments. Because the government bears the burden of proving it restrained alleged fraud proceeds of PPC, it must establish the restrained property belongs to PPC and not Wachovia. <u>See</u> <u>United States v. Payment Processing Center, LLC</u>, 435 F.Supp.2d 462, 469 (E.D. Pa. 2006). For the following reasons, I find by a preponderance of the evidence the government has met its burden as to $1,043,492 of the contested funds. Wachovia's motion will be granted in part and denied in part.

  I.      Overview

Resolution of who owns the funds implicates the concept of provisional banking

credits under the Uniform Commercial Code ("UCC"), as codified at 13 Pa. Cons.Stat.Ann. §§ 1101, et. seq., because Wachovia provisionally credited PPC's account in the amount of demand drafts, also known as "remotely created checks," deposited in PPC's account from third-party telemarketing transactions.[1]  Pursuant to the UCC, Wachovia was required to give PPC only a provisional credit for drafts deposited that have not yet been paid, see 13 Pa. Cons.Stat.Ann. § 4201(a), and such credit may be revoked at any time before the deposit becomes final.  Id.; § 4214(a).  Thus, when a deposit item provisionally credited is later dishonored or suspended, Wachovia may charge-back the credit and obtain a refund from PPC, its customer.  Since Judge Padova entered the TRO on February 21, 2006, payor banks have dishonored $2,083,642 in drafts Wachovia had credited to PPC's account.

Based on the assumption that a deposited draft will be paid by the drawer, Wachovia provisionally placed the value of the draft into a PPC account.  The draft was then forwarded to a bank clearinghouse or transferor bank for collection.  The value of the draft was then shifted from the clearinghouse account of the payor bank, i.e., the bank that had been instructed to pay the draft, see § 4105, to the clearinghouse account of the depositary bank, i.e., Wachovia.  Unless the payor bank timely revoked the provisional credit under § 4301 of

---

[1]  The unsigned drafts are considered "remotely created" because they were prepared by PPC using a consumer's bank routing number and account information that had been obtained by telemarketers.  See generally 12 C.F.R. § 229.2(fff) ("remotely created check means a check that is not created by the paying bank and that does not bear a signature applied, or purported to be applied, by the person on whose account the check is drawn") (effective July 1, 2006).  PPC processed the allegedly fraudulent transaction by making the draft payable to the telemarketer and depositing it into PPC's Wachovia accounts.  After deducting its payment processing fee, PPC returned the balance of the draft to the telemarketer.  The government alleges PPC engaged in fraud involving its processing of more than $142 million for telemarketers between April, 2005 and December, 2005.

Pennsylvania UCC, the payor bank is deemed to have finally paid the draft and is accountable to the depositary bank for the full amount.  See generally NBT Bank, Nat. Ass'n v. First Nat'l Community Bank, 393 F.3d 404, 407-18 (3d Cir. 2004).  Thus, the provisional credit follows the PPC bank draft from bank to bank until settlement of the draft becomes final.

Wachovia claims its provisional credits never became final, i.e., "finally settled" under the UCC as the property of PPC, because the payor banks refused to honor many of the drafts deposited at Wachovia for a variety of reasons, some of which related to potential fraud, such as unauthorized use of a consumer's account.  In addition, Wachovia maintains its depository agreement with PPC allowed settlement of the credits to remain "provisional," or temporary, and therefore the credits never became property of PPC.  When the drafts were dishonored, Wachovia credited the payor banks and it is now seeking to recoup those funds from PPC by exercising its contractual right to "charge-back" PPC accounts restrained by Judge Padova's § 1345 restraining order.  Under § 4214(a), a charge-back is a mechanism for a bank to obtain a refund from its account holder for dishonored checks that had been credited to a customer's account.

The government opposes Wachovia's request because it obtained a court order restraining PPC's accounts in February, 2006 -- before Wachovia was notified that payor banks had dishonored the drafts.  Thus, finality of Wachovia's credits to PPC's account is critical to Wachovia's attempt to access the restrained PPC funds.  If Wachovia's credits to PPC's accounts never became final, the government cannot restrain the contested funds as the property of PPC.

Processing remotely created checks, or demand drafts, has created special problems, especially for banks dealing with telemarketers, who purport to have obtained the

3

consumers' authorization to debit their account.  See generally Clark & Clark, The Law of Bank Deposits, Collections and Credit Cards, § 10.02[2] (2005).  The problem is exacerbated here because PPC is acting as the payment processor for telemarketers – further removing Wachovia from its relationship with the party that purportedly obtained the consumer's authorization to issue drafts.  Many of the underlying issues involving who bears the risk of loss for demand drafts were not contemplated by the UCC and are not easily reconciled with the concept of final settlement of items in the banking system.  For example, because there is no customer's signature on the draft, often it is impossible for the payor bank to detect fraud based on an inspection of the draft itself, especially in the fast-paced world of automated overnight check clearing in the national banking system.[2]

        For the following reasons, the government has established that Wachovia's provisional credits were "finally settled" under the UCC, thereby conferring ownership of the contested funds to PPC.  Wachovia's separate contractual agreement with PPC to vary the effect

---

[2] The issue of liability among banks for remotely created checks was addressed in amendments to Regulation CC, 12 C.F.R. § 229.31, et. seq., effective July 1, 2006 – after the contested conduct in this case.  Under the new regulation, liability for unauthorized remotely created checks has been shifted from the payor banks to the depositary banks (where the checks were deposited).  The underlying rationale for the amendment was that the depositary bank is in the best position to detect fraud by its customer, which has made the contested deposits.  See 70 Fed. Reg. 71218 (Nov. 28, 2005) (to be codified at 12 C.F.R. pts. 210, 229), 2005 WL 3142367 (Nov. 29, 2005) (final Rule adopted by the Board of Governors of the Federal Reserve System).

        Although the 2006 amendments to Regulation CC address liability among banks for dishonored remotely issued checks, they would not control Wachovia's claim even if the amendments had been effective in February, 2006.  First, Wachovia's claim involves a dispute with its customer, PPC.  Second, Regulation CC does not affect the finality rules of the UCC.  See 70 Fed. Reg. 71218, 2005 WL 3142367 at *7 (explaining why Federal Reserve rejected proposals to alter the finality rules by extending the UCC's midnight deadline for remotely issued checks).

of the UCC, as permitted under 13 Pa. Cons.Stat.Ann. § 4103(a), gave Wachovia only a legal

right against PPC, i.e., an expanded right to charge-back PPC's account for the amount of the

dishonored checks, but did not affect the finality of Wachovia's credits to PPC's account.

Accordingly, I credit the view of the government's expert, Professor Amelia Helen Boss,[3] who

correctly summarized the interplay between the UCC's finality rules and the parties' agreement

to expand Wachovia's legal rights against PPC as follows:  although the determination of finality

under the UCC determines the right to charge-back an account, a separate contractual right to

charge-back does not determine the underlying finality of a credit.

## II.  Threshold Questions

First, the parties disagree on the legal standard governing the government's

burden of persuasion.  The government contends it must establish PPC's ownership by probable

cause, i.e., facts establishing a reasonable ground for relief, or evidence proving a proposition by

a fair probability.  See Maryland v. Pringle, 540 U.S. 366 (2003).  Wachovia, meanwhile, asserts

the government must meet its burden by a preponderance of the evidence, i.e., facts proving a

proposition is more likely than not true.  See Bourjaily v. United States, 483 U.S. 171, 175

(1987).  The standard of proof serves to "allocate the risk of error between litigants and to

indicate the relative importance attached to the ultimate decision."  Addington v. Texas, 441 U.S.

418, 423 (1979).  Monetary disputes between private parties are governed by the preponderance

of the evidence standard, under which litigants share the risk of loss in roughly equal fashion.  Id.

at 423-24.  Since this case involves a challenge to property ownership, which is similar to a

---

[3]  Professor of Law, Temple University School of Law; member of the Permanent
Editorial Board of the UCC.

monetary dispute, the preponderance of the evidence standard applies.

Some confusion arises, however, because in a § 1345 action, the government must establish probable cause, i.e., a fair probability, that the restrained property related to alleged fraud.[4]  Section 1345's probable cause standard, however, does not govern the threshold issue whether the property in question belongs to the defendant, as opposed to a third party with no connection to the alleged fraud.  Moreover, the probable cause inquiry is traditionally reserved for ex parte proceedings, including arrest warrants, search warrants, and § 1345 complaints; not for civil disputes over legal title to property.  Accordingly, a higher standard of proof is merited for Wachovia's claim, which involves a dispute over property ownership.  See Addington, 441 U.S. at 423-24; cf. Brinegar v. United States, 338 U.S. 160, 173-74 & n.12 (1949) (noting the substantial differences between the nature of proof and type of tribunals which determine probable cause to arrest or search as opposed to those which determine guilt in a criminal case).

Second, the government maintains my analysis should be limited to the funds in only one of PPC's Wachovia accounts -- account 797 -- which received 12,570 bank drafts totaling $1,355,560.  It maintains the remaining checks, totaling $548,040, in three other PPC accounts, fall outside Wachovia's claim in this case.  I disagree.  Wachovia asserted an ownership interest in $2,083,642 regardless which account held the funds.  Although the parties initially believed the entire balance was held in account 797 and I ruled accordingly, see Payment Processing Center, 435 F.Supp.2d at 463, 468, the underlying ownership issue remains the same even if the contested funds are held in other accounts.  As evidenced by the government's

---

[4]  Although the defendants have not conceded that probable cause is the proper standard for § 1345 injunctions, they have not challenged the validity of the government's property restraint on that basis.

summary of the 18,123 bank drafts, the dishonored drafts implicated four Wachovia accounts.[5]

Accordingly, I deny the government's request to limit this case to account 797.

Third, following the hearing, the government conceded that even under Professor

Boss' view of ownership of the contested funds, the government cannot establish a large portion

of the provisional credits to PPC's accounts became final under the UCC.  Thus, on November 1,

2006, I entered a consent order allowing Wachovia to charge-back $513,625 from account

xxxxxxxxxx797.  The amount represents the value of 5,171 checks that Professor Boss opined

were most likely provisional based on the brief time period (less than seven days) in which

Wachovia received notice the checks had been dishonored.  My analysis, therefore, deals with the

remaining balance of 12,952 checks totaling $1,389,975 from account 797 and three other PPC

accounts at Wachovia.[6]

III.    Discussion

Following a two-day hearing on October 17-18, 2006, featuring detailed testimony

from two eminent and highly qualified experts in the fields of banking law and the UCC, the

parties agree that resolution of Wachovia's claim involves a purely legal question concerning

when the contested credits were finally settled under the UCC.  Although the experts offered

largely conflicting views of the controlling law and its application, they agree that pinpointing

---

[5]  The parties have agreed that an additional $260,705 Wachovia had originally contested is no longer at issue.

[6]  The parties had initially agreed the contested funds were in account 797 and totaled $2,083,642.  At the hearing, however, the witnesses agreed their analysis was based on 18,123 checks totaling $1,903,600. My decision involves only the lesser amount.  The discrepancy apparently arose because some of the checks, totaling $180,042, were in the possession of PPC and not included in Wachovia's document production to the government.

precise ownership of the funds related to the 18,123 bank drafts deposited in PPC's accounts is a

daunting task.  As the Comment to § 4104 of the UCC acknowledges, "it is frequently difficult or

unnecessary to determine whether a particular action is tentative [i.e., provisional] or final or

when a particular credit shifts from the tentative class to the final class."  See Comment 10 (tied

in with the concept of provisional credits is the related question of when an item is "'finally paid'

either to determine the relative priority of the items . . . or in insolvency situations").

> "Finality" is described in § 4214(a), which provides:
>
> If a collecting bank has made a provisional settlement with its
> customer for an item and fails by reason of dishonor, suspension of
> payments by a bank or otherwise to receive settlement for the item
> which is or becomes final, the bank may revoke the settlement
> given by it, charge back the amount of any credit given for the item
> to the account of its customer, or obtain refund from its customer,
> whether or not it is able to return the item, if by its midnight
> deadline or within a longer reasonable time after it learns the facts
> it returns the item or sends notification of the facts.  If the return or
> notice is delayed beyond the bank's midnight deadline or a longer
> reasonable time after it learns the facts, the bank may revoke the
> settlement, charge back the credit or obtain refund from its
> customer, but it is liable for any loss resulting from the delay.
> These rights to revoke, charge-back and obtain refund terminate if
> and when a settlement for the item received by the bank is or
> becomes final.

Id.  The 1990 Comment to the UCC recognized that in most cases banks "make provisional

settlement for items when they are first received and then await subsequent determination of

whether the item be finally paid."  See Comment 1.  Thus, provisional settlements become "final

simply with the lapse of time."  Id.  The bank's right to charge-back the customer's account for a

provisional settlement, i.e., obtain a refund of the credit it extended based on the deposit to the

customer's account, "terminates if and when a settlement received by the bank for the items is or

becomes final."  See Comment 3; Clark & Clark, The Law of Bank Deposits, Collections and

Credit Cards, § 6.01 (2005) (payee receives provisional credit upon deposit of item but upon final

payment by payor bank the "provisional credits firm up into final settlement").

   As between the payor bank (which is instructed to pay the draft) and the

depositary bank, Wachovia (where the drafts were deposited), § 4215 outlines when an item is

"finally paid."  It provides:

> **(a) When item is finally paid by payor bank. --** An item is
> finally paid by the payor bank when the bank has first done any of
> the following:
>   (1)  Paid the item in cash.
>   (2)  Settled for the item without having a right to revoke the settlement
> under statute, clearinghouse rule or agreement.
>   (3)  Made a provisional settlement for the item and failed to revoke the
> settlement in the time and manner permitted by statute, clearinghouse rule or
> agreement.

Sections 4301 and 4302 explain that final payment normally occurs before midnight of the

banking day of receipt.  Section 4301 provides:

> **(a) Return by payor bank of item provisionally settled. --** If a
> payor bank settles for a demand item . . . the payor bank may
> revoke the settlement and recover the settlement if, before it has
> made final payment before its midnight deadline, it:
>   (1) returns the item; or
>   (2) sends written notice of dishonor or nonpayment if the item is
> unavailable for return.

Accord § 4104(a) ("Midnight deadline," with respect to a bank, is midnight on its next banking

day following the banking day on which it receives the relevant item or notice or from which the

time for taking action commences to run, whichever is later.).  The general rule under the UCC is

that "failure to act on a check by the midnight deadline makes the payor bank strictly

accountable."  See Clark & Clark, supra, at § 6.01[1],[3].   Drafts returned after the midnight

deadline still may be dishonored at some later date, e.g., based on information from the account holder contesting authorization, but the bank's remedy is for a breach of warranty for the value of the dishonored draft, lost interest, and expenses.  See § 4208.  The UCC's midnight deadline is a "mechanical" rule that ensures "uniformity and definiteness" for establishing when a provisional settlement may be revoked in the normal course of bank processing.  See § 4104 Comment 9.  It is  "the last milestone for final payment" in which "provisional settlements become final simply because of the passage of time."  See Clark & Clark, supra, at § 6.01[3][d].

From these statutory provisions, Wachovia's expert, Barkley Clark, Esquire[7] has extrapolated that the UCC has built in "a strong linkage between 'provisional' settlement and the bank's right to charge the item back to the customer upon return.  The customer's claim to the deposited funds depends on the strength of the depositary bank's right of charge-back."  See Report of Barkley Clark at 2.  Clark further asserts that the UCC presumes the payor bank has met its midnight deadline, and that a federal regulation, rule, or other agreement can extend the UCC's midnight deadline.  Finally, Clark asserts that pursuant to § 4103, Wachovia and PPC properly varied the UCC's charge-back rules in their depository agreement, see Wachovia Exh. 2, by extending Wachovia's right to charge-back PPC's account beyond the midnight deadline. See Clark Report at 6.

As evidenced by his highly regarded treatise, Clark provides invaluable insight into what he acknowledged is the "tricky" question of finality and ownership for the remotely created drafts in this case.  Nothing in his treatise, the UCC, the federal rules, or federal

---

[7] Co-author of The Law of Bank Deposits, Collections and Credit Cards, and an experienced lecturer, author, and practitioner in banking law.

regulations, squarely resolves the precise issue in this case.  Despite Clark's expertise in the field, his conclusions go too far in extending the provisional nature of the credits Wachovia granted PPC.  His view of a provisional credit would preclude a finality determination for as long as 90 days and would undermine the UCC's goal of achieving finality and definiteness for banks processing financial transactions.  See Clark & Clark, supra, § 6.01[3][d] (Rule that "a check is 'finally paid' by running of midnight deadline facilitates commerce"; upon passage of midnight deadline, payees and holders of checks know that they are safe after passage of a relatively short time").  As recently as the 2006 amendment to Regulation CC, the Board of Governors of the Federal Reserve System reaffirmed the significance of the UCC's finality rule and its midnight deadline as "fundamental and valuable features of the check collection process."  See 70 Fed. Reg. 71218, 2005 WL 3142367 at *8.

Even assuming a presumption that the payor banks met their midnight deadline in returning the drafts and revoking settlement of the items, the government has rebutted the presumption for any draft in which Wachovia learned it was dishonored more than ten days after the draft was issued.[8]  Professor Boss opined that notice to Wachovia more than 31 days after a dishonored draft was issued established a "high probability" of finality, and that notice to Wachovia between 11 and 31 days after the draft was issued established a "very good probability" of finality.  Such evidence is sufficient to rebut the presumption outlined by Clark that the payor banks met the midnight deadline for those checks.  A period of more than 10 days is a sufficient lapse of time to establish the drafts were returned to Wachovia outside the normal

---

[8]  The government's summary witness, Michael Scott, of Kroll Associates, sorted the dishonored drafts based on the length of time that had elapsed between the date of the draft and the date Wachovia issued PPC an "advice" notice that the draft had been dishonored.

computerized processing system, i.e., beyond the "midnight deadline," based on some defect on the face of the draft.

Moreover, the other factors cited by Clark and Professor Boss possibly impacting the settlement's finality become less relevant as the passage of time increases.  This is because returns processed through automated banking systems are known as "with entry" returns,[9] through which the basis for revoking settlement is usually apparent from the face of the draft well within the ten-day window described by Professor Boss.  An example would be a draft drawn on an account containing insufficient funds.  See NBT Bank, 393 F.3d at 407-08 (disputed check was returned before midnight deadline based on absence of sufficient funds in account on which check was drawn).  Returns dishonored after the midnight deadline are based on a breach of warranty, see § 4208, identified by customers or bank employees, e.g., forgeries, unauthorized signatures, which does not impact the finality of the settlement, but does create issues involving who bears the risk of loss for the dishonored item.  See, e.g. July 1, 2006 Amendment to Regulation CC.

Thus, issues such as the manner in which the check was forwarded for collection, the payor bank's practices and relevant "banking day," the precise dates and time the checks were dishonored, and compliance with banking system rules, become less important to the question of finality with the passage of time.  In fact, the parties recognize that many of these facts relating to the precise date and times the drafts were processed are nearly impossible to determine for all 18,123 checks because the drafts were processed through numerous payor and clearinghouse

---

[9]  The parties agree that all drafts in this case involved "with entry" returns of checks through the automated check processing system, as opposed to manual returns of dishonored checks, which typically occur at a later date and are described as "without entry."

banks.  As a result, the parties concede that the dates used by Kroll Associates constituted the

best evidence readily available to either party for ascertaining the drafts' settlement status in this

case.[10]

      I conclude by a preponderance of the evidence, therefore, that any draft

dishonored more than ten days after the draft date constitutes property of PPC, not Wachovia,

because it is more likely than not that Wachovia's provisional credit became final during that ten-

day window.  The government has established its right to restrain $1,043,492, see Exh. C

(categories 1 and 2A).  Nevertheless, Wachovia may charge-back PPC accounts in the amount of

$352,760, id. (category 2B), because those drafts were returned less than 11 days after issuance

and more than likely retained their status as provisional credits.  Although Professor Boss opined

that the $352,760 in drafts returned between eight to ten days "could be final," she expressed less

confidence in her analysis concerning those drafts.  She failed to justify with persuasion why her

August 15, 2006 expert report had established a ten-day cutoff, whereas her October, 2006 trial

testimony reduced the cutoff date to eight days.  Moreover, Boss' ten-day cutoff is consistent

with the testimony of Wachovia's Vice President for Deposit Risk Operations, Linda Mill, who

said Wachovia considers checks "finally paid" after a period of seven to ten days has elapsed.

---

[10]  Although the government has the burden of persuasion, Wachovia -- as one of the
nation's major financial institutions -- was in the best position to identify evidence within the
national banking system that could have rebutted the government's evidence on how and when
the contested drafts were processed.  Indeed, Wachovia said it had fulfilled its pledge to
cooperate by supplying the government with all records relevant to "pinpoint the finality of any
provisional credits."  See Payment Processing Center, 435 F.Supp.2d at 470 n.9  Further, I note
that Wachovia's expert, Clark, had previously represented Wachovia as its legal counsel and had
served as a consultant for Wachovia's predecessor.  Clark's relationship with Wachovia
demonstrates the breadth of his knowledge concerning Wachovia's banking systems and
practices.

Absent controlling law on this complex question, a ten-day cutoff gives banks sufficient

flexibility to comply with the midnight deadline to justify a finding of finality in this case.

    Wachovia nevertheless maintains Regulation CC, 12 C.F.R. § 229.29-43, operates

to extend the midnight deadline, thereby affecting the final settlement of PPC's drafts.  As Clark

properly noted, § 4103(a)-(b) provides that "Federal Reserve regulations" are to be treated as

agreements that may vary the effect of terms of the UCC.  See generally NBT Bank, 393 F.3d at

415 (Regulation CC indisputably binds the parties pursuant to its own terms and § 4103(a)-(b)).

Regulation CC, however, does not apply here because its focus concerns rules governing the

expeditious return of checks and implementing the Expedited Funds Availability Act, 12 U.S.C.

§ 4001 et. seq., which was enacted to ensure customers received prompt access to their funds.

See generally Clark & Clark, supra, § 6.02[1][b] (payor bank "could find itself in a real pickle if

it guided its behavior according to the rules of Regulation CC and totally forgot the midnight

deadline" under the UCC).  Moreover, "courts should use a strong presumption that

clearinghouse rules are not intended to expand the midnight deadline" of the UCC.  See id. at

§ 6.02[2][h].  To the extent Regulation CC varied the effect of the UCC's midnight settlement

deadline, as Clark maintains it does here, it would not impact this case because Regulation CC's

time extensions are limited to four days – well within the 11-day period used to measure the

settlement in this case.  See 12 C.F.R. § 229.30(a)(1).

    Similarly, the July 1, 2006 amendments to Regulation CC establish that the pre-

amendment version of Regulation CC does not support Wachovia's position.  Although the

Federal Reserve Board of Governors amended Regulation CC to shift liability for dishonored

remotely issued checks from the payor bank to the depositary bank, the Board expressly rejected

suggestions that the UCC's midnight deadline should be extended to address the risk of remotely

issued checks.  The Board explained:

> Because the Board believes that finality of payment and the
> discharge of the underlying obligation are fundamental and
> valuable features of the check collection process, the final rule
> does not make any adjustments to the midnight deadline.  Until
> otherwise established by agreement, banks must assert claims
> arising under transfer and presentment warranties for remotely
> created checks outside the check collection process.

See 70 Fed. Reg. 71218, 2005 WL 3142367 at *8 (one alternative the Board rejected "was

whether the Board should extend the UCC midnight deadline for paying banks that return

unauthorized remotely created checks to give the paying bank more time to determine whether a

particular check was authorized").

As a result, the Board amended Regulation CC to require that depositary banks

warrant to other banks in the collection chain that the remotely issued check was authorized by

the person on whose account the check is drawn.  The Board noted:

> The warranties are given only by banks and only to subsequent
> banks in the collection chain.  The warranties ultimately shift
> liability for the loss created by an unauthorized remotely created
> check to the depositary bank.  The depositary bank cannot assert
> the transfer and presentment warranties against a depositor.
> However, a depositary bank may, by agreement, allocate liability
> for such an item to the depositor and also may have a claim under
> other laws against that person.

See 70 Fed. Reg. 71218, 2005 WL 3142367 at *21.  Moreover, the Board noted 19 states had

enacted UCC revisions to address issues created by remotely created checks; Pennsylvania has

not done so.  See id. at *4-5.

Nor does the decision in NBT Bank, 393 F.3d 404, support Wachovia's position.

15

In <u>NBT Bank</u>, the disputed check was timely dishonored by the midnight deadline as part of a check fraud involving an overdrawn account.  In returning the check to NBT Bank, however, the payor bank erroneously encoded a magnetic strip with the routing number of an unrelated bank and not the routing number of NBT, the depository bank.  <u>Id.</u> at 407-08.  NBT Bank alleged Regulation CC required proper encoding and the payor bank should be liable for the amount of the dishonored check because NBT did not receive the dishonored check until three days after the midnight deadline.

The Court rejected NBT Bank's claim because the payor bank had taken steps to give NBT Bank actual notice by telephone and through a telecommunications service of the dishonored check before the midnight deadline even though the encoding error delayed timely return of the actual check, as required by Regulation CC.  <u>Id.</u> at 408.  In denying NBT's claim, the Court reasoned that even if under the UCC the encoding error meant the payor did not properly revoke its provisional settlement and the check was "finally paid," <u>see</u> <u>id.</u> at 414, Regulation CC precluded NBT Bank from holding the payor bank strictly liable for the check. The court reasoned that damages are measured under Regulation CC and NBT Bank had suffered no actual loss since it had received actual notice of the dishonored check despite the encoding error.  <u>Id.</u> at 414-15.  At no point, however, did the Court cite Regulation CC as altering the UCC's rule on when a provisional settlement becomes final.  Rather, the Court read the UCC as not requiring a payor bank to be held strictly accountable for a dishonored check based on its failure to comply with Regulation CC's encoding requirements, absent actual damages.  <u>Id.</u> at 418.

Wachovia also asserts that Rule 8 of the National Clearinghouse Association

would extend the settlement date for remotely created checks such as the remotely created drafts at issue here for as long as 90 days.  Rule 8 provides that a payor bank may make a warranty claim against the depositary bank for remotely created checks and describes the process and timetable through which the contested checks should be delivered.  Relying on § 4103(a) and the rationale of NBT Bank, Clark posits that Rule 8 extends the UCC's midnight deadline by "clearinghouse rule," see § 4103(b), and served to preserve the provisional nature of Wachovia's settlement until expiration of the 90-day dispute mechanism for remotely created drafts.

Even the broadest reading of Rule 8 does not affect the question of finality under the UCC.  Like the July, 2006 amendments to Regulation CC, Rule 8 creates a liability-shifting mechanism between banks through which the payor bank may return remotely created checks as unauthorized by the account holder.  It does not, as Clark maintains, extend the provisional nature of a depositary bank's settlement with the account holder.  The Rule allows a payor bank to file a breach of warranty claim as to the draft's validity against the depositary bank.  "Courts should use a strong presumption that clearinghouse rules are not intended to expand the midnight deadline."  See Clark & Clark, supra, § 6.02[2][h].

Similarly, Wachovia's deposit agreement with PPC creates a right for Wachovia to file a claim against PPC, but does not extend the provisional nature of the credits for the contested drafts.  The relevant portion of the agreement provides:

> All deposited items . . . are credited subject to final payment and our receipt of cash proceeds. . . . Without prior notice to you, we may charge back any item at any time before final payment, whether returned or not, and we may also charge back any item drawn on us if the item cannot be honored against the drawer's account.  We are authorized to pursue collection of previously dishonored items, and in so doing we may permit the payor bank to

17

> hold an item beyond the midnight deadline.  If any check or other item deposited in your account is returned us by the bank on which it was drawn through the Federal Reserve, a clearing house or other normal check return channels, we may accept that return and charge the check or other item back against your account without regard to whether the bank on which the check was drawn returned the check before its midnight deadline. . . . Furthermore, if, after a check or other items deposited into your account is finally paid, it is returned to us by the bank on which it was drawn because someone has made a claim that the check or other item was altered, forged, unauthorized, or should not have been paid for some other reason, we may debit your account in the amount of the item.

See Wachovia Exh. 2 (October 28, 2004 Deposit Agreement and Disclosures for Commercial Accounts).

The parties agree that such risk-shifting agreements are common in the banking industry.  Clark, moreover, maintains that pursuant to § 4103, Wachovia's agreement altered the UCC's finality rules by expanding Wachovia's right to charge-back PPC's account for unauthorized drafts.  In effect, he contends, Wachovia made PPC's property right to the deposited funds conditional as long as the funds remained in a Wachovia account or until the 90-day settlement period for disputed drafts expired under Rule 8.[11]

The parties' agreement, however, did not alter the UCC's finality rules.  It granted Wachovia only an additional right to charge-back or debit PPC's account beyond the UCC's statutory midnight deadline.  Wachovia offered no evidence it permitted the payor bank to hold any of the contested items beyond the midnight deadline, as the agreement allowed it do.

---

[11]  Even if Clark's view were adopted here, I would need to hear additional evidence to determine whether Wachovia exercised good faith and ordinary care under the agreement, as required by § 4103(a).  The testimony of Mill, Wachovia's vice president, raised issues about Wachovia's handling of PPC's account after Wachovia's in-house legal counsel and an official of another bank questioned activity in PPC's account.

Although § 4103(a) permits the effect of UCC provisions to be varied by agreement, it does not allow two parties, i.e., Wachovia and PPC, to vary the terms of the UCC, especially with respect to the interests of others.  See § 4103 Comment 2 ("Owners of items and other interested parties are not affected by agreements under this subsection unless they are parties to the agreement or are bound by adoption, ratification, estoppel or the like.").  The UCC allows agreements to limit only the effect of UCC provisions, but not the meaning of the statute itself.  See § 1102 Comment 2 ("The meaning of the statute itself must be found in its text . . . it cannot be varied by agreement.").  Agreements to vary the effect of UCC provisions are limited to altering "the legal consequences which would otherwise flow from the provisions of the Act."  Id. (noting, for example, that rights of third parties under the UCC cannot be destroyed by a clause in a security agreement).

Thus, PPC's agreement to grant Wachovia expanded rights to charge-back or debit its account did not postpone the final settlement of the credits in PPC's account under the UCC.  Although PPC's provisional credit became final when Wachovia's statutory right to charge-back ended, see § 4214(a), Wachovia's agreement created a separate contractual right against PPC based on the parties' expansion of Wachovia's charge-back and debit rights.  Consistent with this rationale, Wachovia required PPC to sign a collateralization and indemnification agreement on June 8, 2005, see Government Exh. 6, in which Wachovia acknowledged the risks of PPC's collection of telemarketing deposits.  The agreement also required PPC to assign an account containing approximately $100,000 to reimburse Wachovia

for any losses stemming from the deposit of unauthorized items in PPC's account.[12]

The authorities cited by Wachovia support the limited breadth of its deposit agreement with PPC in relation to operation of the UCC's finality rules.  For example, in <u>Lema v. Bank of America, N.A.</u>, 826 A.2d 504 (Md. Ct. App. 2003), the court discussed the interplay between the UCC and deposit agreements between an account holder and a bank.  Noting that a final settlement under the UCC would ordinarily terminate a bank's right to charge-back a customer's account for a dishonored check, the court recognized a contractual agreement can expand a bank's charge-back rights.  <u>Id.</u> at 513-14.  In discussing a similar type of agreement as the one Wachovia used here, the court explained:  "The Agreement also does not terminate the Bank's rights of charge back and reimbursement, as does the UCC, once settlement becomes final and so alters the effect of Section 4-214, as permitted in the UCC."  <u>Id.</u> at 513.  Noting that an agreement changes the "legal consequence that would otherwise flow" from the UCC, the Court cautioned that agreements cannot change the actual meaning of UCC provisions.  <u>Id.</u> (citing § 1-102 Comment 2).

Accordingly, the court held the deposit agreement did not alter the fact of final settlement; rather, the agreement changed the legal consequence of final settlement in which a bank "loses its right to charge-back and obtain a refund from a customer."  <u>See id.</u> at 514.  Similarly, Wachovia's agreement with PPC did not, and could not, alter the finality of the underlying settlement of the drafts within the national banking system.  Rather, the agreement

---

[12]  To the extent Wachovia contends it maintains a security interest in PPC's restrained accounts, <u>see</u> Clark report at 6-7, it appears its collateralization and indemnification agreement would limit Wachovia's interest to the $100,000 certificate of deposit PPC held in account xxxxxxxxxxxx788.  <u>See</u> Government Exh. 6.

allowed Wachovia to modify the legal consequence of a final settlement of its provisional credit, i.e., the effect of the UCC, only with respect to its account holder, PPC.  See § 1102 Comment 2. As in Lema, the agreement granted Wachovia expanded charge-back and refund rights to final credits, which it otherwise would not possess under the UCC.  It did not, as Clark maintains, grant PPC only a conditional right to the funds deposited in its Wachovia accounts.  See Lema, 826 A.2d at 514; see also Springhill Bank & Trust Co. v. Citizens Bank & Trust Co., 505 So.2d 867, 868-69 (La. Ct. App. 1987) (holding banks may agree to extend right to charge-back without addressing issue of finality).

        The only case cited by Wachovia supporting its broad view that a private agreement can alter the UCC's finality rule is First United Bank v. Philmont Corp. Miss., 533 So.2d 449 (Miss. 1988).  In the context of credit card drafts, the court ruled that the parties could extend the bank's charge-back period to 120 days, which it reasoned delays the finality determination by allowing the bank to maintain the provisional status of credits to the customer's account.  Id. at 455-57.  To the extent the court's dicta concerning the agreement's impact on finality supports Wachovia's position, I decline to follow it.  The Court in First United Bank appeared concerned with enabling the bank to prevent a customer from withdrawing funds deposited from unauthorized credit card drafts.  See id. at 456-57.  Delaying the time within which a provisional credit becomes final, however, was not required to preclude the bank from being victimized by fraud.  The parties' agreement granted the bank expanded charge-back and refund rights regardless how the credits were characterized.  Those expanded rights allow the bank to exercise a claim against the account holder even if the credits were deemed final.

        Similarly, Wachovia's agreement with PPC expands its charge-back and debit

rights regardless of the finality of the underlying settlement of the contested drafts under the

UCC.  Wachovia retains whatever rights its agreement with PPC provides.  The agreement,

however, does not preclude the government's § 1345 restraint of PPC's Wachovia accounts.

        An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PAYMENT PROCESSING CENTER, LLC,** | : | **NO. 06-00725** |
| **ET AL.** | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 8th day of November, 2006, upon consideration of Wachovia

Bank, N.A.'s motion for relief from stay and to exempt Wachovia from the April 7, 2006

stipulated preliminary injunction, the government's response, and after an evidentiary hearing on

the disputed issues, it is hereby ORDERED that Wachovia's motion is GRANTED IN PART and

DENIED IN PART.  For the reasons stated in the accompanying memorandum opinion, the

government has established its right to restrain $1,043,492, see Exh. C (categories 1 and 2A), in

the contested Wachovia accounts; Wachovia is permitted to charge-back the applicable PPC

accounts in the amount of $352,760, id. (category 2B).


**BY THE COURT:**


 **/s/** Timothy R. Rice
**TIMOTHY R. RICE**
**U.S. MAGISTRATE JUDGE**